**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**MARK ALLEN GERALDS,**

   *Petitioner*,

v.                                          **Case No.: 5:13-cv-167-MW**
                                            **Capital Case**

**MARK S. INCH, Secretary, Florida
Department of Corrections,[1]** *et. al.*,

   *Respondents*.

_____/

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

Before this Court is a petition for a writ of habeas corpus filed by Mark Allen

Geralds, a Florida death row inmate, pursuant to Title 28, United States Code, Section

2254. ECF No. 1. Geralds has asserted eight claims for relief. Respondents have filed

an answer, ECF No. 14, and Geralds has filed a reply, ECF No. 19. After careful

consideration of the issues raised in the pleadings and for the reasons stated below,

the petition is denied.

---

[1] Mark S. Inch is the current successor to Michael D. Crews as Secretary for the Department of
Corrections and is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d) (1).

# I. FACTS & PROCEDURAL HISTORY

The relevant facts are set out as follows in the Florida Supreme Court's opinion

affirming Geralds' convictions and sentence on direct appeal:

> The convictions arise from events occurring on February 1, 1989, when eight-year-old Bart Pettibone arrived home from school and found his mother, Tressa Lynn Pettibone, beaten and stabbed to death on the kitchen floor. There were two stab wounds on the right side of Tressa Pettibone's neck and one fatal stab wound on the left side. The wounds were consistent with a knife found in the kitchen sink. The medical examiner found a number of bruises and abrasions on the head, face, chest, and abdomen of the victim caused by some form of blunt trauma. The examiner also determined that the victim's wrists had been bound with a plastic tie for at least twenty minutes prior to her death.

> Blythe Pettibone, the victim's daughter, testified that several items of jewelry were missing from the home. Among these were a herringbone chain necklace and a pair of red-framed Bucci sunglasses. Kevin Pettibone, the victim's husband, testified that his wife's Mercedes automobile was missing. The automobile was later found in the parking lot of a nearby school. Cash in the amount of $7,000 hidden in the house was not taken.

> Mark Geralds was a carpenter who had worked on the remodeling of the Pettibones's house. About one week prior to the murder, Tressa Pettibone and her children encountered Geralds in a shopping mall. Tressa Pettibone mentioned that her husband was out of town on business. Later, Geralds approached Bart at the video arcade. He asked when Bart's father would be back in town and when Bart and his sister left for and returned from school during the day.

> Other circumstantial evidence linked Geralds to the crime: (1) at 2:00 p.m. on February 1, 1989, Geralds pawned a gold herringbone chain necklace. Serology testing revealed a stain on the necklace to be blood

compatible with the victim's blood type and inconsistent with Geralds's;
(2) Douglas Freeman, Geralds's grandfather, testified that on occasion
Geralds would come by his house to take a shower. Freeman testified
that Geralds came by at 11:30 a.m. on February 1, 1989, and asked to
shower because he had been working on a fiberglass boat, a reason he
had given in the past. When he left, Geralds stated that he was taking a
pair of sunglasses to some friends; (3) Vickey Ward testified that
Geralds gave her a pair of red Bucci sunglasses in late January or early
February, 1989; (4) a pair of Nike shoes was seized from Geralds's
residence. Evidence indicated that they could have made the tracks on
the floor in the Pettibone house; (5) the plastic tie recovered from the
victim's wrist matched the ties found in Geralds's car.

*Geralds v. State*, 601 So. 2d 1157, 1158-59 (Fla. 1992) (hereinafter *Geralds I*). The

jury found Geralds guilty of first-degree murder, armed robbery, burglary of a

dwelling, and theft of an automobile. After a penalty phase proceeding, the jury

recommended death for the homicide by a vote of eight to four. The trial court

concurred, finding no statutory or nonstatutory mitigating factors and four

aggravating circumstances: (1) the homicide occurred during a burglary; (2) the

homicide was committed to avoid arrest; (3) the homicide was especially heinous,

atrocious or cruel ("HAC"); and (4) the homicide was committed in a cold,

calculated, and premeditated manner without any pretense of moral or legal

justification ("CCP"). The trial court sentenced Geralds to death for the murder and

as a habitual felony offender for the noncapital felonies.

On direct appeal, Geralds raised five claims, including that the prosecutor engaged in an impermissible colloquy regarding his prior nonviolent felonies to impeach a defense mitigation witness. *See Geralds I*, 601 So. 2d at 1159-64. The Florida Supreme Court affirmed Geralds' convictions but found Geralds' claim regarding the prior nonviolent felonies reversible error and remanded for a new penalty phase proceeding. On remand, the jury recommended the death penalty by a vote of twelve to zero. At resentencing, the trial court found the following aggravating factors: (1) the murder was committed during the commission of a robbery and/or burglary; (2) the murder was especially heinous, atrocious or cruel; and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The court found the statutory mitigator of age but afforded it little weight.[2] As for nonstatutory mitigation, the trial court found the following but gave them "very little weight": (1) Geralds' love and concern for his daughter and former wife; (2) Geralds came from a divorced family and was unloved by his mother; and (3) Geralds' antisocial behavior and bipolar manic personality. *Geralds v. State*, 674 So. 2d 96, 98 (Fla. 1996) (per curiam)

---

[2] Geralds was twenty-two years old at the time of the offense.

(hereinafter *Geralds II*). The trial court determined that the aggravating factors outweighed the mitigating factors and sentenced Geralds to death. Geralds appealed his sentence, raising ten claims. *See id.* at 99. On appeal, the Florida Supreme Court found the application of the CCP aggravating factor was error but concluded that the error was harmless and affirmed Geralds' sentence of death. The United States Supreme Court subsequently denied Geralds' petition for writ of certiorari. *See Geralds v. Florida*, 519 U.S. 891 (1996).

Thereafter, Geralds filed initial and amended motions for postconviction relief pursuant to Fla. R. Crim. P. 3.851, raising twenty-six claims. After an evidentiary hearing, the postconviction court denied relief. The Florida Supreme Court affirmed. *Geralds v. State*, 111 So. 3d 778 (Fla. 2010) (hereinafter *Geralds III*). On April 29, 2013, Geralds filed the instant petition for a writ of habeas corpus. On April 21, 2016, Geralds filed a motion to hold this proceeding in abeyance pending state court exhaustion of a claim under *Hurst v. Florida*, 136 S. Ct. 616 (2016), which this Court granted. ECF Nos. 22, 24. In October of 2018, Geralds filed a status report informing this Court that the state court denied his *Hurst*-related motion and his appeals of the denial were not successful. *See* ECF No. 34. Thereafter, he filed a motion to amend his federal habeas petition to include *Hurst*-related claims. ECF No. 35. This Court

denied the motion to amend finding that any amendment would be untimely and futile. ECF No. 38. The petition is now ripe for adjudication.

## II. EVIDENTIARY HEARING

Geralds requests a plenary evidentiary hearing on the claims presented in his petition. ECF No. 1, pp. 32-35. However, 28 U.S.C. § 2254 provides for an evidentiary hearing in federal habeas claims only under very limited circumstances as follows:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
> (A) the claim relies on--
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(2002). Under this provision, a hearing is not warranted "if such a hearing would not assist in the resolution of [the] claim." *See Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002) (citation omitted). In *Schriro v. Landrigan*, 550 U.S. 465, 474-75 (2007), the Court explained:

In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *See, e.g., Mayes v. Gibson*, 210 F.3d 1284, 1287 (C.A.10 2000). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. *See id.*, at 1287-1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").

\* \* \* \*

This principle accords with AEDPA's acknowledged purpose of "reduc[ing] delays in the execution of state and federal criminal sentences." *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (citing *Williams v. Taylor, supra*, [529 U.S. 362] at 386, 120 S. Ct. 1495 (opinion of STEVENS, J.) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law")). If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.

(footnote omitted). Geralds has not presented or proffered any evidence to this Court which would necessitate an evidentiary hearing on any of the claims he has raised. *See Ojeda v. Sec'y for Dep't of Corr.,* 279 F. App'x. 953, 954 n.1 (11th Cir. 2008) (per curiam) (evidentiary hearing is unnecessary where trial transcripts sufficiently address an issue, and a hearing would not have added any new information). *See also Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1334-37 (11th Cir. 2004) (capital petitioner met none of the requirements contained in 28 U.S.C. § 2254(e)(2), thus

district court abused discretion in granting evidentiary hearing). Because Geralds has not met the statutory requirements for an evidentiary hearing, his request for an evidentiary hearing is denied.

## III. STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254. Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[3] The appropriate test was described by Justice O'Connor as follows:

---

[3] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue presented in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *See Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

---

Rehnquist, Kennedy, Thomas, and – except as to the footnote – Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court holdings. *Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007).

Case No.: 5:13cv167/MW

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's holdings. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding. *See Gill v.*

*Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial

court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, this Court will review Geralds' claims.

## IV. PETITIONER'S CLAIMS

Ground I (A): *Brady* claims

In his first ground for relief, Geralds argues that his due process rights were violated when the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and as a result his case was not subjected to a full adversarial testing. Geralds alleges that the following evidence was not disclosed to the defense prior to trial: (1) a two-page handwritten list with descriptions of jewelry missing from the crime scene; (2) an eight-page report dated April 3, 1989, by Shirley

Zeigler, a crime laboratory analyst; (3) a photograph of a photograph depicting a shoe print from the crime scene; (4) a note authored by Investigator Bob Jimmerson on January 26, 1990, related to a jeweler named Anthony Swoboda; (5) criminal charges brought against pawnbroker Billy Danford; (6) an exculpatory interview between Jimmerson and witness Greg Toriac; and (7) several other pieces of evidence admitted during the postconviction evidentiary hearing including a note by Jimmerson regarding a pawn ticket recovered from Geralds and notes regarding the location of finger and palm prints taken from the crime scene. ECF No. 1, pp. 38-67.[4]

1.    State Court Proceedings

Geralds exhausted this claim in his postconviction proceedings, and the postconviction court denied relief. The Florida Supreme Court affirmed the denial, addressing each *Brady* claim separately.

2.    Clearly Established Supreme Court Law

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. Under *Brady*, a

---

[4] Geralds alleges in the alternative that if the State did disclose the evidence at issue, then his trial counsel was ineffective in failing to present it. ECF No. 1, p. 38 n.33. To the extent that these ineffective assistance of counsel claims were exhausted in state court, they are addressed in Ground Two, *infra*.

defendant's due process rights are violated when the prosecution suppresses material evidence favorable to the defendant, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that: (1) the prosecution possesses evidence, including impeachment evidence; (2) the defendant does not possess the evidence, nor could he obtain it himself with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (per curiam); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). As to the suppression element, the State has an obligation to disclose all exculpatory evidence within its constructive knowledge, including "evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The key is a reasonable probability; "[t]he

mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10 (1976).

3.      Federal Review of Claim

The Florida Supreme Court correctly identified *Brady* and its progeny as the clearly established Supreme Court law governing this claim. *Geralds III*, 111 So. 3d at 786-87. Therefore, in order to prevail on habeas review, Geralds must demonstrate that the state court's decision was contrary to or an unreasonable application of *Brady* or that the state court made an unreasonable determination in light of the facts of his case.

The state court evidentiary hearing in this case was held in two different proceedings over the course of five months.[5] At the first evidentiary hearing, Joe Grammer, the Assistant State Attorney who assisted in both the original and the resentencing trial, explained his policy on providing discovery to the defense, excluding his handwritten notes, as ". . . I get it, I give it to the defense attorney."

---

[5] The first evidentiary hearing was held on September 23 and 24, 2003. After several continuances necessitated by the unavailability of witnesses and one of the attorneys, the hearing was continued on February 25, 2004.

(Evidentiary Hearing ("EH") at 2299). He said, "[a]nything that we have, that we had in writing we gave to [defense counsel] Bob Adams. . . . But I don't, I mean, I don't have independent memory of what pieces of paper we gave Bob. But I know it was a continuing thing and any time that something came in that we gave it to Bob Adams." (*Id.* at 2258).[6] Grammer testified that on June 1, 1989, the State filed a pretrial supplemental response to a demand for discovery which contained approximately 543 pages of investigative material; however, not every item contained in these pages was clearly indexed. After being asked about specific pieces of evidence, Grammer testified that he was "[p]retty confident that all of these things, that if they were in our possession that they were shared with Bob Adams. I'm very confident that there was nothing that was received by the state attorney's office that was not disclosed." (*Id.* at 2260). When asked if he recalled how he actually provided the discovery to the defense, Grammer testified:

> I recall how I do it now. We have had in place for probably ten years now an open file discovery, where as soon as our reports come in we supply them to the public defender's office whether we have received any notice that they are on the case or not. And then, of course, the continuing responsibility as those things come in. Back at this time we may have, and I would have to look at the file, we may have used the discovery form

---

[6] Bob Adams was Geralds' defense counsel in both his original and resentencing trials. Mr. Adams died prior to the evidentiary hearings held in the case, so the state court did not have the benefit of his testimony with regard to any of the claims Geralds raised in his postconviction proceedings.

where we check listed and listed things that we gave. It was never my policy, although it is probably not the best to say, if I said reports of Carl Woodall, I wouldn't necessarily say 37 pages, I would say, report of Carl Woodall. So, but, I don't recall. I imagine in this case we probably gave Bob Adams a check list maybe on legal size paper that said we have these items and here are all the things that go with it. And we would, at some point, we used to give those, give a copy of everything that we gave in discovery to the court. But at some point we quit doing that, we would just, even when we were using the form we would just provide the form for the court file and keep all that other stuff out of the public record.

Q [Assistant Attorney General Cassandra Dolgin]: Do you recall if in this case that happened or–?

A [Grammer]: No, no, I don't. I think my recollection is that we gave Bob the form and stacks of things. And then continued. I had quite a bit of contact with Bob Adams during the course of these cases, on this and other cases, but frequent contact with him.

Q: So, are you saying then that it is possible that inventory list of all the discovery that you had provided to Mr. Adams didn't necessarily become part of the court file?

A: Yes. And I'm saying that even more likely there is probably not an inventory, it is probably, seems to me the form we used just had a witness list, then it had checks off where you said, you know, we have statements, we have physical evidence that we would list. And we would list that by giving copies of whatever information that we have.

Q: So your letters to Mr. Adams wouldn't necessarily have inventoried the reports and wouldn't have [set] out –

A: No, and if we gave, if we handed Bob information then that might not be reflected anywhere. I know that there was nothing that ever came up that I recall that Bob said he didn't know about.

Q: So, at no time during the course of trial did Mr. Adams express surprise or –

A: Not that I recall. I don't recall him ever saying, hey, I never heard of that before. I do recall, you know, as I stated on direct, that he went

through some process with Laura Rousseau in an attempt to get her
handwritten notes while she was testifying. And as I recall that's the only
thing that Mr. Adams said that he didn't, he hadn't seen.

(*Id*. at 2299-2302). Grammer also testified that he, State Attorney Jim Appleman and

Adams "got along famously and did not keep, we didn't keep secrets because—or I

didn't, you know, I don't think Bob was keeping secrets from us or keeping secrets

from him as far as pieces of evidence or anything like that. So, no, there wouldn't have

been anything that we would have said we can't show this to Bob." (*Id*. at 2312).

Regarding Adams' experience and reputation, Grammer testified as follows:

> I know that he had a long and generally distinguished career as a defense
> attorney. I know that he was, I always referred to him as the "true
> believer." That was even when, even when what I would call tilting at
> windmills, goes after it hard, used every, every aspect of his person and
> of the facts to try to achieve the result that he had. . . . Bob was a
> crotchety, crusty old guy who was very, very interesting. And who made
> you work. I mean, you couldn't, you couldn't glide through a trial with
> Bob Adams on the other side because he, he would press you. And he
> would press you sometimes in places where you weren't expecting it. In
> fact, in this trial, and I can't recall whether it was the first or second, there
> were several times where I thought that Bob, you know, got the better of
> us on something where we were not expecting it to happen. I know Bob
> tried a lot of cases. I know Bob cared about the cases. . . . He was just a
> tough competitor but someone that I liked him personally. I had no
> qualms about what he did. . . . I found Bob to be very thorough. I
> found—we would go take depositions, Bob wouldn't let us take
> depositions, for instance, of Dr. Lauridson by telephone because he said
> I want to look him in the eye, I want to look these witnesses in the eye.
> He just, he had an old school feel about him. He was a worthy opponent
> and I'm sorry that he's not with us any more.

(*Id*. at 2313-14).

Jim Appleman, who was lead prosecutor in the case, testified at the evidentiary hearing that Grammer would have handled all of the discovery in the Geralds' case. (*Id*. at 2381). Appleman explained that if handwritten law enforcement notes were in their case files, and it was not attorney work product, it would have been given to defense counsel. Appleman was asked about a number of reports in the case and while he did not have a specific recollection of these reports having been provided in discovery, he stated, "[t]hose are the types of reports that I assume the assistants that are assisting me with the case turn over. And if they haven't been turned over we will be chastised by the judge when we handle those particular cases in trial. And I don't recall any of that taking place in this case." (*Id*.). Appleman testified that his office has a set policy and a continuing responsibility to provide evidence or items to defense counsel when they are received by his office.

At the second evidentiary hearing, Grammer testified to the same discovery practices he had previously testified to in the first hearing. (*See* EH at 2650). During this hearing, Grammer was shown numerous exhibits which he believed were disclosed to defense counsel in response to discovery demands. The only two items which Grammer did not remember specifically providing to Adams were an eight-

page lab report by Shirley Ziegler dated April 3, 1989, and a lab report by Larry Smith dated January 25, 1990, whose name was disclosed on a witness list. Grammer testified that there would have been no reason not to disclose these reports, but said, "[m]y memory for many of these documents is based upon the written record, and those two lab reports are the only ones that I don't show on the written record and that I don't have an independent recollection of." (*Id.* at 2691). His general practice, however, was to disclose all lab reports to the defense. (*Id.* at 2715-16).

This Court will address Geralds' specific *Brady* claims individually.

    a.    <u>Two-page handwritten list with descriptions of jewelry missing from the crime scene</u>

Geralds contends that this list was not disclosed to the defense. The Florida Supreme Court held as follows with regard to this item:

> As Geralds' first *Brady* claim, he argues that the State suppressed a two-page handwritten list with descriptions of jewelry that were missing from the victim's home.FN10 Geralds argues that this list makes clear that the herringbone necklace described in the list was not the necklace that was recovered from a pawn shop.FN11 The circuit court denied this claim, holding that Geralds failed to establish that the list was not contained in the State's supplemental response to demand for discovery, which references 543 pages of investigative material being provided to Geralds on June 1, 1989. We agree.
>
> > FN10. At the evidentiary hearing, Geralds introduced a handwritten list that describes a "Herringbone necklace thick gold [and] comes down into a V shape but doesn't lay flat." The list also describes several other pieces of

jewelry, including necklaces, bracelets, watches, and one pair of Bucci sunglasses. The list is marked "Received 02–15–89" across the top.

FN11. Evidence linking Geralds to the crime included a gold herringbone chain necklace, which Geralds pawned. Serology testing of the necklace revealed a stain that was compatible with the victim's blood type and inconsistent with Geralds' blood type. *Geralds I*, 601 So. 2d at 1158.

At the evidentiary hearing, Joe Grammer testified that he was one of the assistant state attorneys involved in Geralds' murder prosecution and was responsible for providing discovery. Grammer testified that on June 1, 1989, the State filed a supplemental response to demand for discovery containing approximately 543 pages of investigative material. Grammer further testified that he found a copy of the two-page handwritten list in the State's supplemental response. Geralds does not identify any portion of the record that contradicts Grammer's testimony. Thus, the record indicates that Geralds had possession of this list. "[A] *Brady* claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot then be found to have been withheld from the defendant." *Occhicone v. State*, 768 So. 2d 1037, 1042 (Fla. 2000). Accordingly, we hold that Geralds has failed to establish that the circuit court erred in denying this *Brady* claim.

*Geralds III*, 111 So. 3d at 787.

Geralds argues that the state court's determination that he failed to establish that the list in question was not contained in the State's supplemental response to the demand for discovery is rebutted by clear and convincing evidence. *See* ECF No. 1, pp. 48-49. Geralds cites Grammer's testimony at the first evidentiary hearing and the

fact that the list was not contained in his defense counsel's trial file as evidence that the state court's determination was incorrect.

At the first evidentiary hearing held in this case, Grammer testified with respect to this list as follows:

> The handwritten notes, I don't believe I've seen those before and then it would be difficult for me to disclose them. I believe those probably came from public records requested of the Panama City Police Department. But, other than that, anything that we had my policy was to give it and I believe that things would have come through me on this case even though, documents would have come through me even though Mr. Appleman was trying the case because I would be the one responsible for making sure that Bob had, Bob Adams had everything that he was supposed to have.

(EH at 2303). Grammer also testified that he believed these were "field notes, law enforcement work product, what typically is summarized in a dictated or written report." (*Id*. at 2305). At the second evidentiary hearing, when Grammer was asked about this list he testified that after the first evidentiary hearing he looked through the State's supplemental discovery response and found the two pages in question. (EH at 2677-78). Grammer explained, "[o]ur pages are not stapled together, everything is loose in there. My belief [is] that these two pages were contained in the, approximately, 543 pages. I do not have today a clear memory of these two documents but they are in our file that we have kept all this time." (*Id*. at 2678). Grammer testified

that it was not his practice to list individually the documents contained in the State's discovery responses.

The postconviction court found that the State had not suppressed this note after hearing testimony from the relevant witnesses. A federal habeas court cannot redetermine the credibility of witnesses whose testimony had been observed by a state trial court. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Consalvo v. Sec'y, Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review."). Given Grammer's testimony at the second evidentiary hearing that the list was contained in the State's supplemental discovery response, Geralds has not rebutted the state court's finding by clear and convincing evidence. Further, the fact that the list was not found in defense counsel's file is not clear and convincing evidence that the note was not disclosed. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

b.    Eight-page report dated April 3, 1989, by Shirley Zeigler

Geralds contends that this report was not disclosed to the defense. The Florida

Supreme Court held as follows with regard to this item:

> As Geralds' second *Brady* claim, he argues that the State suppressed an
> eight-page report, dated April 3, 1989, written by Shirley Zeigler, a crime
> laboratory analyst for the Florida Department of Law Enforcement
> (FDLE).FN12 Geralds argues that this report is exculpatory for two
> reasons: (1) Zeigler's test results indicated that the blood on a
> handkerchief discovered at the crime scene did not belong to Geralds or
> the victim, thus strengthening Geralds' defense that someone else
> committed the crime; and (2) Zeigler's test results indicated that there
> was no blood on Geralds' sneakers, which contradicts crime scene
> analyst Laura Rousseau's testimony during Geralds' guilt phase that the
> sneakers tested positive for blood. The circuit court denied this claim,
> holding that Geralds failed to establish that the report was not included
> in the discovery provided by the State on April 14, 1989. We agree.

> > FN12. At the evidentiary hearing, Geralds introduced
> > Zeigler's report, which totals eight pages and analyzed six
> > lab submittals. Each lab submittal contained several
> > different items for analysis. Zeigler found that a
> > handkerchief listed within lab submittal 03 demonstrated
> > the presence of human blood staining. Zeigler concluded
> > that the handkerchief was stained with blood type O, while
> > Geralds and the victim both have blood type A. Zeigler
> > tested the sneakers, which were listed within lab submittal
> > 06, for blood staining and found none.

> At best, Geralds has only demonstrated that the record is ambiguous as
> to whether Zeigler's report was disclosed. He has not, however, carried
> his burden of demonstrating that the State suppressed Zeigler's report. In
> reviewing the State's discovery produced on April 14, 1989, it is not clear
> whether Zeigler's report was included. Although Zeigler is listed as a

person known to have information that may be relevant, Zeigler's report is not specifically identified. At the evidentiary hearing on September 23, 2003, Grammer testified, "I'm absolutely positive that [defense counsel] Bob Adams had this report before he talked to Shirley Zeigler in preparation for the trial." However, at the evidentiary hearing on February 25, 2004, Grammer testified that he did "not have a clear memory" of providing the report to the defense, but believed that "if we got it, which we did, we shared it with Bob." In looking at his file marked "lab reports," Grammer found Zeigler's report. Grammer further testified that the report is the type of document that he would have provided to the defense and that it was possible that if the State did not have it on April 14, 1989, it was given to the defense afterwards. James Appleman, state attorney and Grammer's co-counsel, testified during the evidentiary hearing that Zeigler's report was available to trial counsel.

Based on this record, the circuit court determined that Geralds failed to establish "that the [Florida Department of Law Enforcement] report was not included in the materials provided April 14, 1989." "A trial court's finding after evaluating conflicting evidence that *Brady* material had been disclosed is a factual finding." *Way* [*v. State*], 760 So. 2d [903] at 911 [(Fla. 2000)]. Therefore, the reviewing court should uphold the finding as long as it is supported by competent, substantial evidence in the record. Accordingly, we hold that Geralds has failed to establish that the circuit court erred in denying this *Brady* claim.

*Geralds III*, 111 So. 3d at 787-88.

Geralds argues that the state court's finding that this report was not suppressed is rebutted by the clear and convincing evidence that the report is not identified by date and name on any discovery response filed by the prosecutor, and the report is not contained in defense counsel's file. Geralds also argues that if his counsel had had the

Ziegler report he would not have asked Laura Rousseau if any subsequent analysis had been done on the Nike shoes taken from Geralds. ECF No. 1, p. 50.[7]

Grammer's testimony concerning this report during the two evidentiary hearings is somewhat equivocal. At the first hearing, he was certain the report had been provided; however, at the second evidentiary hearing, Grammer testified, "[y]ou know, I do not have a clear memory of this one, but I believe if we got it, which we did, we shared it with Bob." (EH at 2683). When asked if it was possible that the report inadvertently did not get listed in the State's response to the defense's discovery demand, Grammer testified, "[i]t's possible that we didn't have it that day, we gave it to him afterwards. It's possible that it did not make it on the list. I don't–it's all speculation, I don't know." (*Id*. at 2684). Grammer testified that the Zeigler report was in his file of lab reports, marked as Exhibit 20, and that Zeigler was listed as a possible witness in the case. Grammer reiterated that his general practice was to

---

[7] During the guilt phase of the trial, Rousseau testified that an area on Geralds' left Nike shoe "came up positive for presumptive testing of blood." (Trial Record ("TR") Vol. XII at 1721). Defense counsel asked her on cross-examination what presumptive testing was, and she explained that it was a pre-test which indicates something which could be blood. (*Id*. at 1722). Rousseau also testified that she was unaware if any further testing had been done, stating, "[n]ot to my knowledge, I don't know. I have not seen the shoes since then." (*Id*. at 1723). While counsel's examination of Rousseau on this point may tend to show that he was unaware of the existence of the Zeigler report, it does not demonstrate by clear and convincing evidence that the State did not provide it to him.

disclose all lab reports to the defense and that it would not have made sense to disclose Zeigler's name as someone who had information and then withhold the document pertaining to her connection with the case. Appleman testified that the Ziegler report was available to defense counsel.

The Florida Supreme Court held that the postconviction court's finding that the report had been disclosed was supported by competent, substantial evidence in the record. Geralds has failed to rebut this finding by clear and convincing evidence. *See Consalvo*, 664 F.3d 842. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

c.      <u>Photograph depicting a shoe print from the crime scene</u>

Geralds argues that this photograph was not disclosed to the defense. The Florida Supreme Court held as follows with regard to this item:

> As Geralds' third *Brady* claim, he argues that the State suppressed a photograph of a photograph depicting a shoe print from the crime scene. Geralds argued that this shoe print did not match his shoes, which further supports his theory that someone else committed the murder. The circuit court denied this claim, holding that Geralds failed to establish that the photograph of a photograph of a shoe print was not made available to him. We agree.
>
> "In previous cases, this Court has broadly stated that evidence was not 'suppressed' where it was equally available to the State and the defense."

*Way*, 760 So. 2d at 911; *see also Roberts v. State*, 568 So. 2d 1255, 1260 (Fla. 1990); *James v. State*, 453 So. 2d 786, 790 (Fla. 1984). However, the defendants were aware of the exculpatory information in those cases. *See Roberts*, 568 So. 2d at 1260 (noting that defendant was aware of evidence that would show he was under the influence of drugs or alcohol during the crime); *James*, 453 So. 2d at 790 (stating that defendant was aware of existence of photographs contained in confidential juvenile records). A circuit court's factual finding that a photograph was or was not made available will not be overturned "as long as it is supported by competent, substantial evidence in the record." *Way*, 760 So. 2d at 911.

At the evidentiary hearing, Grammer testified that "[t]he photographs would not necessarily be turned over but would be made available to defense counsel." In this case, Geralds did not present any evidence that photographs were not made available or that photographs were made available and this particular print was not included. Accordingly, the circuit court's finding that Geralds has failed to establish that the photograph of a photograph of a shoe print was not made available to him is supported by competent, substantial evidence and Geralds has not established a *Brady* violation.

*Geralds III*, 111 So. 3d at 788-89.

Geralds argues that the state court's determination is contrary to or an unreasonable application of the Supreme Court's holding in *Strickler v. Greene*, 527 U.S. 263, that if the prosecutor maintains an "open file" discovery policy, defense counsel has a right to reasonably rely on the file to contain all materials the State is obligated to disclose. At the evidentiary hearing, Grammer testified as follows that the photograph was available to the defense:

Q. [Collateral counsel Todd Doss]: If the crime scene technician took that photograph that would have been turned over in discovery?

A. [Grammer]: Not necessarily. The photographs would not necessarily be turned over but would be made available to defense counsel. If this, in fact, is something that I guess Laura Rousseau would have kept, then it would have been available for review by Mr. Adams.

Q. So, once you list it, it is pretty much Mr. Adams' responsibility to request which photos he wants?

A. To get photographs, right.

Q. Do you have any knowledge as to whether he did that in this case?

A. No, I don't. And I don't recall, I know we, I believe we used photographs and we may have used a photograph of this nature that Bob would have seen but I don't know.

(EH at 2286). *Strickler* does not require more of the State than making the photograph available to the defense. *See also High v. Head*, 209 F.3d 1257, 1265 (11th Cir. 2000) ("We do not read *Strickler*, however, to indicate that defense reliance on a general government representation of compliance with *Brady* establishes cause for failing to pursue available exculpatory evidence where collateral counsel had actual knowledge or reasonably could have discovered knowledge clearly suggesting that the prosecution may have misinterpreted that evidence as nonexculpatory."). Geralds has not shown that the photograph at issue was not made available to him or was not contained in the prosecutor's file. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Case No.: 5:13cv167/MW

Accordingly, Geralds is not entitled to habeas relief on this ground.

d.     <u>Note authored by Jimmerson related to jeweler Anthony Swoboda</u>

Geralds argues that this note was not disclosed to the defense. The Florida

Supreme Court held as follows with regard to this item:

> As Geralds' fourth *Brady* claim, he argues that the State suppressed a
> handwritten note authored by Investigator Bob Jimmerson on January 26,
> 1990, three days before Geralds' first trial.FN13 Geralds argued that this
> note is important because it establishes that the State confirmed Geralds'
> theory that he legally bought the herringbone necklace from a jeweler
> named Anthony Swoboda. The State argued, and the circuit court agreed,
> that Geralds knew of Swoboda's statement made to Jimmerson because
> Swoboda was listed as a witness for the defense. Thus, the circuit court
> denied relief on this claim. We agree.

>> FN13. At the evidentiary hearing, Geralds introduced
>> Jimmerson's note, which is dated January 26, 1990. Next to
>> the date there is a notation that reads "Tony Swobata
>> [sic]—Gordon's Jewelry." The note then provides, "It was a
>> thin chain[;] don't remember the length[;] price? [;] I sold it
>> to him under the table[;] no records."

> Swoboda testified at the evidentiary hearing that Geralds' trial counsel
> contacted him by phone and in person to confirm the fact that he had sold
> Geralds some jewelry. Furthermore, Swoboda was listed as a witness for
> the defense in preparation for trial. Based on this record, the circuit
> court's finding that Geralds knew of Swoboda's statement is supported
> by competent, substantial evidence. Accordingly, Geralds could not
> establish a *Brady* violation because the record supports the circuit court's
> finding that Geralds knew of Swoboda's statement. *See Occhicone v.
> State*, 768 So. 2d at 1042 ("[A] *Brady* claim cannot stand if a defendant
> knew of the evidence allegedly withheld or had possession of it, simply

because the evidence cannot then be found to have been withheld from the defendant.").

*Geralds III*, 111 So. 3d at 789.

While Geralds acknowledges that the defense was aware of Swoboda and his importance to the case, he argues that the defense was unaware that Swoboda had spoken with law enforcement and told them that the sale had been made "under the table." Geralds believes that this statement is important because it corroborates his own statements that the pawned necklace was not the victim's, thereby increasing his credibility, and the note would have allowed defense counsel to have cross-examined Jimmerson on this point. Geralds also argues that Swoboda's statement provides an explanation for why he asked the pawnbroker if the chain were real gold and had exculpatory value because it makes more sense for him to have pawned his own necklace, and receive a lower value, than to pawn the victim's necklace, which would have yielded more money if sold. (*Id.*).[8]

---

[8] Defense counsel made this point in his guilt phase closing argument:

> But there is two sides to the pawning of that necklace. And I use the word pawn. And you learn, I believe from questions from Mr. Appleman that laws apply to pawn shop operators. Mr. Danford was on the stand. They got to get identifying material. The law requires it. Ask yourselves, this was the afternoon of February 1st. Mark Geralds pawned the necklace. Did he try to hide his identity? His driver's license is in evidence. You know he's a young man of twenty-two years of age. If you don't remember that, look on the driver's license when you go back in the jury room. Height,

Anthony Swoboda testified at the evidentiary hearing that he was an employee

of Gordon Jewelers, and in 2003, he had known Geralds for approximately twenty

years. (EH at 2545). Swoboda testified that he sold Geralds a gold herringbone chain

several months before the police contacted him in connection with Mrs. Pettibone's

murder. Swoboda explained that occasionally he would order jewelry to sell to friends,

and he sold the necklace in question to Geralds "under the table" which meant that

Geralds paid no sales tax on the transaction. (*Id*. at 2549-50). Swoboda testified that

defense counsel came to the jewelry store to speak to him about the necklace and told

him "that what I had to say was important and that I would probably be subpoenaed."

(*Id*. at 2548). However, Swoboda was not called as a defense witness at either of

Geralds' trials even though the defense listed him as a possible witness at both. (*See*

Postconviction Record ("PCR") Vol. I at 2322 (dated January 15, 1990); PCR Vol. II

---

weight, description, talked to the man. No attempt to hide his identity.
The man wanted to buy it. Do you want to sell this? No I.D. required.
Yeah, I'll give you a quick thirty or fifty bucks for it. No, Mark wanted to
pawn it. Gave all his identification. Common sense and experience. The
day of the event, that's probably the greatest coincidence of all. But it helps
us understand how these things could happen. To pawn something as
opposed to selling it. And to give your full identification and even sign the
slip in your own handwriting. No attempt to disguise. That's a fact that
you can consider in determining whether this case was proven.

(TR Vol. XIV at 2006-07).

Case No.: 5:13cv167/MW

at 301 (dated March 18, 1993)). Because defense counsel died prior to the evidentiary hearings held in this case, there is no explanation in the record as to why Swoboda was not called as a defense witness.

The state court found that Geralds could not establish a *Brady* violation because the record supported the postconviction court's finding that Geralds knew about Swoboda and the information he had about the necklace. Geralds argues that it is not enough that his counsel was aware of a potential witness's testimony when the State had actually obtained exculpatory information.

The Supreme Court, in considering a procedural default of *Brady* claims in *Strickler v. Greene*, 527 U.S. 263, reserved decision as to whether cause might be negated if the defendant had actual knowledge of the factual basis for his *Brady* claim and the ability to obtain the necessary proof through the exercise of reasonable diligence. 527 U.S. at 288 n. 33 ("We do not reach, because it is not raised in this case, the impact of a showing by the State that the defendant was aware of the existence of the documents in question and knew, or could reasonably discover, how to obtain them.").[9] The Eleventh Circuit has stated that it does not read *Strickler* "to indicate

---

[9] The federal circuit courts of appeal have divided into two camps over this issue. The First, Second, Third, Sixth, Seventh, Eighth, and Eleventh Circuits have interpreted the possible exception the Court reserved in *Strickler* to mean that prosecutors need not disclose exculpatory or impeachment evidence that was publicly available or could have been discovered by a diligent investigation by the defense. *See*

that defense reliance on a general government representation of compliance with *Brady* establishes cause for failing to pursue available exculpatory evidence where collateral counsel had actual knowledge or reasonably could have discovered knowledge clearly suggesting that the prosecution may have misinterpreted that evidence as nonexculpatory." *High v. Head*, 209 F.3d 1257, 1265 (11th Cir. 2000), *cert. denied*, 532 U.S. 909 (2001). The Eleventh Circuit has also held that "[t]he government is not obliged under *Brady* to furnish a defendant with information which . . . with any reasonable diligence, he can obtain himself." *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir.) (citation omitted), *cert. denied*, 493 U.S. 932 (1989); *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1315 (11th Cir. 2005) ("Our case law is clear that '[w]here defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged *Brady* material, there is no suppression by the government.'" *United States v. Griggs*, 713 F.2d 672, 674 (11th

---

*United States v. Rodriguez*, 162 F.3d 135, 147 (1st Cir. 1998), *cert. denied*, 526 U.S. 1152 (1999); *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003), *cert. denied*, 540 U.S. 1157 and 541 U.S. 956 (2004) and 546 U.S. 925 (2005); *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005), *cert. denied*, 546 U.S. 1137 (2006); *Bell v. Bell*, 512 F.3d 223 (6th Cir.), *cert. denied*, 555 U.S. 822 (2008); *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001), *cert. denied*, 535 U.S. 1078 (2002); and *Zeitvogel v. Delo*, 84 F.3d 276, 279-80 (8th Cir.), *cert. denied*, 519 U.S. 1036 (1996). By contrast, the Fourth, Fifth, Ninth, and Tenth Circuits have held that *Brady* focuses on the prosecution's misconduct, not the defendant's diligence, and that if exculpatory or impeachment material is suppressed by the prosecution, its availability to the defendant through other sources is wholly irrelevant. *See Walker v. Kelly*, 195 F. App'x. 169, 175 (4th Cir. 2006); *Johnson v. Dretke*, 394 F.3d 332, 335 (5th Cir. 2004); *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004); and *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995).

Cir. 1983) (citation omitted)); *see also Jennings v. McDonough*, 490 F.3d 1230, 1238-39 (11th Cir. 2007), *cert. denied*, 128 S. Ct. 1762 (2008) ("[T]here was no suppression of [a] tape" where defendant had knowledge of a witness and "had within his knowledge information by which he could have ascertained her statement."). Swoboda's testimony at the evidentiary hearing establishes that defense counsel interviewed him and was aware that Geralds purchased a necklace similar to the victim's sometime prior to the murder. Because there is no clearly established Supreme Court precedent on this point, the state court's determination that there was no suppression cannot be an unreasonable application of or contrary to clearly established Federal law. *See Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003).

Moreover, Geralds cannot demonstrate materiality with respect to the note of the interview because there is not a reasonable probability that the absence of its disclosure is sufficient to undermine confidence in the outcome. At the evidentiary hearing, Swoboda testified that he sold Geralds a herringbone necklace some months before Mrs. Pettibone's murder. Geralds argues that this testimony establishes that the necklace he pawned is not the one that belonged to the victim. However, Swoboda's testimony did not establish this; Swoboda could not identify the necklace recovered

from the pawn shop as the one he sold Geralds. Additionally, Geralds cannot explain

the presence of blood matching the victim's blood type that was found on the pawned

necklace. Therefore, Geralds has failed to demonstrate that the state court's denial of

this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

e.      Criminal charges brought against pawnbroker Billy Danford

Geralds argues that the State did not disclose criminal charges which had been

brought against this witness. The Florida Supreme Court held as follows with regard

to this item:

> As Geralds' fifth *Brady* claim, he argues that the State suppressed information regarding criminal charges brought against pawnbroker Billy Danford while the case against Geralds was being litigated.FN14 Geralds argued that he could have used this information to impeach Danford during the guilt phase of trial. The circuit court held that Geralds failed to establish that there were any deals between the State and Danford, and further, even if this evidence should have been disclosed, there was no prejudice. We agree.
>
> > FN14. At the evidentiary hearing, Geralds introduced two exhibits regarding Danford's criminal charges. The first exhibit is a case history of three separate incidents. The first incident shows that Danford was charged with, but found not guilty of, driving a vehicle on a sand dune in 1987. The second and third incidents show that Danford was charged with failure to record transactions by a pawn broker in April 1989 and October 1989; each case was dropped within the same month that the charges were filed. The second exhibit is a note, dated July 19, 1990, written by a state attorney to

> a detective stating that after reviewing the investigative files
> on charges that Danford was dealing in stolen property, the
> State could not prove the charges and declined to prosecute.

The information introduced at the evidentiary hearing regarding Danford's criminal charges was not admissible and had no impeachment value. This information demonstrates that Danford was charged with a crime, but never convicted. *See* § 90.610(1), Fla. Stat. (2007) ("A party may attack the credibility of any witness, including an accused, by evidence that the witness has been *convicted* of a crime....") (emphasis added). Geralds suggests that the charges against Danford were dropped because of a "deal" between the State and Danford in exchange for Danford's testimony against Geralds. However, the only evidence provided at the evidentiary hearing regarding this alleged "deal" is Grammer's testimony that none had been made. Geralds has not identified any portion of the record that would contradict this testimony. Thus, there is competent, substantial evidence in the record to support the circuit court's finding that there was no evidence of a "deal" in the record. Furthermore, Geralds did not deny at trial that he pawned a herringbone necklace on the day the victim was murdered. Instead, he only argued that the necklace he pawned was sold to him by his pawnbroker friend, Swoboda, and that Danford's testimony did not portray Geralds as a person who had just committed a murder. Danford's trial testimony is entirely consistent with Geralds' theory. At trial, Danford identified Geralds as the person who pawned a herringbone necklace on the day the victim was murdered. Accordingly, even if the information regarding Danford's criminal charges were admissible as impeachment evidence, Danford's testimony does not contradict Geralds' theory of the case. Consequently, Geralds was not prejudiced by not being able to impeach Danford with information regarding the criminal charges.

*Geralds III*, 111 So. 3d at 789-90.

Geralds argues that the state court's determination that he failed to establish that

any deal existed between the State and Billy Danford and that he failed to establish

prejudice if the deal should have been disclosed is contrary to or an unreasonable application of *Brady*. At trial Danford testified that on February 1, 1989, the day of the murder, Geralds pawned a 14 karat gold triple weave herringbone necklace which the State argued belonged to the victim.[10] During a pretrial deposition taken January 23, 1990, Danford was asked if he had a criminal record. He testified that he did not and remarked, "Mr. Adams I've never had a parking ticket in my life and I'm sixty-one years of age." (EH Exhibit List Vol. I at 88 (Defense Exhibit 9)). At the first evidentiary hearing, postconviction counsel showed Grammer the records pertaining to several charges brought against Danford and asked him if he knew about them before trial.[11] Grammer answered, "No. I doubt if we even ran a rap sheet on him. But we may have. But, again, if we had been aware of that we would have seen that he had no, didn't have a record. But I don't recall, I don't recall before today ever seeing anything about driving a vehicle on a sand dune or failure to record a

---

[10] Danford also testified that Geralds presented his driver's license, and Danford recorded identifying information on the pawn ticket. (TR Vol. XIII at 1753-54). Danford testified that Geralds asked if the necklace were real and stated that he wanted to pawn it. (*Id*. at 1756-57). Geralds pawned the necklace for $30, although Danford estimated its price in a jewelry store to be approximately $300. (*Id*. at 1758-59). On cross-examination, Danford did not recall Geralds discussing where the necklace came from and he did not attempt to disguise his appearance or identity. (*Id*. at 1766-67).

[11] Geralds' postconviction counsel had discovered the following criminal charges made against Danford: driving a vehicle on a sand dune (Danford was found not guilty on August 4, 1987); failure to record a pawn broker transaction (case dropped on April 26, 1989); and failure to record a pawn broker transaction (case dropped October 27, 1989). (*See* EH Exhibit List Vol. I at 66-69 (Defense Exhibit 8)).

transaction as a pawn broker or this well–actually before today." (EH at 2253).

Grammer testified that because the cases were dismissed, he did not believe that they

would have been admissible to impeach Danford. Grammer also testified that

Danford's testimony was administrative in nature, explaining, "Mr. Danford, by my

recollection, was able to identify a pawn ticket that he had given to Mark Geralds on

whatever date that was, close in time to the murder, and identify what it was that was

pawned. He wasn't able to say, for instance, that was Ms. Pettibone's necklace. He

wasn't able to say where it came from. He was administrative in nature. He was a

witness of happenstance, he happened to be the one that Mr. Geralds took the necklace

to." (*Id*. at 2307). He testified that he "was unaware of Billy Danford's name other

than as it was connected to Mark Geralds." (*Id*.). He was not aware of any deals offered

by the State to Danford for his testimony.

Geralds has not presented clear and convincing evidence that there was any

deal between Danford and prosecutors in exchange for damaging testimony in

Geralds' trial or for any other purpose.[12]  Geralds has also failed to demonstrate how

---

[12] This Court recognizes, however, that the defense has wide latitude in cross-examining a government witness for the purpose of discrediting them by showing bias, prejudice or interest, and "[a] well recognized area of cross examination is how pending criminal charges may have influenced a witness' cooperation with the state and the content of in-court statements." *See Livingston v. Florida*, 678 So. 2d 895, 897 (Fla. 1996) (citation omitted).

he was prejudiced by Danford's testimony. As noted by the state court, Danford's testimony did not contradict Geralds' theory of the case, specifically that he did not attempt to disguise his identity when pawning the necklace. Additionally, the State did not elicit any testimony from Danford that Geralds was agitated or appeared to him to have been involved in a recent altercation when he pawned the necklace on the same day as Mrs. Pettibone's murder. Thus, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

f.      Exculpatory interview between Jimmerson and witness Greg Toriac

Geralds argues that this interview was not disclosed to the defense. The Florida Supreme Court held as follows with regard to this item:

> As Geralds' sixth *Brady* claim, he argues that the State suppressed an exculpatory interview that occurred between Investigator Jimmerson and Greg Toriac two days before Geralds' trial began. Toriac worked at Club LaVela in Panama City Beach, the city where the murder took place. Geralds argued that the substance of the interview contradicts the alibi of William Pelton (Toriac's coworker and a suspect early in the case) and could have been used to argue that Pelton committed the murder.FN15 The circuit court denied this claim, holding that Geralds knew of Toriac and that there was no *Brady* violation as to this exhibit. We agree.
>
> > FN15. At the evidentiary hearing, Geralds introduced Investigator Jimmerson's notes regarding an interview with Toriac. "Gregg Toriac" is written across the top of the note and reads in whole:

> Middlebrooks & myself were discussing William Pelton
> (01–26–90) & we know he would leave work alot [*sic*] &
> stopped at Radio Shack & would bring in a reciept [*sic*] to
> show or cover why he was missing or gone so long.
>
> Dave Meadows [the manager of Club LaVela] did write his
> time in on Feb. 1, 1989 but he is like us wouldn't really
> know if William stayed or left that day.

First, the interview has no favorable evidentiary value to Geralds.
Geralds is attempting to establish that Pelton murdered the victim. He
argues that he can establish this by showing the jury that Pelton was not
at work at Club LaVela on the day of the murders, which was Pelton's
alibi. In the interview, Toriac states that he, like the manager of the club,
would not know whether Pelton was at work on the day of the murder.
Indeed, Geralds candidly admits when arguing this point under his *Giglio*
claim below that "Jimmerson's interview notes ... indicate that no one
was certain whether Mr. Pelton was at work on the morning of February
1, 1989."

Second, Geralds failed to establish that information regarding this
interview was suppressed. At the evidentiary hearing, Grammer testified
that the information about Pelton being away from work was part of
discovery. Additionally, Toriac was listed as a witness for the defense
and in the defense praecipe for subpoena.

Third, Geralds has not established that he was prejudiced. Even if Toriac
would have testified to the exact information he gave at the interview, his
testimony would not discredit Pelton's alibi. In the interview, Toriac
merely states that he does not know whether Pelton was at work on the
day of the murders. Geralds fails to establish how this testimony would
have undermined confidence in the outcome of his trial. Accordingly, the
circuit court did not err in holding that there was no *Brady* violation as to
this interview.

*Geralds III*, 111 So. 3d at 790-91.

Geralds argues that the state court's conclusion that this evidence had no favorable evidentiary value and that he failed to establish both suppression and prejudice is contrary to and an unreasonable application of *Strickler*. Geralds contends that defense counsel's knowledge of the existence of Toriac did not absolve the prosecution of the duty to disclose this evidence because the notes show that Toriac was not as certain about Pelton's whereabouts on the day of the crime as Jimmerson's report indicated. Geralds states that he was unaware that another employee, David Meadows, wrote in Pelton's time at work and that no formal time keeping device was utilized. Thus, Geralds believes that the notes were powerful exculpatory evidence which would have allowed him the opportunity to demonstrate Pelton was responsible for the murder.

David Meadows testified at the evidentiary hearing that at the time of the crime he was employed at Club LaVela as a manager while renovations were being done. (EH at 2327). The club had an external construction crew and some of their own employees working on the renovations. The club employed Pelton who was dealing with the acquisition of materials and the installation of sound and lighting equipment. Meadows met Geralds because he and Pelton were friends, and Geralds was at the

club on occasion. When asked how the club kept track of employees' time, Meadows

testified:

> Basically what we did as far as–it was not a time clock. Basically what we did was just recorded presence in the morning. We met in the office in the morning, this was not a formal meeting, basically coffee cinnamon rolls, what are we going to do for the day. At that time we would log in who was there, whether or not anyone was missing. There was not a formal recording of hours like 8 to 11:30 or 11:45, it was not a factory type environment where we kept rigid adherence to a schedule. During the course of the day if someone needed to come and go, they could come and go without it being clocked in, clocked out.

(*Id*. at 2327). Meadows also testified that on frequent occasions Pelton would need to

leave the club to get things for the job, often going to Radio Shack, and he had the

freedom to come and go as necessary. Meadows testified that he was never contacted

or interviewed by police about the crime.

The record reflects that in the State's supplemental response to demand for

discovery, dated January 22, 1990, Greg Toriac was listed as a witness who was

known to have information which may be relevant. (PCR Vol. I at 2325). Defense

counsel also listed all of the State's witnesses as possible defense witnesses for trial.

(*See* PCR Vol. I at 2322 (dated January 15, 1990)). Because counsel was aware that

Toriac was a possible witness for the State, the state court held correctly there was no

suppression where defense counsel knew or could have known of the alleged *Brady*

material. *See Maharaj*, 432 F.3d at 1315; *Jennings*, 490 F.3d at 1238-39. Furthermore,

Jimmerson's notes do not contain the powerful exculpatory evidence Geralds claims.

Geralds contends that had this information been known to the defense then he "could

have legitimately pointed the finger at Pelton as having committed the crimes." ECF

No. 1, p. 61. However, at most, Toriac and Meadows would have testified that they

could not be certain if Pelton was at the club during the time of the crime.[13] Therefore,

Geralds has failed to demonstrate that the state court's denial of this claim is not

entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

---

[13] Grammer pointed out the limited value of this evidence in the evidentiary hearing. When questioned about this exhibit, the following exchange occurred:

Q. [Assistant Attorney General Cassandra Dolgin]**:** And in reading this is it your understanding that it says that Mr. Pelton was not present on February 1, 1989? Not present at LaVela?

A. [Grammer]: Well, in the information here it doesn't list any place, but I know that this relates to Mr. Pelton working at LaVela. It doesn't indicate to me that they're saying that Mr. Pelton was not there on the date of the murder. Also says Dave Meadows did write his time in, Dave Meadows wrote his time in on February 1, 1989, but he's, like us, he wouldn't really know. So somebody apparently wrote in William Pelton's time on his time sheet but he doesn't know whether he was there or not.

Q. So, there is not statement that Mr. Pelton was not there present at his work?

A. No, I don't recall that ever being the case, that anyone ever said Mr. Pelton was definitely not there.

(EH at 2306).

g.      Other pieces of evidence admitted during the postconviction evidentiary hearing

Geralds alleges that several exhibits which the postconviction court failed to address, including a note by Jimmerson regarding a pawn ticket recovered from Geralds and notes regarding the location of finger and palm prints taken from the crime scene, were not disclosed to him.

The Florida Supreme Court held as follows with regard to this evidence:

As Geralds' seventh *Brady* claim, he argues that the circuit court failed to address several pieces of evidence that were admitted during the evidentiary hearing and alleged to have been suppressed. Specifically, Geralds argues that the court ignored Exhibit 11, which is a handwritten note by Investigator Jimmerson indicating that he recovered a pawn ticket from Geralds six days after the herringbone necklace was recovered. Geralds argues that this evidence is inconsistent with Jimmerson's testimony that he obtained the pawn ticket the day the necklace was recovered. Geralds further argues that the court ignored Exhibits 31, 34, and 36, which consist of notes regarding the location of finger and palm prints lifted from the crime scene and the victim's automobile, the reports, and the notes of hair analysis. Finally, Geralds argues that the court ignored evidence that the State suppressed other handwritten notes by Jimmerson regarding his initial interview with the victim's husband. Geralds fails to identify which exhibits involve this latter information. Although the trial court did not specifically address these pieces of evidence in its order, we deny relief because the record supports the conclusion that Geralds failed to demonstrate either that the information was suppressed by the State or that the information was material. Thus, *Brady* error has not been demonstrated.

*Geralds III*, 111 So. 3d at 791. Geralds argues that the state court's determination is objectively unreasonable and its factual findings are rebutted by clear and convincing evidence.

Geralds argues that Grammer testified at the evidentiary hearings that he did not have Jimmerson's handwritten notes and that he did not disclose any of the FDLE analysts' notes. While Grammer's testimony at times is conflicting on whether he disclosed a certain piece of evidence, Geralds has not carried his burden by clear and convincing evidence. For instance, Grammer was asked about Exhibit 11[14] at the February 2004 evidentiary hearing as follows:

> Q. [Assistant Attorney General Cassandra Dolgin]:–can you that describe [Exhibit 11]?
>
> A. [Grammer]: It's a handwritten note that I believe was written by Bob Jimmerson dated 3-7-89, 9 a.m., talks about collecting a pawn ticket from the wallet of Geralds.
>
> Q. Turning to State's Exhibit page 2247, do you see a description that matches that exhibit?
>
> A. There is handwritten notes, Geralds, dated 3-6-89, one page, that's the closest thing.
>
> Q. Mr. Grammer, when you had your secretary type up this attachment, did you review it for accuracy as to dates?

---

[14] Exhibit 11 is a note by Jimmerson dated March 7, 1989, at 9 a.m. which states, "collect pawn ticket from wallet of Geralds/ pink piece of paper dates & times/ Zales blue credit card." (EH Exhibit List Vol. I at 109).

A. I did–I didn't, I don't remember going through every single document. I can't tell you that this is the same document but it could be. I don't recall in going back through the file any other document that said 3-6-89 that was one page but I don't know. Yes, I did review it and, no, I didn't pull every document out and go line-by-line and make sure it was the right number of pages or the right date, so I don't, I just don't know.

Q. Based upon your review of the file, um, having not found another document marked 3-6-89 pertaining to Mr. Geralds, is it your belief to the best of your knowledge that this document is one and the same of that description?

A. The best I can say it probably is.

Q. And this would have been disclosed to the Defense?

A. Yes. It mentions the Zales–if I could look back in that other file. I don't know if you want me to compare. Seems like there's a picture of the Zales card in the 71-page[s] of property evidence so it could be in there, I don't know.

(EH at 2672-73). Given this testimony, Geralds cannot demonstrate by clear and convincing evidence that this note was suppressed. Furthermore, Geralds has not demonstrated that this note is material. He does not dispute that he pawned a gold herringbone necklace, and he does not demonstrate how this evidence undermines confidence in the outcome of the trial. With regard to Exhibit 36, the following evidence was taken at the February 2004 evidentiary hearing:

[Dolgin]: Turning your attention, Mr. Grammer, to Defense Exhibit 36, if you could describe that.

[Grammer]: That's a report that says by Larry Smith, microanalysis, four pages, dated January 25th, 1990.

Q. In looking at your file marked lab reports from box one, did you locate that report?

A. Yes.

Q. Is Defense Exhibit 36 the type of report that would have been disclosed to the Defense?

A. Yes. The one in our file looks like a faxed copy, if that makes a difference. But, yes, that's the type of item that would have been disclosed as soon as we received it.

Q. Does the faxed copy indicate what time of day that it was received?

A. No, it doesn't. It's just the way it's printed that makes it look like it came from the type of fax machine we had back in the late '80's, early '90's. There are no dates or times.

Q. What's the date of that report?

A. January 25th, 1990.

Q. And if you could take a look at State's Exhibit E.

A. E?

Q. E. Do you see Larry Smith's name listed?

A. I do. State's Exhibit E is a supplemental response where we provided seven witnesses' names, provided them on January 24th of 1990 to Mr. Adams.

Q. So is it fair to say that when you disclosed Mr. Smith's name to the Defense, that was the day prior to receiving what has been marked and admitted as Defense Exhibit 36?

A. I don't think it's fair to say it's the day prior to receiving because we don't have it stamped in. It's dated the day prior to the date on the report, um, but I couldn't tell you when our office received it.

Q. Would you have disclosed Mr. Smith's name and not disclosed the report that he provided to you?

A. Well, when I disclosed his name we didn't have the report, based on the dates. So, yes, I would have disclosed his name without at the same time providing a report, but I would not have withheld his report.

Q. Given that you had included his name to someone, who, as someone who would have had information that may have been relevant, would you have known that he was preparing a report?

A. No. Oh, would I have once I got his name? Yes, I would have known it then. I am guessing we found out right here in late January that Larry Smith, whoever he is, was involved in the case.

(*Id*. at 2685-86). Grammer had previously testified that it was absolutely his practice to disclose all FDLE lab reports to the defense, and it is possible that he hand delivered the Larry Smith report dated January 25, 1990, to defense counsel. (*See* EH at 2715-16). After conducting the evidentiary hearings, the state court resolved this claim in favor of the State. The record can support such a finding. Thus, Geralds cannot demonstrate by clear and convincing evidence that this evidence was suppressed. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Geralds also argues that the state court failed to conduct a cumulative analysis of various pieces of evidence which pointed to another perpetrator, *e.g*., the specific location and number of unidentified palm and finger prints at the crime scene; unidentified hairs found in the victim's hand; and Jimmerson's notes of his interview with the victim's husband which noted that Mr. Pettibone thought there might have

been short plastic ties at his home. First, the state court did not find that these items were suppressed. Thus, there is no suppression to view cumulatively. Moreover, Geralds has failed to show that there is a reasonable probability that had this allegedly suppressed evidence been disclosed that the result of the trial would have been different. While some of this evidence may cast doubt as to Gerald's guilt, most of this evidence does not contradict the strong circumstantial evidence of guilt in this case. Given the deference owed to the state court's finding that the evidence against Geralds supports the verdict of guilt, Geralds cannot prevail on this claim.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground I (B): *Giglio* Claims

In this ground Geralds alleges that the prosecution employed deliberate deception in making its case against him by the false testimony of two witnesses. ECF No. 1, pp. 67-77.

1. State Court Proceedings

Geralds raised this claim in his postconviction proceedings, and the claim was denied. The Florida Supreme Court affirmed the denial, holding as follows:

a. First *Giglio* Claim

As Geralds' first *Giglio* claim, he argues that the State allowed crime scene analyst Rousseau to testify falsely when she stated that she tested Geralds' sneaker and it "came up positive for presumptive testing for

blood." Geralds argued that the State failed to reveal that when the sneakers were tested by FDLE analyst Zeigler, Zeigler did not find the presence of blood. Geralds concluded that the State violated *Giglio* by allowing Rousseau to testify as she did while possessing Zeigler's report. We deny relief because error has not been demonstrated. Geralds has failed to show how the Zeigler report makes Rousseau's testimony false or misleading. Rousseau conducted her own test on the sneakers, and she testified concerning her results, not the results from any other testing.

### b. Second–Fifth *Giglio* Claims

Geralds' second through fifth *Giglio* claims all relate to Investigator Jimmerson's testimony, which was presented during the resentencing phase. Geralds argued that the prosecutor violated *Giglio* during resentencing when Investigator Jimmerson testified that (1) Pelton's alibi had been confirmed, (2) the shoeprints found at the crime scene were similar to Geralds' sneakers, (3) one of Geralds' shoes tested positive for blood, and (4) the lab determined that blood found on the herringbone necklace belonged to the victim. The circuit court denied these claims, holding that Jimmerson's testimony at the resentencing did not constitute a *Giglio* violation. We agree.

At resentencing, Jimmerson testified that he verified that Pelton was at work on the date of the murder. There is nothing in the record indicating that Jimmerson did not confirm Pelton's alibi, and Geralds did not present any evidence at the evidentiary hearing to the contrary. Geralds relies on Jimmerson's interview with Toriac, raised as his sixth *Brady* claim, and argues that this interview indicates that no one was certain whether Pelton was at work on the morning of the murders. This interview only indicates that Toriac, not Jimmerson, did not confirm Pelton's alibi. At resentencing, Jimmerson also testified that he saw one consistent shoe track throughout the victim's home that came from the same type of shoe that belonged to Geralds. Jimmerson testified to what he observed. In his observation, he saw only one consistent shoe track. Jimmerson also testified at resentencing that he was present when Geralds' shoes were tested for the presence of blood and that one of the shoes tested positive. Again, Jimmerson testified to what he personally observed, and Geralds failed to present any evidence indicating that this

testimony was false. Finally, the record does not support Geralds'
argument that Jimmerson testified that the blood found on the
herringbone necklace belonged to the victim. Instead, Jimmerson
testified at resentencing that the laboratory determined that the blood type
on the necklace matched the victim's type. Accordingly, there is
competent, substantial evidence to support the circuit court's
determination that this testimony was not inaccurate or untrue.

*Geralds III*, 111 So. 3d at 792-93.

2.      Clearly Established Supreme Court Law

To succeed on a claim that the State presented false evidence, a petitioner must

establish that the prosecutor "'knowingly used perjured testimony, or failed to correct

what he subsequently learned was false testimony,' and that the falsehood was

material." *Tompkins v. Moore*, 193 F.3d 1327, 1339 (11th Cir. 1999) (quoting *United

States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995)); *Giglio v. United States*, 405

U.S. 150 (1972). For *Giglio* purposes, "the falsehood is deemed to be material 'if there

is any reasonable likelihood that the false testimony *could have* affected the judgment

of the jury.'" *Alzate*, 47 F.3d at 1110 (emphasis in original) (quoting *United States v.

Agurs*, 427 U.S. 97, 103 (1976)).

3.      Federal Review of Claim

Geralds argues that the state court's determination that there was no *Giglio*

violation with respect to the Rousseau and Jimmerson testimony was objectively

unreasonable and that its factual findings are rebutted by clear and convincing evidence.

    a.    <u>Rousseau testimony</u>

Laura Rousseau, a crime lab analyst with the FDLE, testified during the guilt phase of Geralds' trial that she coordinated evidence collection at the crime scene. After she identified the Nike sneakers which are the subject of this *Giglio* claim, the following exchange occurred:

Q. [Appleman]: What tests did you conduct upon the shoes?

A. [Rousseau]: I examined them visually to see if there were any stained areas that possibly could be blood. I did not detect any visible stained areas. Then I used Luminol, which is a chemical presumptive test for detecting trace amounts of blood. It was sprayed on the shoes, the uppers and the soles. Any areas that luminesced were then tested with Phenophaline, another presumptive test for blood, and on the left shoe I found some areas that did positively with Luminol and Phenophanline, came up positive for presumptive testing for blood, and it was on the left shoe.

Q. In what area on the left shoe?

A. On the–all right, this is the left shoe and on the inside portion on the outer soul area, the area that I have marked here with a sharpie, inside this area luminesced and came up positive with Phenophaline.

Q. The area that you marked?

A. Yes, I marked it with a sharpie, but I don't have my initials on the shoe.

Q. Okay, you don't have your initials on the shoe or on the bag.

A. That's correct.

Q. But the shoes in front of you have your mark where you tested; is that correct?

A. That's correct.

Q. All right. And you used two tests. Is that correct?

A. Yes, I did.

Q. And what was the results of both tests?

A. Both tests were positive for presumptive testing for blood.

(TR Vol. X at 1720-22). On cross-examination, defense counsel clarified as follows:

Q. [Adams]: Ma'am, what do you mean by presumptive tests?

A. [Rousseau]: That's just a pre-test that it could be blood.

Q. And in your training and experience, those presumptive tests which is a pre-test meaning it could be blood, would that differentiate between human and fish blood?

A. No, it would not.

Q. To your knowledge was any further testing done with regard to those items in front of you?

A. Not to my knowledge, I don't know. I have not seen the shoes since then.

(*Id*. at 1722-23). The state court held that Rousseau's testimony was not false or misleading because she conducted her own tests on the sneakers and did not testify about the results from any other testing. This finding is clearly supported by the record. Geralds has failed to demonstrate a *Giglio* violation with regard to this testimony.

Accordingly, Geralds is not entitled to habeas relief on this ground.

b.    Jimmerson testimony

The record reflects that at Geralds' resentencing trial Jimmerson testified about the investigation of the murder and summarized the evidence that was presented in the guilt phase of the original trial. Geralds points to four instances in Jimmerson's testimony which he claims violate *Giglio*. First, Geralds points to the following testimony:

Q. [State Attorney Appleman]: Do you know any reason why Mr. Toriak [*sic*] would lie about Mr. Pelton's presence at work the day of this crime?

A. [Jimmerson]: No reason.

Q. As a matter of fact he provided you a document; didn't he, saying that I know on February 1st he, William Pelton was here from 8 a.m. to 12 and from 1 'til 6?

A. That's correct.

Q. So, you verified that William Pelton was at work on the date of this crime?

A. Yes, sir.

(Resentencing Trial ("Resentencing"), Vol. III at 443). Geralds argues that Jimmerson's undisclosed notes, discussed *supra,* indicated that no one was certain whether Pelton was at work on the morning of February 1, 1989. The postconviction court found that "the testimony of Detective Jimmerson at the re-sentencing was not so inaccurate and untrue to constitute a *Giglio* violation." (Final Order Denying Defendant's Motion for Postconviction Relief, PCR Vol. X at 1750). Geralds has not

demonstrated that the state court's determination is not entitled to deference. As noted by the state supreme court in denying this claim, Jimmerson could have verified Pelton's whereabouts during the time of the crime independently of Toriac, and Geralds has failed to demonstrate that this did not occur.[15]

---

[15] Jimmerson also testified about the investigation into Pelton and other suspects who were eliminated as follows:

Q. [State Attorney Appleman]: Now, if William Pelton had been involved or you could have found something that William Pelton, to indicate that he was involved in this crime, what would you have done?

A. [Jimmerson]: Would have arrested him.

Q. And you have found nothing to show that either he or Archie, whatever his name is, were involved in this crime, have you?

A. Nothing.

Q. As a matter of fact, how many people did you eliminate in your investigation before you centered on this defendant?

A. Forty, fifty people.

Q. Even going as far as going up to a murder scene in Graceville, Florida where a couple was killed; is that true?

A. That's correct.

Q. And going to Alabama where another couple was killed; is that true?

A. That's correct.

Q. And checking out one in Kentucky, if I remember correctly; is that true?

A. Yes, sir.

Q. So, you have covered the gamit of every possibility that you are aware of and where does everything point in this case?

A. Mark Geralds.

(Resentencing, Vol. III at 441-42).

Case No.: 5:13cv167/MW

The second portion of testimony that Geralds claims violates *Giglio* is when Jimmerson was asked to identify the Nike sneakers he collected from Geralds:

Q. [Appleman]: Now, in your investigative capacity, have you worked in reviewing and looking at shoe prints and patterns like in sand or in blood in comparing them to the tracks that you see on the bottom of shoes?

A. [Jimmerson]: Yes, sir.

Q. Did you see these particular tracks off these shoes in the Pettibone home?

A. Yes, sir.

Q. Did you see one consistent shoe track throughout the home?

A. Correct.

Q. That would be coming from the Nike type shoe?

A. That's correct.

Q. Indications to you as far as those particular shoe prints are concerned as far as the Nikes and the blood track, is there is one set of footprints inside the home, is that correct?

A. That's correct.

(*Id*. at 401-02). Geralds argues that this testimony is inaccurate and misleading. However, Jimmerson did not testify that the tracks found at the crime scene came from Geralds' shoes. In fact, just a little later in his testimony when asked about a chart indicating footprints throughout the crime scene, Appleman asked him the following:

Q. Do those show the path of the single set of footprints that you saw throughout the house that day?

A. Yes, sir.

Q. And those were *similar in characteristic* as to the Nike shoes that you obtained from the defendant's motel room?

A. That's correct.

(*Id*. at 413) (emphasis added). Jimmerson did not testify that the shoe prints found at the crime were positively identified as being Geralds'; his testimony was that the tread pattern was similar and seemed consistent with Geralds' Nikes in his observation. This conclusion is the same one reached by the FDLE expert, Kenneth Hoag, who testified following Jimmerson about his examination of Geralds' shoes. Hoag testified that he compared pieces of vinyl taken from the crime scene which had visible shoe tracks with the Nikes taken from Geralds, and he determined that "the shoe print that is visible on both pieces of vinyl was similar in pattern and in the size of the pattern to [Geralds'] left shoe." (*Id*. at 490). Hoag testified that he could not determine if the shoe tracks came from the Nikes because there were no individual characteristics which were visible:

> [Appleman]: Had there been some unusual mark on either of these shoes would you have been able to go further than to say similar in tread design and size?
>
> [Hoag]: Yes. If there had been in the area of these markings of the lugs, if there had been some individual cuts or say a chip out of the corner of one of these, it would be possible that I could have said that it was a positive identification. But in this particular case since none of that is there I could not say that.

(*Id*. at 494). Geralds has failed to demonstrate a *Giglio* violation with regard to this testimony.

Third, Geralds argues that the prosecution's deception continued when he elicited testimony about the presence of blood found on the shoe in the following exchange with Jimmerson:

Q. [Appleman]: Were [the Nike shoes] sprayed with what is known as Luminol?

A. [Jimmerson]: Luminol and–

* * *

A. It is a chemical test to detect human blood or blood.

Q. Was those [*sic*] shoes sprayed?

A. Yes, sir.

Q. And did the test come positive, showing there was blood on the shoes?

A. Positive on the left shoe.

Q. Now, you couldn't tell whether it was fish blood, animal blood or what kind of blood it may be?

A. No, sir.

Q. You had a positive reaction for blood?

A. That's correct.

(*Id*. at 413-14). As discussed *supra* with regard to Rousseau's testimony, the Luminol test done on the shoe did indicate the presence of blood. Therefore, Jimmerson did not testify falsely. Further, while it was later determined that the stain was not blood, this fact is not material here because Jimmerson was clear that no determination was made

regarding whether the blood was human, and most importantly, he did not testify that

the blood on the shoe was from the victim. Geralds has failed to demonstrate a *Giglio*

violation with regard to this testimony.

Finally, Geralds argues that Jimmerson misled the jury about the blood analysis

of the stain found on the pawned herringbone necklace. The testimony he refers to is

as follows:

> Q. [Appleman]: And you've testified about the herringbone necklace that had been pawned by the defendant?
>
> A. [Jimmerson]: That's correct.
>
> Q. Does this show one similar?
>
> A. Similar.
>
> Q. With respect to that particular necklace were there any stains found on the necklace?
>
> A. When it was looked at at the Miracle Strip Pawn Shop a blood stain, or what appeared to be a blood stain was on the necklace.
>
> Q. Did you take and send that particular necklace and sample of the blood of both the defendant and Mrs. Pettibone to the laboratory for analysis?
>
> A. That's correct.
>
> Q. And did they determine that the type was of Mrs. Pettibone?
>
> A. Yes, sir.

(*Id*. at 406). Geralds argues that the blood was not matched conclusively to the victim

so Jimmerson's testimony was false. However, the blood stain found on the necklace

was matched to Mrs. Pettibone's blood type. Shirley Zeigler, the crime lab analyst

with the FDLE specializing in blood and bodily fluids, testified at the resentencing

with regard to this evidence as follows:

> Q. [Appleman]: What was your determination as to the presence of blood on the chain itself?
>
> A. [Zeigler]: Well, first of all I tested the sample for the presence of blood and found that blood was present. Then I did a species identification test which told me that the results was that the blood was from a human source. I do this because blood would look the same whether it was from human or animal. Then I did the blood typing test that I did on the liquid blood, the results of this test matched that of Ms. Pettibone.
>
> Q. Were you able to eliminate it as matching that of the defendant?
>
> A. Definitely.
>
> Q. Did it match all of the criteria as to type and the enzyme types that you described as to Mrs. Pettibone?
>
> A. Yes, it did.
>
> Q. What is your conclusion as to the blood that was contained upon this particular necklace?
>
> A. I concluded that that blood definitely did not originate from Mr. Geralds and that it *could have, could have* originated from Mrs. Pettibone.

(*Id*. at 472) (emphasis added). Jimmerson's testimony was not false or misleading on

this point, and Geralds cannot demonstrate a *Giglio* violation with regard to this

testimony. Geralds also argues that Jimmerson's testimony may have been technically

correct, but it gave the jury a false impression of the evidence. However, the context

of Jimmerson's testimony, given in a new penalty phase trial, is significant. Geralds

had already been convicted of the murder, and his conviction had been upheld on

direct appeal. Thus, any minor misstatements of the evidence or any possible false impression drawn from his testimony which went to Geralds' guilt was not material for purposes of the resentencing trial. Geralds has failed to demonstrate a *Giglio* violation with regard to this testimony. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground I (C): Denial of a Full and Fair Hearing

In this subclaim, Geralds addresses two supplemental motions he filed in his postconviction proceedings that were based on additional records containing investigative reports about other potential suspects in the crime that were not originally turned over to his collateral counsel. ECF No. 1, pp. 77-86.

1.      State Court Proceedings

The postconviction court denied both of the supplemental motions. The Florida Supreme Court affirmed, holding as follows:

> Geralds argues that the postconviction court erred in summarily denying the first and second supplement to his postconviction motion, various claims of ineffective assistance of counsel contained in his amended postconviction motion, and a newly discovered evidence claim in his amended postconviction motion. We conclude that the circuit court did not err in summarily denying these claims.
>
> In determining whether an evidentiary hearing is required, we have held:

[A] defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient. The defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden. However, in cases where there has been no evidentiary hearing, we must accept the factual allegations made by the defendant to the extent that they are not refuted by the record.

*Hannon v. State*, 941 So. 2d 1109, 1138 (Fla. 2006) (quoting *Freeman v. State*, 761 So. 2d 1055, 1061 (Fla. 2000)). This standard must be applied to each of Geralds' claims that summary denial was improper.

### First and Second Supplements

In both supplements, Geralds argued that he had learned of other suspects involved in the murder investigation. He alleged that either the State violated *Brady* when it failed to disclose this exculpatory evidence or trial counsel was ineffective for failing to present it to the jury. The circuit court summarily denied this claim, holding that there were no specifics contained in the supplement sufficient to establish that this information should have been disclosed or, if it was required to be disclosed, that it would have any prejudice on the defense by the failure to disclose it. The circuit court further held that there were no allegations that this information was available to trial counsel and that he had failed to act on it. We agree.

In his supplements, Geralds identified other suspects in this case and the details of why they were suspected. In addressing these suspects, however, Geralds merely provided facts and failed to allege any of the proper elements of a *Brady* or ineffective assistance of counsel claim. Geralds bears the burden of establishing a prima facie case based upon a legally valid claim. *Freeman*, 761 So. 2d at 1061. The fact that others were suspected of committing this crime, without more, is insufficient to establish a legally sufficient *Brady* claim. With respect to the ineffective assistance of counsel aspect of this claim, Geralds also fails to allege that

trial counsel knew of, or failed to act on, any information regarding other suspects. Accordingly, the circuit court did not err in summarily denying these claims because Geralds' conclusory allegations failed to establish a legally sufficient *Brady* or ineffective assistance of counsel claim.

*Geralds III*, 111 So. 3d at 799-800.

    2.      Clearly Established Supreme Court Law

The standard for an evidentiary hearing is well established. As it relates to the underlying issue, the law governing *Brady* claims is set forth *supra.*

    3.      Federal Review of Claim

In denying Geralds' first supplemental motion, the postconviction court noted that "conclusory allegations without specific allegations of prejudice would make [the] claims insufficiently pled and would not warrant an evidentiary hearing." Order Denying Defendant's Supplement to Amended Motion to Vacate Judgments of Conviction and Sentence, PCR Vol. IX at 1528 (Tab 53). With regard to the allegations that the defense should have been provided with all information regarding the prosecution's investigative work, the court held that under Florida law investigators are not required to provide all of their notes and information regarding their investigation, and the failure to disclose this information to the defense was not a *Brady* violation. *See Wright v. State*, 857 So. 2d 861 (Fla. 2003). [16] The

---

[16] In *Wright v. State*, 857 So. 2d 861, 869-70 (Fla. 2003), the court held that investigators in a

postconviction court also held that "[i]t would be pure conjecture at this point to see any connection between these crimes based upon the facts provided by the defense." Order Denying Defendant's Supplement to Amended Motion to Vacate Judgments of Conviction and Sentence, PCR Vol. IX at 1529. Therefore, the court found that Geralds failed to establish any prejudice sufficient to require a hearing. The postconviction court denied Geralds' second supplemental motion for the same reasons, again holding that Geralds' *Brady* claims were conclusory and that he failed to sufficiently allege prejudice under *Brady* and its progeny.

In his petition, Geralds requests an evidentiary hearing to determine if he can meet his burden to establish a *Brady* violation with respect to the various pieces of evidence that he identified in his two supplemental motions in state court, most of which involve other potential suspects in the crime. *See* ECF No. 1, pp. 77- 86. As found by the state court, these allegations are conclusory and do not meet the requirements which entitle a petitioner to an evidentiary hearing under 28 U.S.C. § 2254(e)(2). *See Schriro*, 550 U.S. at 475 ("If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in

---

capital murder case had no duty under *Brady* to disclose to the defendant the criminal history of another possible suspect, neighbors' complaints to police about that suspect, or police reports involving other known criminals in the neighborhood in which the murder occurred.

evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts."). Thus, Geralds is not entitled to an evidentiary hearing on this subclaim.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground II: Ineffective Assistance of Counsel/Guilt Phase

Geralds raises four categories of allegedly deficient performance by his counsel during the guilt phase of his original trial, including his counsel's failure to (a) present evidence from the crime scene; (b) cross-examine witnesses; (c) investigate and present witnesses; and (d) make objections and proper motions. ECF No. 1, pp. 86-118.

1.      State Court Proceedings

Geralds exhausted these claims in his postconviction proceedings. The postconviction court denied relief, and the Florida Supreme Court affirmed the denial.

2.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the

proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms. *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the *Strickland* standard, a petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And a petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of*

*Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 694–95. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of the trial, not on appeal. *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105. As the *Richter* Court explained:

The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### 3.    Federal Review of Claim

The Florida Supreme Court correctly identified *Strickland* as the clearly established Supreme Court law governing this claim. *Geralds III*, 111 So. 3d at 793. Therefore, in order to prevail on habeas review, Geralds must demonstrate that the state court's decision was contrary to or an unreasonable application of *Strickland* or that the state court made an unreasonable determination in light of the facts of his case.

### A. Failure to Present Evidence from the Crime Scene

The Florida Supreme Court denied this claim, holding as follows:

Geralds argues that trial counsel should have presented evidence related to the physical evidence, or lack thereof, obtained from the crime scene and the victim's body. After the State rested its case at trial, the defense moved for a judgment of acquittal based on the insufficiency of the evidence. When the motion was denied by the court, the defense rested its case without calling any witnesses or presenting any evidence.

Because trial counsel is deceased, he was not able to testify at the evidentiary hearing regarding his trial strategy. Nevertheless, a review of

his closing argument during Geralds' guilt phase suggests that trial counsel's strategy was to highlight all the missing pieces of evidence in order to create a reasonable doubt. We agree with the circuit court's summary of trial counsel's closing argument and hold that trial counsel's performance was not deficient, because his closing argument during the guilt phase addressed the evidentiary issues Geralds raised in his postconviction motion. In denying this claim, the circuit court noted the following facts from the record:

> On page 79 of Volume III of the guilt phase transcript (page 1982) trial counsel called the jurors' attention to what they did not hear in the case. He specifically argued the lack of evidence on page 81 (page 1984) and trial counsel reminded the jurors that the sunglasses and gold chain only looked like the victim's. He also argued there was no way to tell what things were actually taken due to Carolyn Pettibone gathering up some jewelry before the family came back from Ohio. On page 90, [ (]page 1993) he also pointed out that there was only presumptive tests for blood made by Laura Russo [on Geralds' sneakers]. He questioned the lack of presence of blood in the car. On page 92 he argued the stain in the back seat could mean more than one individual was involved and the one who was bloody got in the back seat (page 1995). He also questioned the failure to show that a contact lens found on the victim actually belonged to the victim. He again pointed out that a prescription check could reveal if the lens could have belonged to another person who lost it in the struggle. On page 95 he pointed out the lack of testimony about the defendant's clothes being bloody and the lack of scratches on his face. He argued the importance of this when compared to the fingernail torn off on the victim's hand. On pages 97–98, trial counsel commented on the fact that the Thomas ties were not uncommon and that one of the ties in Geralds' trunk was not a Thomas tie. On page 99, he argued about the failure to pursue other suspects and how that was a lack of evidence (page 2002). He further argued the lack of blood on the Nike shoes and the fact that

the tread designs were not uncommon. He argued that the pawning of the necklace and the giving of your identification without any attempt to disguise yourself was inconsistent with a guilty conscious [*sic*]. He also pointed out that Bill Danford did not see any scratches, bruises or hurt knuckles (page 2007). He pointed out to the jurors the various samples taken from Geralds and why none were found at the scene. He questioned the lack of evidence as to anything under the fingernails of the victim and the fibers on a corner of the residence in the interior. He pointed out to the jury that the defense requested DNA testing on the necklace and why didn't the State do it itself. On rebuttal, trial counsel again argued the lack of evidence. He argued where were certain witnesses and this was really a case of coincidence. All of these arguments by trial counsel refute the claims of the defendant that his trial counsel was not prepared and was deficient in his performance.

Geralds does not deny that trial counsel argued these points during closing argument. Instead, he argues that trial counsel should have presented evidence of this lack of evidence instead of merely arguing in closing that there was no evidence.

Even though closing argument is not evidence, it is a powerful tool. Through his closing argument, trial counsel was able to highlight the lack of evidence and characterize the State's case as a failure to properly investigate and present the entire picture. For example, when highlighting the lack of evidence regarding to whom the torn fingernail belonged, trial counsel argued, "Either they [(the State)] didn't check or it didn't match up with Mark Geralds. And they want you to guess a man into a guilty verdict in a case this terrible." Lynn Henson, a microanalyst for FDLE, analyzed the fingernail and concluded that it belonged to the victim. Geralds makes no argument that trial counsel was not aware of this report. Had counsel presented Henson's analysis, he could not have argued that the State failed to present evidence that it had fully investigated and tested the evidence, such as the fingernail. Other than stating what trial counsel should have done differently, Geralds does not establish why trial counsel's strategy was deficient. When held up against

the strong presumption that trial counsel's performance was not ineffective, Geralds has failed to carry his burden. *See Strickland*, 466 U.S. at 690, 104 S. Ct. 2052.

Furthermore, even if trial counsel's performance was deficient for not presenting this evidence, Geralds fails to establish how he was prejudiced. Trial counsel referenced the lack of evidence in closing argument and the jury was aware of it. Accordingly, the failure to actually present evidence of non-evidence in this case could not have affected the fairness and reliability of the proceeding so that confidence in the outcome is undermined.

*Geralds III*, 111 So. 3d at 794-95 (footnote omitted).

Geralds primary argument in this claim is that his counsel did not present any evidence in defense, but rather chose to make a closing argument which was particularly damaging since the case against him was circumstantial. Geralds contends that because the jury was specifically instructed that the attorneys' closing arguments were not evidence and should not be considered as such, the jury did not hear the "irrefutable physical evidence indicating that someone other than Mr. Geralds entered the victim's home, struggled with her, beat and killed her, rummaged her home for jewelry and valuables, and then stole her automobile." ECF No. 1, p. 104. With the benefit of time and hindsight, Geralds has identified a number of pieces of evidence that he believes his counsel should have highlighted in defending the case.[17]

---

[17] This evidence includes several hairs found in the victim's hand and collected around her body which did not match her hair or Geralds'; a handkerchief found at the scene containing blood which did not match the victim or Geralds; several unidentified finger and palm prints found at the scene (including

A review of the guilt phase record supports the state court's determination that Geralds' counsel challenged the lack of evidence incriminating Geralds in his guilt phase closing argument. The following are a few examples which illustrate counsel's arguments:

> "[Laura Rousseau] used that luminous stuff and some other chemicals and she made a chart with tracks and all that. But when she was recalled she was asked, what do you mean by a presumptive test. It sounds very definitive, doesn't it. Well, presume it's blood. That stuff showed up, it must be blood. What was her answer the second time she testified. A presumptive test that I use. Both of them are a pre test. A pre test for what could be blood. Her precise words when asked what that presumptive test meant. A pre test for what might be blood. But if she hadn't been recalled, wouldn't you have been left with the impression without any doubt, without any reasonable doubt that she saw blood in those tracks, in all those things?" (TR Vol. XIV at 1993).
>
> ***
>
> "The back of the car that was located over by the school. Did you find anything in it, particularly did you see anything you thought might be blood and she, I believe [Jan Johnson] had to look at her notes. Yes. She did see something that might have been blood in the back seat of the car. And the samples taken of it for future laboratory procedures. I want to ask you, did you hear any results of that stain in the back of that car? What did they do with it. Certainly Ms. Zeigler didn't tell us, the serology expert. Aren't you entitled to know. Isn't that a lack of evidence? . . . .

---

on the victim's jewelry box) which did not match the victim, her family or Geralds; and a crime scene photograph of a second shoe print dissimilar from the tread on Geralds' shoes. Geralds also contends that his counsel should have made various arguments about the blood evidence in the case, *e.g.*, there were signs of a struggle at the scene but no blood or bloody shoe prints found in the victim's stolen car; there was no blood on Geralds' clothes or on his person when he got to his grandfather's home; and Ziegler's report rebutted Rousseau's testimony about the presumptive blood found on Geralds' Nike shoe. Finally, Geralds alleges that his counsel failed to develop evidence that illustrated the Nike shoes' common tread design and size and that the victim's nail scrapings did not match Geralds.

Was it blood, yes or no. If it was, did we type it, did we check it, things of that nature." (*Id*. at 1994-95).

***

"Interesting thing which we didn't hear at all from Mr. Freeman who was probably the first witness you did hear, who saw Mark Allen Geralds that day, did you hear anything about his clothes being bloody? No. Did you hear anything about he had scratches on his face? No. Was there any testimony indicating that Mark had been involved in a struggle or a fight? No, nothing. Nothing unusual about Mark being there to take a shower." (*Id*. at 1997-98).

***

"Laura Russo [*sic*] was called. And talked about. I only see one . . . well, here's another one. The Nikes. Oh, yeah, there was blood on them, I identified a little area that might be blood. What did you do with them? Sent them to the lab. Did you hear Ms. Zeigler say, yes, there is blood on those shoes? No. Did you hear Ms. Zeigler say I checked those shoes in Jacksonville laboratory? No. You didn't hear any testimony about that.

Or did Ms. Zeigler test those shoes and find no blood? You're left in the realm of guessing. And even Ms. Russo at that time told us about that presumptive test which was really a pre test which could show blood and it couldn't even tell whether it was human or fish blood because she was asked that by me. The answer was she couldn't even tell the difference on that pre test." (*Id*. at 2003-04).

***

"But [Kenneth Hoag] did say that there were no individual characteristics on those shoes that he could tie to that print. His words were no individual characteristics. So, the only thing we know is that Nike, Lord knows how many thousand of them has the same tread design as they saw in the kitchen floor or den. Nothing more." (*Id*. at 2004-05).

***

"No witness said positively that was Tressa's gold chain. None." (*Id*. at 1984).

***

"But no positive identification of the sunglasses or the gold chain." (*Id*. at 1984).

While Geralds argues that all of the evidence he highlights in his petition demonstrates that the victim was killed by another person or persons, on direct appeal the Florida Supreme Court held that "[a]fter a thorough review of the record, we are satisfied that the evidence in this case was sufficient to sustain the jury verdict." *Geralds I*, 601 So. 2d at 1159. In denying the ineffective assistance claim, the state court found that defense counsel's strategy was to highlight all of the missing pieces of evidence in order to create reasonable double. The record demonstrates that defense counsel consistently highlighted the deficiencies in the state's evidence in his cross-examination of witnesses and in his opening and closing arguments, arguing that the insufficiency of the evidence should give rise to reasonable doubt.

Because there are no absolute rules dictating what reasonable performance is, counsel cannot be considered ineffective for performing in a particular way in a case, as long as the approach taken "might be considered sound trial strategy." *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (citation omitted). A strong presumption of competence must be applied to counsel's performance, and the question is not what the best lawyer would have done, but whether counsel's performance were acts that some reasonable lawyer might do. The Eleventh Circuit has explained:

> To uphold a lawyer's strategy, we need not attempt to divine the lawyer's mental processes underlying the strategy. "There are countless ways to

> provide effective assistance in any given case." *Strickland*, 104 S. Ct. at
> 2065. No lawyer can be expected to have considered all of the ways. If a
> defense lawyer pursued course A, it is immaterial that some other
> reasonable courses of defense (that the lawyer did not think of at all)
> existed and that the lawyer's pursuit of course A was not a deliberate
> choice between course A, course B, and so on. The lawyer's strategy was
> course A. And, our inquiry is limited to whether this strategy, that is,
> course A, might have been a reasonable one.

*Chandler*, 218 F.3d 1305, 1315 n.16. The Eleventh Circuit has also defined strategy

as "trial counsel's course of conduct, that was neither directly prohibited by law nor

directly required by law, for obtaining a favorable result for his client." *Id*. at 1314,

n.14. Geralds bears the burden of persuasion on the issue of his counsel's competence.

Because Geralds' counsel died prior to the postconviction evidentiary hearing

held in this case, no court has had the benefit of his testimony explaining his defense

strategy or any other matters he took into consideration in defending the case.

However, "an ambiguous or silent record is not sufficient to disprove the strong and

continuing presumption of counsel's competency. Therefore, where the record is

incomplete or unclear about counsel's actions, we will presume that he did what he

should have done, and that he exercised reasonable professional judgment." *Williams*

*v. Allen*, 598 F.3d 778, 794 (11th Cir. 2010) (quotation marks and brackets omitted);

*Putman v. Head*, 268 F.3d 1223, 1243 (11th Cir. 2001) ("If the record is incomplete

or unclear about counsel's actions, then it is presumed that counsel exercised

reasonable professional judgment."). *See also Holland v. Fla, Dep't of Corr.*, 631 F. App'x 726, 729 (11th Cir. 2015) (affirming denial of ineffective assistance claim where defense decided not to present a defense case and stating, "[m]oreover, defense counsel was able in his rebuttal closing argument to the jury to explain to the jury why he had not presented evidence, noting the law that there was no burden on the defense to present evidence and that the state had the burden to prove guilt beyond a reasonable doubt. Thus, the defense was able to suggest to the jury that there was additional evidence of Holland's innocence, in addition to the evidence already adduced before the jury in cross-examination of the government witnesses."). Given these standards and the high threshold necessary to establish ineffective assistance of counsel, Geralds has not met his burden of persuasion that his counsel's performance was a course that no other counsel would have pursued in these circumstances. After a thorough review of the guilt phase trial in this case, this Court concludes that the state court's determination that defense counsel challenged the lack of evidence is supported by the record. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

B. Failure to Cross–Examine Witnesses

In his petition Geralds raises several ways in which his counsel should have impeached the Pettibone children. ECF No. 1, pp. 104-07.

The Florida Supreme Court denied this claim, holding as follows:

Geralds argues that trial counsel should have cross-examined Blyth [*sic*] and Bart Pettibone, the victim's children, to show that their testimony evolved over a period of time. Specifically, Geralds argues that trial counsel should have cross-examined Blyth and Bart on the fact that they did not tell the police that they encountered Geralds until after Geralds was arrested. Blyth was in the ninth grade when she testified. Bart was nine years old when he testified. Through Blyth and Bart, the jury heard evidence that one week prior to the murder, Blyth, Bart, and the victim encountered Geralds in a shopping mall and Geralds learned that the victim's husband was out of town. Blyth was cross-examined while Bart was not. Trial counsel questioned Blyth regarding Judy Lundmark, the victim's housekeeper, who reportedly had a key to the home. Counsel also questioned Blyth regarding the fact that she and at least three other family members went through the victim's possessions after the murder. Counsel was also able to obtain a concession from Blyth that she could not conclusively identify the herringbone necklace. The circuit court held that trial counsel's performance on this point was not deficient. We agree.

First, Geralds does not identify any reason why the children should have told police that they encountered Geralds in the mall until after he was arrested. Second, trial counsel could have been exercising restraint in cross-examining these witnesses because they are children. Trial counsel could have reasonably believed that the jury would penalize Geralds for allowing trial counsel to strenuously cross-examine the victim's children. In *Brown v. State*, 846 So. 2d 1114 (Fla. 2003), we rejected an argument that trial counsel should have cross-examined a witness on certain issues, or more strenuously examined him on certain issues, because such an argument "is essentially a hindsight analysis." *Id*. at 1121. "The standard is not how present counsel would have proceeded, in hindsight, but rather whether there was both a deficient performance and a reasonable probability of a different result." *Id*. (quoting *Cherry v. State*, 659 So. 2d

1069, 1073 (Fla. 1995)). Similarly, we hold that Geralds' argument is essentially a hindsight analysis and that trial counsel's performance was not deficient in this regard.

Nevertheless, even if trial counsel was deficient for not cross-examining these children any further, Geralds fails to establish how he was prejudiced. Geralds does not make the connection as to how cross-examining these witnesses any further on the point he raises would undermine confidence in the outcome. Accordingly, Geralds fails to establish that he was prejudiced.

*Geralds III*, 111 So. 3d at 795-96.

Geralds argues that defense counsel should have pointed out various inconsistencies in the children's testimony, including that neither told investigators that they had encountered Geralds at the mall prior to his arrest. As noted by the state court, Geralds does not point to any reason why the children would have remembered this incident prior to the arrest. Bart Pettibone testified that he knew Geralds from doing carpentry work at his home. (*See* TR Vol. XI at 1458-75). He testified that he saw Geralds at the mall prior to his mother's murder speaking with her. Bart then encountered Geralds a short time later that same day in an arcade at the mall, and the following occurred:

> Q. [Grammer]: Okay. Did you talk to Mark Geralds while you were in the arcade?
>
> A. [Bart]: Yes.
>
> Q. And what did you talk about?
>
> A. He walked up to me and he started talking to me.

Q. Okay. What did he say?

A. He asked me, he asked me when my dad would be back.

Q. Okay, where was your dad?

A. He was out of town someplace.

Q. Working?

A. Yes. I think it was North Carolina, I'm not positive.

Q. Okay. And so what did you tell Mark Geralds when he asked you when your daddy would be back?

A. I said I don't know.

Q. Okay. And did he ask you anything else or did he talk about anything else?

A. Yes

Q. What did he say?

A. He asked me what time I went to school.

Q. What time did you tell him, Mark Geralds, that you went to school?

A. I told him I left at 8:00 and I told him my sister left at 6:00-7:00.

Q. Okay. You left at 8:00 and Blythe left at 7:00?

A. Um hum.

Q. Okay. Did you talk to him about anything else?

A. And that's all, besides he asked me what time I got home.

Q. What time did you tell Mark Geralds you got home?

A. 3:00 and Blythe got home about 2:45.

(*Id*. at 1468-69). Bart then described coming home from school on the day of the murder, finding his mother in the kitchen and calling for help. Defense counsel did not cross-examine Bart. Given Bart's young age and the fact that he found his mother's

body, defense counsel may have felt that subjecting this witness to cross-examination may have been more detrimental to the defense than beneficial. In addition, Blythe corroborated Bart's testimony about their mother speaking with Geralds shortly before her murder. She testified that exactly one week prior to the murder she heard a conversation between Geralds and her mother, in the following exchange:

> Q. [Appleman]: And did you hear any conversation that went on between your mother or your brother and the defendant?
>
> A. [Blythe]: Yes, sir, my mother and him. I heard them talking.
>
> Q. And was there any questions asked about your father and his work?
>
> A. Yes, sir, he asked how his work was doing, my mother told him fine. And that he was doing a job out of town right at that point.

(*Id.* at 1486).

Geralds also argues that his counsel failed to adequately challenge Blythe's identification of missing jewelry and sunglasses from the crime scene. As to Blythe's identification of these items, the record demonstrates that defense counsel cross-examined her as follows:

> Q. [Adams]: And you've identified them as best you can.
>
> A. [Blythe]: Yes, sir.
>
> Q. But, Young Lady, you're not telling these folks positively or unequivocally that those items are your mother's, are you.
>
> A. No, sir, some of them I am positive about.
>
> Q. Which one is that?

A. I am positive about the gold earrings, I'm positive about the sunglasses, I'm as close to positive as I can be about the herringbone necklace.

Q. Do you recall talking to me before and I'll ask you substantially the same questions. Was there anything about your mother's herringbone necklace that enabled you to identify it such as a particular make or carat of gold or a bend or a kink in it or anything in particular you can say that was Mom's herringbone necklace?

A. Not really, it's a very popular necklace. Lot of people have them.

Q. I understand. But certainly it looks exactly like the one your mother had.

A. Yes, sir.

(TR Vol. XI at 1514-15). With regard to the Bucci sunglasses, Adams cross-examined Blythe who indicated that she had seen Bucci sunglasses which were similar to her mother's worn by other people, although "not very many people have them because they're expensive. Lot of people won't pay that much for them." (*Id*. at 1516). Additionally, the record indicates that during Blythe's direct testimony when she was identifying items of jewelry that belonged to her mother, she began weeping, and the court took a recess. (*Id*. at 1499). Given that Blythe was fifteen years old and the record reflects that she was emotional in her direct testimony, the fact that defense counsel did not vigorously cross-examine her is not an unreasonable tactic. Most importantly, however, counsel was able to make the point to the jury that while Blythe believed that these recovered items were probably her mother's, she could not provide

any definitive proof that they were. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

C. Failure to Investigate and Present Witnesses

Geralds argues that the herringbone necklace he pawned on the day of the murder was not the victim's but was one he had purchased previously from his friend Tony Swoboda, and he argues that the evidence that he pawned the necklace "is suspect at best" because of discrepancies in when the pawn ticket was discovered. Additionally, Geralds argues that because he had no driver's license when the necklace was pawned, he could not have shown it to the pawnshop owner.[18] ECF No. 1, pp. 108-09.

The Florida Supreme Court denied this claim, holding as follows:

> With respect to Swoboda, Geralds has not shown that counsel acted deficiently in failing to present his testimony. At the evidentiary hearing, Swoboda testified that he sold Geralds a herringbone necklace. Geralds argues that this evidence would establish that the necklace he pawned is not the one that belonged to the victim. However, even if Swoboda had testified at trial that he sold Geralds a herringbone necklace, Geralds fails to explain how the victim's blood type appeared on the necklace that he pawned. Thus, Swoboda's testimony would not have helped Geralds.

---

[18] The pawnbroker Billy Danford testified that Geralds presented his driver's license when he pawned the necklace. (*See* TR Vol. XIII at 1753-54).

Case No.: 5:13cv167/MW

Nevertheless, even if trial counsel was deficient for not presenting Swoboda's testimony, Geralds fails to establish prejudice. Swoboda's testimony does nothing to discredit the fact that Geralds pawned a necklace that was identified as belonging to the victim and had a blood stain matching the victim's blood type. At best, Swoboda's testimony only establishes that Geralds purchased an unrelated herringbone necklace at a time unrelated to the murder. Accordingly, Geralds fails to establish that this evidence would undermine confidence in the outcome of the trial.

*Geralds III*, 111 So. 3d at 797.

While Geralds contends that his counsel failed to properly investigate the case, the record reflects that on January 15, 1990, counsel filed a list of witnesses who might be called on behalf of the defense. Tony Swoboda was listed as a potential witness; thus, counsel was aware that Swoboda had information which was potentially relevant to the defense. (*See* PCR Vol. XX at 2322). Swoboda's evidentiary hearing testimony also confirmed that he met with defense counsel about the necklace he sold Geralds and that counsel told him that what he had to say was important and that he would probably be subpoenaed. (*See* EH at 2544-49). While the reason counsel ultimately failed to call Swoboda is not known, this Court will not second guess counsel's strategic reason for not calling any witnesses in the face of a silent record under the circumstances of this case. *See Putman v. Head*, 268 F.3d at 1243 ("If the record is incomplete or unclear about counsel's actions, then it is presumed that counsel

exercised reasonable professional judgment."). Further, as to *Strickland* prejudice, there is no evidence that Swoboda would or could have testified that the pawned necklace was the same one he sold Geralds. Finally, Geralds has failed to make a credible argument that he is not the one who pawned the necklace or explained the presence of the blood on the necklace which was consistent with the victim's blood type. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

D. Failure to Make Objections and Proper Motions

Geralds argues that his counsel failed to object to statements made by the prosecutor which allegedly misrepresented the evidence and attempted to inflame the jury.[19] ECF No. 1, pp. 109-10.

---

[19]  These statements include telling the jury in his opening statement that the victim was found with a towel gagging her mouth and that Geralds wore gloves in order to conceal his fingerprints during the crime when in fact his grandfather, Douglas Freeman, testified that the gloves he saw Geralds wearing the day of the crime did not have any material over the upper portion of his fingertips. Geralds also points to the following argument made by the prosecutor in his guilt phase closing:

> You know who the dummy is in this group? Right there. Right there is the dummy. Because he took that necklace thinking that he could go far across Hathaway Bridge and not get caught pawning it because he needed thirty bucks. He needed some money. And that's why he went into that house. And that's why he tied her up. And that's why he beat her. He beat her to get her to tell him where's the seven thousand dollars. **And she would scream every time he left that gag off her mouth.** And he hit her again. Ten times. **And the only way he could stop her from screaming was to stick that knife in her neck to the hilt, to the point where it cut off her windpipe and she couldn't scream no more**.

The postconviction court summarily denied the claim that defense counsel was deficient in failing to object to improper prosecutorial comments. The Florida Supreme Court affirmed, holding, "[a] review of Geralds' allegations reveals that Geralds has not met his burden of alleging a legally sufficient claim. *See Freeman* [*v. State*], 761 So. 2d [1055] at 1061 [Fla. 2000]. Specifically, Geralds fails to establish how any of these alleged instances of ineffective assistance of counsel prejudiced him." *Geralds III*, 111 So. 3d at 800.

In order to demonstrate deficient performance, Geralds must show that the prosecutor's remarks were prejudicial. In *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), the Court explained that the relevant question is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." (citations and internal quotation marks omitted). It "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id*. at 181 (citation omitted). *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging

_____

(TR Vol. IV at 2055) (emphasis added in petition).

Case No.: 5:13cv167/MW

interpretations."); *United States v. Young*, 470 U.S. 1 (1985) (holding that inappropriate prosecutorial comments, standing alone, would not justify a reviewing court in reversing a criminal conviction obtained in an otherwise fair proceeding; instead, remarks must be examined within the context of trial to determine whether the prosecutor's behavior amounted to prejudicial error). In determining whether arguments are sufficiently egregious to result in the denial of due process, the Eleventh Circuit has considered the statements in the context of the entire proceeding, including factors such as: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors. *Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009) (citing *Romine v. Head*, 253 F.3d 1349, 1369–70 (11th Cir. 2001)). "Of primary importance is the need to examine the entire context of the judicial proceeding. Thus, it is not our duty to ask whether a particular remark was unfair; we are concerned with whether it rendered the entire trial unfair. In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity." *Brooks v. Kemp*, 762 F.2d 1383, 1403 (11th Cir. 1985) (en banc), *vacated on other grounds by* 478 U.S. 1016 (1986), *reinstated by* 809 F.2d 700 (11th Cir. 1987) (en banc). "[P]rosecutorial arguments will not warrant habeas corpus relief

unless they . . . have encouraged the jury to take into account matters that are not legitimate sentencing considerations." *Johnson v. Wainwright*, 778 F.2d 623, 630 (11th Cir. 1985). Finally, to date the Supreme Court has not granted habeas relief based on a prosecutor's closing argument being so unfair as to violate due process. *See Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012).

In this case, the prosecutor's remarks highlighted by Geralds fall far short of a deprivation of due process. *Compare Darden*, 477 U.S. 168 (prosecutor's closing argument stating that death sentence would be the only way to prevent a future similar act and referring to defendant as an "animal" did not improperly mislead the jurors into thinking that they had a reduced role in the sentencing process); *Cargill v. Turpin*, 120 F.3d 1366, 1381 (11th Cir. 1997) (holding that a prosecutor's argument at sentencing about "a bunch of little boys" at Christmas thinking about their dead parents was permissible because "the prosecutor was attempting to convey the gravity of the crime and its consequences—the murder of the [boys' parents] left four young boys without parents—to convince the jury that life imprisonment, *i.e.*, allowing [the defendant] to continue to live, would be too lenient a sentence."); *Brooks*, 762 F.2d at 1396, 1416 (denying habeas relief where the prosecutor asked the jurors, "Whose daughter will it be next time?"). Additionally, when viewed in the context of the entire

closing argument and trial, these isolated remarks do not undermine confidence in the outcome nor did they mislead the jury in its sentencing role.

Because Geralds has not demonstrated that the prosecutor's comments were improper, he cannot satisfy *Strickland* regarding his counsel's failure to object to the comments. *See Chandler v. Moore*, 240 F.3d 907, 914 (11th Cir. 2001) (holding that because the prosecutor's comments did not rise to fundamental error, counsel could not be deemed ineffective for failing to object). The record does not support Geralds' argument that his trial counsel's failure to object to these comments constitutes an error no competent counsel would have made or that there is a reasonable probability that "but for" counsel's failure to object, the result of the trial would have been different. *See also Zakrzewski v. McDonough*, 455 F.3d 1254, 1259–60 (11th Cir. 2006) *(per curiam)* (denying an ineffective assistance claim stating "[a]n objectively reasonable trial lawyer could" believe that "cases must be won at trial, not on appeal, and prefer [ ] not to make objections during closing argument unless the objection is a strong one.").

Geralds also argues that the prosecutor misstated the evidence regarding the gloves he wore on the day of the crime. The Florida Supreme Court denied this claim, holding as follows:

Geralds argues that trial counsel failed to object to the State's closing argument that Geralds wore gloves to conceal his fingerprints.FN18 Geralds further argues that the gloves he wore did not have any material over the upper portion of his fingertips, which would prevent him from leaving prints.

> FN18. At trial, Douglas Freeman, Geralds' grandfather, testified that Geralds was wearing gloves that had the backs and tops of the fingers cut out. At closing argument, the State argued that Geralds wore gloves, "[t]he kind that don't leave fingerprints in houses."

We deny relief because Geralds does not establish how the prosecutor's comment undermines confidence in the outcome of the trial. Indeed, Geralds does not make any arguments on how this comment undermines the evidence linking him to the crime. Accordingly, Geralds fails to establish that this evidence undermines confidence in the outcome of the trial.

*Geralds III*, 111 So. 3d at 797.

Douglas Freeman testified that on the day of the murder Geralds came by his house and wanted to take a bath because he had been working on a boat. (TR Vol. XII at 1673). When asked whether Geralds was wearing gloves, Freeman stated, "I couldn't say I noticed he was wearing anything on his hands. They talked about some gloves, but I weren't paying too much attention to them. I don't know whether he had them on his hands or what." (*Id.*). Because this testimony conflicted with a pretrial statement, the prosecutor refreshed Freeman's memory by showing him his statement. After which the following exchange occurred:

Q. [Appleman]: Does that assist you, sir?

A. [Freeman]: Well, I don't know whether he had them on or not.

Q. Did he have gloves?

A. Yes.

Q. Can you describe the gloves?

A. Well, they had the back cut out and the top of the fingers.

Q. Okay. Driving gloves?

A. Driving gloves or something. Race car gloves or something like that.

(*Id*. at 1675). The state court found that this testimony did not establish prejudice under *Strickland* nor undermine the evidence linking Geralds to the crime. Geralds fails to make any arguments in support of this claim in his federal petition. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

E. Cumulative Consideration

Geralds argues that this Court should evaluate his *Strickland* claims and his *Brady* claims cumulatively. ECF No. 1, pp. 110-11. There is no Supreme Court law requiring such an analysis. *See Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority) ("The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim."). Therefore,

this Court will decline to do such an analysis, only noting that because Geralds has

failed to raise any meritorious *Strickland* or *Brady* claims, there are no errors to

consider cumulatively.

Accordingly, Geralds is not entitled to habeas relief on this ground.

F. Denial of a Full and Fair Hearing

Finally, Geralds argues that he was unable to develop certain allegations of

ineffective assistance of counsel in an evidentiary hearing in state court because the

relevant information was contained in documents that were not obtained until after his

postconviction motion was filed. ECF No. 1, pp. 111-18. These supplemental motions

were discussed in detail in Ground One, section C, *supra*. The Florida Supreme Court

denied the claim as follows:

> With respect to the ineffective assistance of counsel aspect of this claim,
> Geralds also fails to allege that trial counsel knew of, or failed to act on,
> any information regarding other suspects. Accordingly, the circuit court
> did not err in summarily denying these claims because Geralds'
> conclusory allegations failed to establish a legally sufficient *Brady* or
> ineffective assistance of counsel claim.

*Geralds III*, 111 So. 3d at 800.

Geralds has not demonstrated that the information regarding other suspects and

the police investigation was available to counsel. Therefore, Geralds has failed to

demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground III:  Ineffective Assistance of Counsel/Resentencing Trial

A. Failure to Know the Law

Geralds argues that his counsel was ineffective when he argued lingering doubt as a mitigating circumstance during his resentencing trial because it is not recognized as a valid mitigating circumstance in Florida.[20] ECF No. 1, pp. 121-23. Geralds contends that his counsel failed to know the law; thus, any strategic reason he had for arguing lingering doubt was unreasonable.

1.     State Court Determination

Geralds raised this claim in his postconviction proceedings, and the postconviction court denied the claim, holding as follows:

> In his closing argument in the second penalty phase trial, defendant's counsel presented three alternatives for the jurors to consider: first, Mr. Geralds killed the lady; second, Mr. Geralds participated in the burglary and what could have happened that resulted in the death of the lady; and third, Mr. Geralds wasn't there. Defense counsel commented on there being circumstantial evidence including the shoes having only a similar tread design. Defense counsel also pointed out the fact that Dr. Sybers did not testify and that this deprived the jurors of the opportunity to observe him and judge his credibility. He continued to question if someone else killed the lady and why no further investigation was done. He also questioned whose blood it really was that was on certain objects.

---

[20] *See Darling v. State*, 808 So. 2d 145, 162 (Fla. 2002) ("We have repeatedly observed that residual doubt is not an appropriate mitigating circumstance.").

All of this goes to establish defense counsel was following a trial strategy both in the guilt phase and the re-sentencing phase that focused on the circumstantial nature of the evidence in this case and the lack of definite evidence to link the defendant to the crime. Defense counsel did take the opportunity to argue there was an unknown assailant who was responsible for this crime as evidenced by his comments on the blood and the testimony of Archinque McGowen and William Pelton. The record reflects there was no witness who testified the red Bucci glasses were "positively" those of the victim. At a hearing held on January 12, 1990, trial counsel acknowledged the testimony of relatives about the herringbone necklace as being the victim's because it looked like hers. The defendant has therefore failed to establish trial counsel's performance was deficient . . . .

(Final Order Denying Postconviction Relief, PCR Vol. X at 1743-44) (citations to the record omitted). While the Florida Supreme Court did not address this claim specifically, it noted the following in denying relief as to Geralds' guilt phase ineffective assistance of counsel claims:

"The purpose of closing argument is to help the jury understand the issues in a case by 'applying the evidence to the law applicable to the case.'" *Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1028 (Fla. 2000) (quoting *Hill v. State*, 515 So. 2d 176, 178 (Fla. 1987)). As the Second District Court of Appeal noted:

Although it is axiomatic that the arguments of counsel are not evidence, it would be naive to suppose that they do not have a profound effect upon the jury. These summarizing remarks often tie together for the jurors previously unconnected or seemingly irrelevant testimony, and highlight those phases of the evidence considered most favorable by each of the opposing parties. In short, the closing argument is a crucial phase of a lawsuit. . . .

*Collins Fruit Co. v. Giglio*, 184 So. 2d 447, 449 (Fla. 2d DCA 1966).

*Geralds III*, 111 So. 3d at 795 n.3.

2.      Clearly Established Supreme Court Law

The law governing claims of ineffective assistance of counsel is set forth *supra*.

3.      Federal Review of Claim

While he argues that his counsel should not have argued lingering doubt, Geralds testified in the resentencing that he did not kill Mrs. Pettibone and that he never pawned a gold necklace. (Resentencing, Vol. V at 717, 726).[21] He also testified that William Pelton and Archie McGowen made threats to his ex-wife allegedly telling her that she and their child would be put in danger if Geralds "said anything" to the police, thereby implying that they or someone else was involved in the crime. These threats were allegedly made just prior to the resentencing trial in September 1992. (*See id.* at 719-20). While lingering doubt may not be a valid mitigating circumstance

---

[21] In sentencing Geralds to death, the trial court addressed this portion of Geralds' testimony as follows:

> The defendant claims that he did not kill the victim. In light of the evidence in the case including the fact that the shoe prints of only one adult was found in the victim's home and these matched those found in the defendant's hotel room, the Court finds this circumstance not to exist. The defendant has not offered any testimony or evidence to establish he was only an accomplice and his participation was minor. The only evidence offered is his testimony that he didn't do it. In view of the other evidence in this case, the Court does not believe his testimony.

(Resentencing, Vol. VII at 915).

Case No.: 5:13cv167/MW

in Florida, placing doubt as to Geralds' guilt and the circumstantial nature of the crime before the resentencing jury was not an impermissible or unreasonable strategy, particularly given the relatively weak mitigation evidence in this case. The Florida Supreme Court, in rejecting an ineffective assistance claim for relying on residual doubt mitigation despite Florida law refusing to recognize lingering doubt mitigation, stated "[i]t is certainly logical that a jury of laypersons is less likely to recommend death if they have some lingering concerns about guilt than if there is absolute certainty on the issue of guilt." *Hannon v. State*, 941 So. 2d 1109, 1129-30 (Fla. 2006). *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) ("[J]urors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts . . . about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases.") (quoting *Grigsby v. Mabry*, 758 F. 2d 226, 247–48 (8th Cir. 1985) (Gibson, J., dissenting)); *Parker v. Sec'y, Fla. Dep't of Corr.*, 331 F.3d at 787–88 ("Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the most effective strategy to employ at sentencing.") (internal quotation marks omitted); *Chandler v. United States*, 218 F. 3d 1305, 1320 (11th Cir. 2000) ("We have said before that focusing on acquittal at trial and then on residual doubt at

sentencing (instead of other forms of mitigation) can be reasonable. . . . Especially when-as in this case-the evidence of guilt was not overwhelming, we expect that petitioners can rarely (if ever) prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client.") (citation omitted)); *See Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir. 1999) (citing law review study concluding that "the best thing a capital defendant can do to improve his chances of receiving a life sentence . . . is to raise doubt about his guilt"). Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

B. Failure to Conduct a Reasonable Investigation

Geralds alleges that because his counsel focused on lingering doubt, he provided scant mitigation evidence to the jury. ECF No. 1, pp. 123-35. While his counsel presented the testimony of a mental health professional, Geralds contends that his evaluation was incomplete and inadequate. Had counsel's investigation been adequate, Geralds believes that he would have been able to establish a diagnosis of bipolar disorder, as well as evidence that he suffered from attention deficit hyperactivity disorder (ADHD) and depression as a child.[22]

---

[22] To the extent that Geralds makes a claim under *Ake v. Oklahoma*, 470 U.S. 68 (1985), that he was entitled to, but did not receive, competent and appropriate expert psychiatric assistance, *see* ECF No.

1.      State Court Determination

Geralds raised this claim in his postconviction proceedings and the claim was

denied. The Florida Supreme Court affirmed the denial as follows:

> Geralds argues that trial counsel was ineffective for failing to investigate
> and present sufficient mitigating evidence at Geralds' resentencing. At
> the postconviction hearing, Geralds presented the testimony of James E.
> Beller, the psychotherapist who testified on Geralds' behalf during
> resentencing. Geralds argued that Beller's testimony at the
> postconviction hearing establishes that Beller's diagnosis was not
> supported by sufficient evidence and that additional investigation
> revealed that Geralds suffered from attention deficit hyperactivity
> disorder (ADHD) and depression as a child. Geralds further argues that
> trial counsel failed to develop or present evidence regarding Geralds'
> childhood difficulties and early mental health problems, his family
> dysfunction, and his life of isolation. The State argues, and the circuit
> court agreed, that Beller's testimony did not change at the evidentiary
> hearing. The postconviction court further noted that trial counsel
> conducted an investigation and presented mitigating evidence at the
> second penalty phase. We agree and hold that trial counsel's performance
> at Geralds' resentencing does not constitute ineffective assistance of
> counsel.
>
> Beller's testimony at Geralds' resentencing was not significantly different
> from the testimony he gave at the evidentiary hearing. At resentencing,
> Beller testified that he diagnosed Geralds as "an anti-social personality
> disorder and bi-polar disorder manic." Beller testified that he came to this
> conclusion after administering five different tests and conducting an
> interview. He saw Geralds once for testing and once for a two-hour
> therapy session. Beller further testified that Geralds was depressed due
> to family issues and suffered from anxiety. As a child, Geralds became
> significantly depressed and lonely. On cross-examination, Beller testified

1, p. 129, the record reflects that he did not raise an *Ake* claim in state court. Thus, any such claim raised
for the first time here is procedurally defaulted. *See* 28 U.S.C. § 2254(b) (1).

that he did not talk to any of the investigating officers or to Geralds' family or friends in preparing for his testimony.

At the evidentiary hearing, Beller testified that he did not change his opinion on whether Geralds was bipolar or antisocial. Furthermore, Beller testified that he felt that he was prepared to testify when he testified during Geralds' resentencing. Beller also admitted that the testing conducted for the evidentiary hearing came out identical to the testing conducted for the resentencing.

There were two differences between Beller's evidentiary and resentencing testimony. First, Beller interviewed two family members and one friend, and these contacts led Beller to believe that Geralds would have been diagnosed as ADHD when he was a child. Second, Beller administered the Psychopathy Check List Revised test (PCLR).

With respect to the two family members and one friend, Geralds does not present any evidence that he told his trial counsel about these contacts or that trial counsel should have been aware of them. In fact, these contacts are not even identified by name in the record—they are only referred to as "two family members and one friend." Accordingly, Geralds fails to establish that trial counsel's performance was deficient for failing to discover these unidentified contacts. Geralds also fails to establish prejudice on this issue. Beller admitted that Geralds told Beller about his background information and family history for the resentencing. Indeed, Beller admitted that the information Geralds gave was "remarkably similar" to the information learned from these two family members and one friend.

With respect to the PCLR test, Beller admitted that this test was not available at the time of Geralds' resentencing because it had not been developed yet. Accordingly, even assuming that psychological tests are something that trial counsel should investigate, trial counsel cannot be deficient for failing to investigate a test that did not exist.

Accordingly, Geralds fails to establish how trial counsel was ineffective during the penalty phase.FN19

> FN19. We also note that the resentencing trial court entered an order to hire an investigator on October 5, 1992. On

November 18, 1992, trial counsel filed a motion for continuance, arguing, in part, that the investigator "has been conducting background investigation" and that additional time was necessary to prepare for resentencing. Geralds does not establish how or why the postconviction trial court should have found that this investigation was inadequate.

*Geralds III*, 111 So. 3d at 797-99.

2.      Clearly Established Supreme Court Law

The law governing claims of ineffective assistance of counsel is set forth *supra*.

3.      Federal Review of Claim

Geralds argues that the state court's rejection of this claim is objectively unreasonable and its factual findings are rebutted by clear and convincing evidence. James Beller, a psychotherapist, testified at Geralds' resentencing trial that he interviewed and tested Geralds, giving him the Minnesota Multi-phasic Personality Inventory, the Rorschach Ink Blot test, the Thematic Apperception Test, and the Rust Test of Schizotypical Cognition. (Resentencing, Vol. VI at 736). Beller diagnosed Geralds as a bi-polar disorder manic with an anti-personality disorder. Beller also determined that Geralds' I.Q. was around 120, placing him in the eighty-fifth percentile or the top fifteen percent of intelligent people, and his ability to think abstractly was also in the superior range which ruled out the influence of brain damage or retardation. (*Id*. at 739; 754). Additional testing revealed that Geralds had an

aggressive acting out profile. Geralds reported that as a child he was significantly depressed starting about the age of nine or ten, that he had developed emotional problems by that age, and was lonely and had difficulty with authority figures because he was never really close to his father. At the age of ten, Geralds also started to show signs of emotional withdrawal and paranoid behavior in not being able to trust or to get close to people. Beller opined that this became the basis of an over controlled emotionality which resulted in the explosive temper which Geralds displays, particularly in stressful situations. However, in Beller's opinion, Geralds is not psychotic and knows right from wrong and cannot be diagnosed as a mental case. (*Id.* at 745). Beller acknowledged that he did not speak to any of Geralds' family members or friends in making his diagnosis. (*Id.* at 757). Beller testified that Geralds' primary method of acting out was anger, although he had described some sexual episodes of acting out as well. Beller stated that Geralds was also manipulative and a loner. Finally, Beller testified that there was no evidence of deception in Geralds' answers.

In Geralds' postconviction hearing, Beller testified that in the resentencing proceedings he did not have any collateral evidence, such as speaking with family members, when he diagnosed Geralds as having a bipolar disorder. (EH at 2568). However, Beller maintains that his diagnoses of bipolar disorder, manic, and

antisocial personality disorder are correct. In preparation for the postconviction hearing, Beller spoke with two family members and a friend and administered a test called the Psychopathy Check List Revised, which did not exist in 1992 when Beller first tested Geralds, and he administered a different personality evaluation test. Beller explained that usually persons who are diagnosed with bipolar disorder have a childhood history of impulsivity and hyperactivity. Beller testified that these were corroborated in Geralds' case, explaining:

> All of the people I talked to that knew him described a child and adolescent who was very, in their words, very, very rambunctious, very impulsive, reckless. It was easy for me to determine that he probably would have been diagnosed as an attention deficit hyperactivity disorder, impulsive type.

(*Id*. at 2569). Youngsters with these disorders need a lot of structure, and Geralds' parents' divorce broke the family structure down.

Beller also testified that while he found in his earlier testing that Geralds was a psychopath, when tested a second time with the benefit of having a testing instrument that measured that and with corroborative information, he no longer believed that Geralds is a psychopath, but scores well within the norm for the typical prison inmate. (*Id*. at 2575). Beller did acknowledge that in the DSM-IV psychopathy is listed in the definition of antisocial personality disorder. As to his previous opinion that Geralds

has an aggressive, acting out profile, as indicated by self-destructive behaviors and/or violence toward others, Beller believes that acting out for Geralds was demonstrated by his leading "a very destructive lifestyle." (*Id*. at 2579). Beller explained:

> All the testing that I did and all the people I talked to describe impulsivity that could be extreme. Mark was always in trouble. I don't mean legal trouble, but, I mean, there was a report of, I think, it was Mr. Hobbs' mother didn't like Mark to come over to the house because toys would get broken. On one occasion they were playing, [Geralds] accidently hit [Hobbs] with a shovel and it wasn't serious but it was a cut there. He was just rambunctious and destructive, just very hyper.

(*Id*. at 2579). When asked what the effect of this hyperactivity had in relation to Geralds' family structure and his parents' divorce, Beller testified, "Mark was born with a disorder, was born with a problem that would take more than parenting can fix. The best parents in the world are going to have problems with a child like that. But being like that there were bound to be conflicts, conflicts certainly with one parent or with both." (*Id*. at 2580). Beller testified that there was a family history of mental illness involving a maternal aunt, but he did not follow up on this information. (*Id*. at 2580). Beller also acknowledged that his observations of Geralds were affected by the fact that Geralds had been in prison since 1987.

Beller testified that he had felt prepared to testify at Geralds' resentencing trial, although he thought that the case seemed a little more rushed than others he had done.

He recalled that defense counsel provided him with "very little, if any" materials and provided mostly anecdotal information. However, Beller acknowledged that he has testified in other cases in which he did not consult other people in reaching his diagnosis. The court clarified that Beller did take a family history from Geralds originally, and his history was "remarkably similar" to the ones he gathered in postconviction. (*Id.* at 2597).

A review of Beller's testimony in both the resentencing and evidentiary hearings supports the state court's determination that his resentencing testimony was not significantly different from the testimony he gave at the evidentiary hearing. Additionally, Geralds has not demonstrated how his counsel was deficient with regard to Beller's preparation or testimony.

Geralds also contends that if his counsel had conducted an adequate investigation, he would have presented a compelling life history to the jury. The record fails to support this contention however. For example, Scott Hobbs, a childhood friend of Geralds, testified in the resentencing trial that Geralds was very supportive when Hobbs' parents divorced when he was a teenager, and he could not recall any examples of violence in Geralds' past. (*See* Resentencing, Vol. V at 623-30). There came a point, however, when Geralds began associating with people who were boasting about doing

some illegal things, and Hobbs began to distance himself from Geralds. At the evidentiary hearing, Hobbs fleshed out some of his previous statements; however, his testimony is not substantially different from what he offered at the resentencing. (*See* EH at 2526-2543). For instance, Hobbs described Geralds as "kind of pushing it to the limit" when playing, driving cars fast and generally being a risk taker. Hobbs reiterated that he never saw Geralds angry or violent and stated that "he always seemed to be happy-go-lucky," although now that he has had experience with a bipolar ex-wife Hobbs recognized some of the same characteristics in Geralds. (*Id*. at 2531). Hobbs also testified that he never saw Geralds drink or do any drugs and explained that when he met with defense counsel prior to the resentencing, counsel asked him to relate instances describing how he and Geralds interacted in order to humanize him before the jury.

Donald Harlan, a building contractor who employed both Geralds and his father, also testified at the resentencing. (*See* Resentencing, Vol. V at 671-78). Harlan described Geralds as an interested, good worker until after his parents' divorce when his work deteriorated. Harlan also testified that he was very close to Geralds' father and because of that relationship he learned the following about the family dynamic:

> Well, it was really an unusual situation. You know, where you have an
> ideal like family and then all of a sudden there is a divorce and a lot of

hard feelings. I'm sure that this happens to a great number of people that go through a divorce and I learned—one of the things that I learned was that his mother resented the fact that she had conceived a child and that, had not treated Mark very well during all of his lifetime.

(*Id*. at 676).

Geralds also testified at the resentencing about the difficulty of his parents' divorce when he was a young teenager and the period which Harlan described as his deteriorating, in the following exchange:

A. [Geralds]: That's a kind of difficult period of my life, really, to discuss openly but at some point, I can't exactly pinpoint when, but I lost a lot of values that I had. My work ethics, you know, dropped off considerably and I got to the point where the important things weren't really so important any more.

Q. [Adams]: Like?

A. Well, it's, again it's kind of difficult to explain. I want to work, yeah, and I knew I needed to in order to pay the rent and keep the car payment going and stuff. But when I woke up in the morning if I was just too tired or something and I just, I was lazy, you know, and–

Q. Well, were you out running the roads at night and stealing and stuff?

A. Yeah, and coming through that period of time I got involved with stealing some automobiles and generally running around with a bad crowd. And it was a lot easier for me at that time, you know, just to instead of trying to discuss it with people, maybe trying to find some help, just kind of keep that thing to myself, you know, and just go about doing my own thing. It got to the point where I was out late at night. I would come early in the morning, then I would sleep during the day and not worry about going to work. Then I would get up in the afternoon and get ready to go out for the night again. And it just got to be a habit, you know, I guess is the word. And it got easier and easier.

(*Id*. at 704-05). Significantly, the record also reflects that Geralds testified that he did not want his ex-wife or other family members called to testify on his behalf. In addressing his counsel, Geralds explained:

> *When I came back in September of last year and me and you first had an opportunity to discuss what tentatively we might do here today I made it quite clear at that time to you that I didn't want to call any witnesses for the defense other than myself. At that time my way of thinking was, you know, it's Mark Geralds who is on trial. And I don't need my family and my friends in here to be on trial with me. Okay. I am the accused, my family, my friends are not.* Yet if they come in and they take part and they participate then they are, in fact, on trial with me and when they have to return out into the community to their work place, you know, or to the businesses that they own, nearly everybody I know, nearly everybody I care about, they either work with people or in some kind of business, they own a business, they own a business where they're involved with dealing with a lot of people in the community. All right, and when you–these people watch the T.V., they read the newspaper and perhaps they're scouting around for somebody who wants to do something for them or they want to go here and want to do this little bit of business and they see a person who is associated with me and my family and everything that has gone along with it over the last three years and it turns people away just like my wife was fired from her two jobs, you know, it puts to me, in my mind, an unnecessary burden and unnecessary strain on my family, you know. And that's something that I can do without.

(*Id*. at 713-14) (emphasis added).

At the evidentiary hearing, postconviction counsel presented two witnesses who did not testify at the resentencing trial: Geralds' sister, Lisa Johnson, and Vicki McCann, formerly Ward, the friend to whom Geralds gave the red Bucci sunglasses.

Johnson testified that Geralds was a fun, good kid who was sort of a daredevil, but who did not do very well in school. (*See* EH at 2432-2440). Johnson recalled that at one point a teacher suggested to her parents that her brother go see a psychiatrist, testifying, "I don't remember what the specific thing was that he had done for that but I do remember that he was just always, you know, cutting up in school, didn't, didn't do his work." (*Id*. at 2433). Their father, however, did not send Geralds to a psychiatrist because he did not think that he needed one, but was "just being a boy." (*Id*.). She testified that their parents' divorce affected Mark the most because he did not have as much support as she and their other brother had. She believed that Geralds had mood swings at this point. Johnson also stated that after Geralds dropped out of high school, she became worried about him, and there was a time when he was living in his car. As far as any interaction with defense counsel, Johnson stated that after Geralds' arrest she met with Adams at his office, and she explained, "he wanted to know all the good things about Mark, all of the, he wanted me to bring out all of the good stuff about him and not mention anything else. And he wasn't very friendly. He wasn't, I don't know, I just didn't like him too much." (*Id*. at 2438). At one point she told Adams that it looked like he wanted her to lie, and Adams was offended by her remark. Johnson was not called to testify in either the original trial or the resentencing

trial. When asked if she would have testified at either proceeding for her brother, Johnson replied, "I probably would have, yes." (*Id.* at 2439).

Vicki McCann testified that she and Geralds were childhood friends, and she described him as always fun and joking. (*See id*., pp. 2440-2448). She testified that after his parents' divorce Geralds became more withdrawn, sad and depressed, and he told her that he did not feel like he fit in anywhere. While McCann testified in the guilt phase of the first trial, she did not testify at the resentencing because of medical concerns due to a pregnancy, but she stated that she would have provided a statement if asked. McCann stated that defense counsel never discussed her providing any evidence in the penalty phase of the trial, but if she had been asked to, she "would have tried my very best to have testified then." (*Id*. at 2445). On cross-examination, McCann acknowledged that she was upset and emotional when she testified in the guilt phase of the trial.

The record supports the state court's finding that the mitigation evidence presented in postconviction is essentially cumulative to that which was presented at the resentencing trial, and that Geralds has not demonstrated that his counsel was deficient in investigating or presenting mitigating evidence. Geralds has not presented the type of compelling evidence of mental and psychological impairments or

childhood history that would render his counsel's investigation into mitigation ineffective. *Compare Wiggins v. Smith*, 539 U.S. 510 (2003) (mitigating evidence trial counsel failed to discover and present was powerful, showing that petitioner had experienced severe privation and abuse in first six years of his life while in custody of his alcoholic, absentee mother, and had suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care, and had jury been confronted with evidence, there was reasonable probability that it would have returned with different sentence); *Rompilla v. Beard*, 545 U.S. 374 (2005) (trial counsel failed to investigate a file containing information relating to potential mitigating factors, including the records of defendant's imprisonment on an earlier conviction, which pictured defendant's childhood and mental health very differently from anything defense counsel had seen or heard, including a statement by a corrections counselor outlining defendant's upbringing in a slum environment, disclosing test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling).

Geralds has failed to demonstrate that had the evidence presented at the evidentiary hearing been presented at the resentencing trial, it would have changed the

outcome. *See Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F. 3d 1271, 1296 (11th Cir. 2012) (stating "[b]oth the Supreme Court and this Court have consistently held that is reasonable for a state court to conclude that a petitioner suffers no prejudice when the evidence is either weak or cumulative of the testimony presented at trial."); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011) ("Given what little additional mitigating evidence Pinholster presented in state habeas, we cannot say that the California Supreme Court's determination was unreasonable."); *Wong v. Belmontes*, 558 U.S. 15 (2009). Finally, Geralds has not addressed the impact on his counsel's mitigation strategy of his wish that no family members, friends or his ex-wife testify at the resentencing trial. Counsel cannot be faulted for acceding to this wish, particularly given the fact that this testimony when given at the evidentiary hearing was not of a significantly compelling nature. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

C. Failure to Object and/or Correct Inaccurate Testimony

Geralds argues that at his resentencing trial Detective Jimmerson was allowed to testify in a summary fashion regarding the testimony and reports presented in his original guilt phase trial and complains that Jimmerson's testimony was not an

accurate reflection of what the prior witnesses said.[23] Geralds alleges that his counsel was ineffective in failing to object to this testimony. *See* ECF No. 1, pp. 135-38.

1.      State Court Determination

Geralds raised this claim in his postconviction proceedings, and it was summarily denied. In its order denying relief, the postconviction court also noted that defense counsel "strenuously" objected to Detective Jimmerson's testimony at the resentencing, but was overruled by the trial court. (Final Order Denying Motion for Postconviction Relief, PCR Vol. X at 1745). The Florida Supreme Court affirmed, holding that Geralds failed to establish prejudice under *Strickland*. *See Geralds III*, 111 So. 3d at 800.

2.      Clearly Established Supreme Court Law

The law governing claims of ineffective assistance of counsel is set forth *supra*.

3.      Federal Review of Claim

Contrary to Geralds' assertions, the record reflects that during portions of Jimmerson's direct examination, defense counsel made hearsay objections to statements he made which summarized testimony by other witnesses at the first trial,

---

[23] In his petition, Geralds references Jimmerson's testimony with regard to the shoe prints found at the crime scene; the test which detected blood on Geralds' Nike shoe; the blood found on the pawned herringbone necklace; and the testimony of Douglas Freeman about whether Geralds was wearing gloves on the day of the crime.

including the results of some of their reports.[24] At one point during Jimmerson's direct examination, the record reflects that the prosecutor expressed frustration because he felt defense counsel's objections were getting too disruptive, and the parties agreed that the defense would essentially have a standing objection to previously admitted items and testimony which the court had ruled were admissible. (Resentencing, Vol. III at 373-74). The record also reflects that during cross-examination, counsel questioned Jimmerson as to his personal knowledge about some of his testimony and objected that Jimmerson was not qualified when he was asked on direct examination if the Nike shoes obtained from Geralds were tested with Luminol. The trial court overruled this objection. (*Id*. at 415). Finally, counsel cross-examined Jimmerson about his knowledge of DNA testing. (*Id*. at 431-34). Thus, the record reflects that defense counsel objected to Jimmerson's testimony and attempted to make clear to the jury that much of Jimmerson's testimony was hearsay and gathered from other witnesses who had direct knowledge of the evidence. Defense counsel was so effective in making this point that on redirect, the prosecution repeatedly asked

---

[24] The record also reflects that, before opening statements, defense counsel objected to the introduction of numerous exhibits from the guilt phase trial, and his objection was overruled. (Resentencing, Vol. III at 363). The following day, counsel again objected to the admissibility "carte blanche of all the items which had been introduced in the trial in the case in chief in the past." The court overruled these objections as well. (*Id*. at 350).

Jimmerson whether each of these witnesses would have a reason to lie to him, and Jimmerson consistently answered no. (*See id.* at 442-44). Therefore, Geralds has failed to demonstrate that the state court's summary denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

D. Failure to Subject the Penalty Phase to Adversarial Testing

Geralds alleges that his counsel failed to subject the resentencing proceeding to an adversarial testing with respect to Dr. Syber's trial testimony that he could not determine whether the victim was conscious prior to the fatal stab wound, which could have rebutted the HAC aggravator, and failed to effectively cross-examine Dr. Lauridson, who testified at the resentencing, on this and several other points. ECF No. 1, pp. 138-41.

1.     State Court Determination

Geralds exhausted this claim in his postconviction proceedings, and the postconviction court summarily denied the claim. The summary denial was affirmed by the Florida Supreme Court. *See Geralds III*, 111 So. 3d at 800. The postconviction court also held on a related issue:

> As to the issue of Dr. Sybers' testimony, the record reflects defense counsel did, in fact, move to continue the re-sentencing trial to allow him

to subpoena and question Dr. Sybers. This Court denied that motion. Counsel also commented during his closing argument on the nonappearance of Dr. Sybers and the fact that Dr. Lauridson's opinions were based upon actions performed by Dr. Sybers. In his closing argument, defense counsel did raise the issue of the possibility that Dr. Sybers had provided incorrect information and that Dr. Lauridson's opinions were wrong.

(Final Order Denying Motion for Postconviction Relief, PCR Vol. X at 1746). In addition, the postconviction court held that to the extent there were any errors by defense counsel, the cumulative effect of those errors did not rise to the level of ineffective assistance of counsel. (*Id*. at 1747).

2.      Clearly Established Supreme Court Law

The law governing claims of ineffective assistance of counsel is set forth *supra*.

3.      Federal Review of Claim

In Geralds' original trial, Dr. William Sybers, the medical examiner at that time, testified as to his autopsy findings.[25] At the resentencing, Dr. James Lauridson, an Alabama medical examiner, testified for the State as to the mode and cause of the

---

[25] After Geralds' first trial, information regarding the credibility of Dr. William Sybers came to light. Dr. Sybers was the subject of a law enforcement investigation concerning the death of his wife. While Dr. Sybers was not indicted for the murder, during this investigation a number of problems were revealed with the manner in which Dr. Sybers operated the medial examiner's office and conducted autopsies, including having unauthorized persons performing autopsies, improper handling of specimens, and Dr. Sybers' possible drug use during the time of the homicide in this case. *See* ECF No. 1, p. 199; Defense Exhibit 2, Resentencing, at 317-18).

victim's death. The record reflects that defense counsel made a motion in limine to exclude Dr. Lauridson's testimony, but the trial court denied the motion holding that Dr. Lauridson was testifying to his own opinion based upon his review of the autopsy performed by Dr. Sybers. (*See* Resentencing, Vol. IV at 519-25). Dr. Lauridson also confirmed that his testimony was his independent opinion after reviewing the results of the victim's autopsy.

Geralds identifies a few instances of defense counsel's failure to cross-examine Dr. Lauridson. First, Geralds argues that Dr. Sybers testified that he could not determine whether the victim was conscious when the fatal stab wound to her neck was made. (*See* TR Vol. XIII at 1871). At the resentencing, Dr. Lauridson was not asked about whether the victim was conscious or not. Geralds contends that this testimony could have been used to rebut the HAC aggravating factor. However, in the face of a silent record as to defense counsel's resentencing trial strategy, this Court will not assume that defense counsel did not have a strategic reason for not asking Dr. Lauridson whether the victim was conscious prior to the fatal blow.

Second, Geralds argues that Dr. Sybers testified that the victim had ten contusions, but when asked how many contusions he found on the victim, Dr. Lauridson testified, "[w]hat one calls individual injuries, it gets to be a matter of

judgment but there is certainly evidence for between ten to fifteen blunt force injuries and then the three stab wounds to the neck." (Resentencing, Vol. IV at 547). Thus, Dr. Lauridson acknowledged himself that determining the number of abrasions on a victim is a judgment call. Additionally, defense counsel may not have wished to draw attention to the number of contusions found on the victim since in the opinion of both doctors, Mrs. Pettibone received a minimum of ten blunt force injuries. Finally, Geralds argues that while Dr. Sybers testified that all of the victim's blunt force injuries were caused by a fist, Dr. Lauridson opined that one injury may have been caused by a stomp:

> A. [Lauridson]: Now, this is a view of the chest area. There again is a bruise with hemorrhage on the inside medial side of the left breast and a larger bruise and hemorrhage on the inside of the right breast.
> I find this an interesting configuration because although it is not possible to say with certainty, one can begin to see a pattern to this bruising. You can see that there appears to be possibly a curved line here and a straight line here and almost as if there were squares here. For example, here, here, here and here, making me at least conjecture the possibility that this is a stomp, that this is the imprint from a shoe of some kind.
>
> Q. [Appleman]: Possibly a tennis shoe?
>
> A. Very possibly. . . .

(*Id*. at 563-64). As the testimony indicates, Dr. Lauridson did not testify that the injury was definitely caused by a stomp, and defense counsel may reasonably have decided not to spend too much time focusing on this conjecture. On a brief cross-examination,

defense counsel made the point that in forming his opinion Dr. Lauridson relied on diagrams and other materials prepared by Dr. Sybers. Given the nature of the wounds and the autopsy pictures shown to the jury over defense counsel's objection, he could reasonably have felt that he did not want to keep this witness or this type of evidence before the jury any longer than necessary. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

E. Failure to Object to Improper Prosecutorial Comments and Argument

Geralds argues that the prosecutor made numerous improper comments to which defense counsel failed to object. Geralds also argues that the prosecutor's closing argument caused the jurors to consider improper and unconstitutional non-statutory aggravating factors in violation of the Eighth Amendment. ECF No. 1, pp. 142-47.

1.    State Court Determination

Geralds exhausted this claim in his postconviction proceedings and the postconviction court summarily denied the claim. The summary denial was affirmed by the Florida Supreme Court. *See Geralds III*, 111 So. 3d at 800.

2.      Clearly Established Supreme Court Law

The law governing claims of ineffective assistance of counsel is set forth *supra*.

3.      Federal Review of Claim

While Geralds cites numerous statements made by the prosecutor in his resentencing closing argument which he characterizes as impermissible, none of them rise to the level of improper comment or argument. *See* ECF No. 1, pp. 142-46.[26]  A

---

[26] For instance, the prosecutor made the following comments in his closing argument:

You remember Kelly Stracener's time period of the phone call, getting ready, going by the house, for 20 minutes that doctor said those hands had to be tied together and she was alive for that blood to swell those hands to that extent. 20 minutes.

**The last 20 minutes of Tressa Pettibone's life her home had been invaded, her hands had been bound with a plastic strap that made them swell and hurt**. She received 10 to 15 blows of blunt trauma and three stab wounds to her body.

Before she died her left eye was blackened with something like a fist. Her right eye was blackened with something like a fist. Before she died she received not one cut, but two cuts over the top of her left eye, blows that opened up her skin. Her jaw was slammed so hard that the inside of her mouth bled. And the left side of her face was struck so hard by one or two blows or a foot that her face was almost beaten beyond recognition.

She received three blows to the chest. One of them, as the doctor indicated, had these little squiggly marks, little squares on them. Doctor, those consistent with a tennis shoe? Yes, Mr. Appleman.

Well, what did they do? That stomp was so hard, it just didn't bruise the skin, it left an impression there that lasted upon her body and caused further injury to the inside, to the diaphragm.

And then she was stabbed. Maybe not in that order. Stabbed twice. Two times in the right neck and a stab wound that severed her windpipe and severed her artery.

She bled to death in her own home. A woman who was a caring person. That life was taken, Mr. Beller says, by an uncaring person. **And in her own home she took the last gasps of breath that she could and sucked blood into her lungs**.

prosecutor may not "misstat[e] the facts in his cross-examination of witnesses" or "assum[e] prejudicial facts not in evidence." *Berger v. United States*, 295 U.S. 78, 84 (1935). The law governing whether prosecutorial argument is sufficiently egregious to result in a denial of due process is addressed in Ground II, subclaim D, *supra*.

Geralds has not demonstrated that the prosecutor's comments were improper or a deprivation of due process. A review of the prosecutor's closing argument shows that he did not misstate the evidence or misstate the law, nor did he make an improper "Golden Rule" argument or ask the jury to consider an invalid aggravating factor. (*See* Resentencing, Vol. VII at 857-68).[27] The prosecutor specifically told the jury, "the

---

The courtroom is a place for truth. **For 20 minutes I've stood before you. For 20 minutes Tressa Pettibone suffered an agonizing beating and torture**.

(Resentencing, Vol. VII at 866-67) (emphasis added).

[27] The prosecutor stated:

Let's think about that for just a minute. A young man walked into this courtroom the other day, Scott Hobbs.   Lifelong friend of the defendant. A young man who grew up with him. A young man who went through the situation of divorce. And what did he say to you? He said yes, we were friends and then there was a period of time when I really didn't like who he was associating with and I didn't want to be out and about with him.

And the defense brought in Archie McGowan. And Pelton. And you know who chose to associate with those people? Not Scott Hobbs. This defendant. Because he didn't care. He didn't care and **those are the things that you have to look at when you look at the words that will be used as the Court describes them to you concerning the aggravating circumstances**.

(Resentencing, Vol. II at 861-62).

Court's going to say to you that you can take into consideration any other aspect of

the defendant's character or record or any other circumstance of the offense. Take

those into consideration, all of those things." (*Id*. at 861). He then argued that the fact

that Geralds has a child and came from divorced parents do not mitigate the crime.

The prosecutor also asked if Geralds had a substantial impairment which kept him

from conforming with the law and argued:

> And I submit to you there was none. Let's look at what Dr.
> Beller or Mr. Beller said, about impairment. He had an IQ
> of 121 or thereabouts. Superior intelligence level. A man
> Mr. Beller said if he applied himself, yes, Mr. Appleman, he
> could graduate from college; yes, he could get a master's
> degree; yes, he could do those things. Yes, Mr. Appleman,
> he knew right from wrong. He's not mentally ill. He has an
> uncaring attitude. He just doesn't give a damn. He's
> manipulative. He's a loner, and yes, Mr. Appleman, on one
> of my tests he was good at making up stories. No
> impairment. No substantial impairment.

(*Id*. at 860-61). *Compare Darden*, 477 U.S. 168 (prosecutor's closing argument stating

that death sentence would be the only way to prevent a future similar act and referring

to defendant as an "animal" did not improperly mislead the jurors into thinking that

they had a reduced role in the sentencing process); *Cargill v. Turpin*, 120 F.3d 1366,

1381 (11th Cir. 1997) (holding that a prosecutor's argument at sentencing about "a

bunch of little boys" at Christmas thinking about their dead parents was permissible

because "the prosecutor was attempting to convey the gravity of the crime and its consequences—the murder of the [boys' parents] left four young boys without parents—to convince the jury that life imprisonment, *i.e.*, allowing [the defendant] to continue to live, would be too lenient a sentence."); *Brooks*, 762 F.2d at 1396, 1416 (denying habeas relief where the prosecutor asked the jurors, "Whose daughter will it be next time?"). Additionally, when viewed in the context of the entire closing argument and trial, these isolated remarks do not undermine confidence in the outcome nor did they mislead the jury in its sentencing role.

Because Geralds has not demonstrated that the prosecutor's comments were improper, he cannot satisfy *Strickland* regarding his counsel's failure to object to the comments. The record does not support his argument that his trial counsel's failure to object to these comments constitutes an error no competent counsel would have made, or that there is a reasonable probability that "but for" counsel's failure to object, the result of the trial would have been different. *See also Zakrzewski v. McDonough*, 455 F.3d 1254, 1259–60 (11th Cir. 2006) (*per curiam*) (denying an ineffective assistance claim stating "[a]n objectively reasonable trial lawyer could" believe that "cases must be won at trial, not on appeal, and prefer [ ] not to make objections during closing

argument unless the objection is a strong one"). Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground IV: Ineffective Assistance of Appellate Counsel

Geralds asserts that he was denied effective assistance of appellate counsel when his counsel failed to raise and/or failed to adequately raise meritorious issues which he claims would warrant reversal of his conviction.

A. Failure to Adequately Raise the Denial of Geralds' Right to Confront Witnesses

Geralds alleges that he was denied his right to confront witnesses during his resentencing when the court allowed the State to present the testimony of several witnesses who testified in his original trial through Investigator Jimmerson. ECF No. 1, pp. 150-61. Geralds asserts that Jimmerson's testimony was often inaccurate, and he could not be cross-examined because he was relating hearsay rather than speaking from personal knowledge. While defense counsel objected to this testimony at trial, Geralds' appellate counsel did not raise the issue on direct appeal.

1.   State Court Proceedings

Geralds raised this claim in his state petition for a writ of habeas corpus. The Florida Supreme Court denied relief.

2.    Clearly Established Supreme Court Law

a.    Ineffective Assistance of Appellate Counsel

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is that enunciated in *Strickland. See Smith v. Robbins*, 528 U.S. 259, 285 (2000). The Supreme Court has held that counsel need not raise every nonfrivolous claim on appeal. *See Jones v. Barnes*, 463 U.S. 745 (1983). The Court in *Jones* emphasized the importance of winnowing out weaker arguments in favor of stronger ones. The Court stated:

> 'Most cases present only one, two, or three significant questions . . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weaker arguments will be to dilute the force of the stronger ones.' (Citing R. Stern, Appellate Practice in the United States 266 (1981)).

*Id*. at 752. The Court has also stated that while it is possible to bring a *Strickland* claim based on appellate counsel's failure to raise a particular claim in a merits brief, it will be difficult to demonstrate incompetence. *See Robbins*, 528 U.S. at 288. "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Id.* (citation omitted). To demonstrate prejudice, the petitioner must show a reasonable probability that, but

for his counsel's unreasonable failure to brief a particular issue, the petitioner would have prevailed on appeal. *See id.*, 528 U.S. at 285.

b.    Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. In 1993, at the time of Geralds' resentencing trial, the standard for determining whether the admission of a testimonial hearsay statement against a criminal defendant violated the right of confrontation was controlled by *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), which held that a hearsay statement could be admitted in a criminal trial without violating the right of confrontation if it was shown that the declarant was unavailable and the out-of-court statement bore adequate indicia of reliability.[28] The *Roberts* test focused on the reliability of the statement. As explained in *Roberts*, a statement had adequate indicia of reliability if it either fell within a firmly rooted hearsay exception or if it bore "particularized guarantees of trustworthiness." (*Id.*).

_____

[28] In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court rejected *Roberts'* "indicia of reliability" test with respect to testimonial statements—such as prior testimony and custodial interrogations—holding that the Confrontation Clause does not permit the introduction of such statements unless the declarant is both unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant. The holding in *Crawford* is not retroactively applicable to cases on collateral review. *Whorton v. Bockting*, 549 U.S. 406 (2007).

The Supreme Court has also held that hearsay testimony is admissible at capital sentencing hearings. *Williams v. New York*, 337 U.S. 241, 252 (1949) ("We cannot say that the due-process clause renders a sentence void merely because a judge gets additional out-of-court information to assist him in the exercise of this awesome power of imposing the death sentence."). In *Muhammad v. Sec'y, Fla. Dep't. of Corr.*, 733 F.3d 1065, 1074 (11th Cir. 2013), the Eleventh Circuit addressed the interplay between the Confrontation Clause and a capital sentencing proceeding and observed that "[a]lthough the law of capital sentencing has changed in some respects since *Williams*, 'the Supreme Court of the United States has never questioned the precise holding of *Williams v. New York*.'" (quoting *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2003)).[29] *See Jones v. GDCP Warden*, 815 F.3d 689, 723-24 (11th Cir. 2016) ("Because a state habeas court's interpretation of the federal Constitution is constrained only by clearly established Supreme Court law (*i.e.*, *Williams*), we cannot find unreasonable the state court's determination that the contents of the Stapert file

---

[29] *See also United States v. Fields*, 483 F.3d 313, 326 (5th Cir. 2007) (concluding, after a comprehensive review of the law, that "the Confrontation Clause does not operate to bar the admission of [hearsay] testimony relevant only to a capital sentencing authority's selection decision"); *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2003) (explaining that "the Supreme Court has held that the Confrontation Clause does not apply to capital sentencing," and that the right to confrontation "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty"); *United States v. Barrett*, 496 F.3d 1079, 1100 (10th Cir. 2007) (explaining that "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding" (quoting *United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003))).

was admissible hearsay." (footnote omitted)). *See Gardner v. Florida*, 430 U.S. 349 (1977) (holding that a defendant does have a right to rebut information relevant to his character and record that is admitted against him at the sentencing hearing); *Chandler v. Moore*, 240 F.3d at 918 (confirming that hearsay is admissible at capital sentencing and that a defendant's rights under the Confrontation Clause are not violated if the defendant has an opportunity to rebut the hearsay). In *Chandler*, during a capital sentencing hearing a police officer summarized the testimony of several witnesses who testified during the guilt phase trial. The Eleventh Circuit noted that the hearsay evidence was admitted under Florida Statutes § 921.141(1), and found:

> At trial, Chandler's counsel vigorously cross-examined the State's witnesses to whom Officer Redstone referred at the re-sentencing when he gave his recitation of the evidence of guilt. The State did not do anything to prevent Chandler from rebutting this hearsay evidence. The fact that Chandler chose not to rebut any hearsay testimony does not make the admission of such testimony erroneous. Moreover, having reviewed both the trial and the re-sentencing transcript, we conclude that Officer Redstone's synopsis was consistent with the witnesses' trial testimony. Accordingly, we see no Confrontation Clause violation.

*Chandler*, 240 F.3d at 918.[30]  In *Muhammad*, the Eleventh Circuit held that hearsay testimony from a police detective at a resentencing hearing did not violate the defendant's Confrontation Clause rights and explained:

---

[30] The Florida Supreme Court held as follows in *Chandler v. State*, 534 So. 2d 701, 703 (Fla. 1988):

We do not find that the introduction of hearsay testimony rendered subsection 921.141(1) unconstitutional as applied in this case. As stated before, Chandler's counsel vigorously

Although Muhammad did not have a prior opportunity to cross-examine the helicopter pilot [a witness who had given an affidavit and testified at the prior trial], he had "the opportunity to rebut any hearsay information." *See Chandler* [*v. Moore*] , 240 F.3d [907] at 918 [(11th Cir. 2001)]. The Supreme Court "has never said that the right to 'deny or explain' sentencing information includes the confrontation rights that *Williams* rejected." [*U.S. v.*] *Fields*, 483 F.3d [313] at 329 [(5th Cir. 2007)] (quotation marks omitted). And we explained in *Hodges* that the right to rebut hearsay at capital sentencing does not include the right to cross-examine the hearsay declarant. *Hodges*, 506 F.3d [1337] at 1344 [(11th Cir. 2007)]. In that case, we held that a defendant had a "fair opportunity to rebut any hearsay statements" at his capital sentencing even though the defendant did not have an opportunity to cross-examine the hearsay declarant herself. *Id.* (quotation marks omitted). Muhammad does not argue that he was denied access to the prior statements of the helicopter pilot, that he could not cross-examine [Detective] Smith, or that he could not call his own witnesses. Because Muhammad had an opportunity to rebut the hearsay, his claim under the Confrontation Clause fails.

*Muhammad*, 733 F.3d at 1077.

3.     Federal Review of Claim

The Florida Supreme Court denied this claim, holding as follows:

Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. *See Freeman v. State*, 761 So. 2d 1055, 1069 (Fla. 2000). Consistent with the *Strickland* standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine

---

cross-examined the state's witnesses. That Chandler chose not to rebut any hearsay testimony does not make the admission of such testimony erroneous. The currently objected-to testimony came from a police detective and concerned statements made by a police chief, another detective, and a state expert. Those individuals had testified, consistent with what the detective stated they said, during the guilt phase. Chandler has not demonstrated an abuse of the trial court's discretion regarding hearsay testimony in allowing the recitation of this testimony by the detective.

first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

*Pope v. Wainwright*, 496 So. 2d 798, 800 (Fla. 1986); *see also Freeman*, 761 So. 2d at 1069; *Thompson v. State*, 759 So. 2d 650, 660 (Fla. 2000). In raising such a claim, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." *Freeman*, 761 So. 2d at 1069; *see also Knight v. State*, 394 So. 2d 997, 1001 (Fla. 1981). Claims of ineffective assistance of appellate counsel may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion. *See Rutherford v. Moore*, 774 So. 2d 637, 643 (Fla. 2000). "If a legal issue 'would in all probability have been found to be without merit' had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." *Id.* (quoting *Williamson v. Dugger*, 651 So. 2d 84, 86 (Fla. 1994)). This is also generally true as to issues that would have been found to be procedurally barred had they been raised on direct appeal. *Id.*

### 1. Hearsay

In his first claim of ineffective assistance of appellate counsel, Geralds argues that certain hearsay statements admitted during the resentencing phase of his trial violated his right to confront witnesses under the Sixth Amendment of the United States Constitution.FN22 Geralds argues that the circuit court erred in allowing the State to read the testimony of Billy Danford and Vicky Ward into the record, and appellate counsel was ineffective for failing to raise this issue on appeal. Geralds also argues that five portions of the resentencing testimony of lead investigator Bob Jimmerson violated his right to confrontation, and appellate counsel was ineffective for failing to challenge this testimony on appeal.

FN22. The Confrontation Clause of the Sixth Amendment provides that in all criminal prosecutions the accused has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI.

At the time of Geralds' direct appeal from his resentencing, the United States Supreme Court had held that the Confrontation Clause was not violated if the witness was unavailable and the evidence was admitted within a firmly rooted hearsay exception or there were particular indicia of reliability. *See Ohio v. Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed.2d 597 (1980); *Idaho v. Wright*, 497 U.S. 805, 816, 110 S. Ct. 3139, 111 L. Ed.2d 638 (1990).FN23

FN23. The Supreme Court overruled this approach in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed.2d 177 (2004), wherein it held that a testimonial hearsay statement is inadmissible at trial unless the declarant is shown to be unavailable and the party against whom the statement is admitted had an opportunity for cross-examination. *Id*. at 68, 124 S. Ct. 1354. This Court has since held that *Crawford* does not apply retroactively. *Chandler v. Crosby*, 916 So. 2d 728 (Fla. 2005). *Crawford* does not apply to Geralds because his case became final almost eight years before *Crawford* was decided. *See Geralds v. Florida*, 519 U.S. 891, 117 S. Ct. 230, 136 L. Ed.2d 161 (1996) (denying certiorari).

\* \* \* \*

The second of Geralds' allegations concerns five portions of the testimony of lead investigator Bob Jimmerson during resentencing, wherein Jimmerson allegedly testified to matters that he learned through hearsay. Geralds argues that his right to confrontation was violated when (1) Jimmerson testified that the plastic ties recovered from the scene and the ties recovered from Geralds' trunk were Thomas Industry ties; (2) Jimmerson testified that there was one consistent shoeprint throughout the house; (3) Jimmerson testified that luminol testing conclusively indicated the presence of blood and that one of Geralds' shoes tested positive for blood; (4) Jimmerson testified that the blood on the necklace

"was of" the victim; and (5) Jimmerson related the testimony of Geralds' grandfather when he testified that Geralds was wearing gloves.

Although trial counsel objected in some instances, trial counsel never objected on the basis of hearsay or the Confrontation Clause. Thus, Geralds must demonstrate that error, if any, was fundamental in order to show that appellate counsel was ineffective in failing to raise these claims on appeal. Fundamental error is error that reaches down into the validity of the trial itself to the extent that the jury's verdict could not have been obtained without the assistance of the alleged error. *Anderson v. State*, 841 So. 2d 390, 403 (Fla. 2003). In each instance, Geralds has failed to argue how Jimmerson's testimony constituted fundamental error. Accordingly, appellate counsel cannot be deemed ineffective for failing to raise these unpreserved claims on appeal.

*Geralds III*, 111 So. 3d at 803-05.

The state court held that defense counsel did not object to Jimmerson's testimony on the basis of hearsay or the Confrontation Clause so the issue was not preserved for appeal.[31] The record supports this finding. The court also held that Geralds failed to demonstrate a fundamental error with regard to this unpreserved claim. The Florida Supreme Court has defined fundamental error in this context as "error that 'reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" *Urbin v. State*, 714 So. 2d 411, 418 n. 8 (Fla. 1998) (quoting *Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996)).

---

[31] The record reflects that defense counsel objected to portions of Jimmerson's testimony on the basis that he was not qualified to render the conclusions. (*See e.g.*, Resentencing, Vol. III at 413).

Under that stringent standard, Geralds has failed to demonstrate fundamental error in light of the fact that any misstatement of evidence made by Jimmerson occurred during a resentencing proceeding and not in the guilt phase of his trial. Moreover, Florida law at the time of Geralds' resentencing trial specifically authorized the use of hearsay evidence at a capital sentencing proceeding.[32] *See Teffeteller v. State*, 495 So. 2d 744, 745 (Fla. 1986) ("We hold that it is within the sound discretion of the trial court during resentencing proceedings to allow the jury to hear or see probative evidence which will aid it in understanding the facts of the case in order that it may render an appropriate advisory sentence. We cannot expect jurors impaneled for capital sentencing proceedings to make wise and reasonable decisions in a vacuum.").

In this case, defense counsel cross-examined Jimmerson and had the opportunity to correct any misstatements as to the evidence presented in the original trial. Geralds also had the right to confront witnesses during his original trial. Geralds has not

---

[32] Florida Statutes § 921.141(1) (1993) provided as to the penalty phase of a capital trial:

In the proceeding, evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.

demonstrated that his counsel preserved a Confrontation Clause issue. Moreover, Geralds has not demonstrated that any misstatements made by Jimmerson in summarizing the evidence from the original trial resulted in a jury verdict which could not have been obtained without the assistance of the alleged error. Therefore, Geralds has not demonstrated that his conviction would have been reversed if a Confrontation Clause claim had been preserved and raised on appeal. If the claim would not have been meritorious on appeal, then appellate counsel cannot be found ineffective for failing to raise it.[33] Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

B. Prosecutorial Comments

Geralds argues that the prosecutor made improper comments throughout his resentencing trial which tainted the jury's deliberations, and his appellate counsel was deficient for failing to raise the issue on appeal. ECF No. 1, pp. 161-73.

---

[33] Appellate counsel raised nine claims on appeal. *See Atkins v. Singletary*, 965 F.2d 952, 957 (11th Cir. 1992) (holding appellate counsel is not constitutionally deficient for foregoing an unpreserved issue on appeal).

1.      State Court Determination

Geralds raised this claim in his state habeas petition, and the Florida Supreme

Court denied the claim, holding as follows:

> Geralds argues that the State made improper comments during his
> resentencing, and appellate counsel was ineffective for failing to raise them
> as error on appeal. Geralds groups the comments into those that trial
> counsel objected to and those to which trial counsel raised no objection.
>
> In the first category, Geralds argues that the State made inappropriate
> comments during voir dire. Specifically, he argues that the State
> inappropriately listed the aggravating and mitigating circumstances
> applicable to Geralds' case. During voir dire, the State noted, "I anticipate
> that the Court may say something along this line about what the
> aggravating circumstances are." Without giving any specific facts, the
> State then described the aggravators of flight after a robbery or burglary
> and of avoiding arrest. Defense counsel objected and the trial court held a
> sidebar. At sidebar, the court instructed the State that it could only
> comment on the applicable aggravating and mitigating circumstances the
> evidence would show. The State then commented on three other
> aggravating circumstances, pecuniary or financial gain, HAC, and CCP,
> noting, "I anticipate that those possibly could be some of the aggravating
> circumstances that the Court would give you." The State followed these
> comments with a discussion of mitigating circumstances, noting that these
> encompassed any aspect of the defendant or his life, including his age, and
> asked a juror whether he felt that he could weigh the penalties in light of
> evidence of that nature. On the following day of voir dire, the State
> commented on the same aggravating circumstances in response to a juror's
> question. Trial counsel objected again and moved for a discharge of the
> panel for deliberate misconduct by the State.FN26 The trial court overruled
> the objection and denied the motion.
>
>> FN26 At sidebar, the State argued that the trial court
>> permitted it to "go over the anticipated aggravating
>> circumstances that I anticipated the evidence would show.
>> That's what I'm doing." The State also argued that even

though the Florida Supreme Court reversed the CCP aggravator in Geralds' initial appeal, the State still intended on presenting evidence on the CCP aggravator in an attempt to convince the court that there was sufficient evidence to instruct on CCP.

"The purpose of voir dire is to 'obtain a fair and impartial jury, whose minds are free of all interest, bias, or prejudice,' not to shock potential jurors or to obtain a preview of their opinions of the evidence." *Hoskins v. State*, 965 So. 2d 1, 13 (Fla. 2007) (quoting *Ferreiro v. State*, 936 So. 2d 1140, 1142 (Fla.3d DCA 2006)), cert. denied, 552 U.S. 1152, 128 S.Ct. 1112, 169 L.Ed.2d 827 (2008). "The scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused." *Id*. (quoting *Vining v. State*, 637 So. 2d 921, 926 (Fla. 1994)). Further, "where a juror's attitude about a particular legal doctrine ... is essential to a determination of whether challenges for cause or peremptory challenges are to be made, it is well settled that the scope of the voir dire properly includes questions about and references to that legal doctrine even if stated in the form of hypothetical questions." *Walker v. State*, 724 So. 2d 1232, 1233 (Fla.4th DCA 1999) (quoting *Lavado v. State*, 469 So. 2d 917, 919–20 (Fla.3d DCA 1985) (Pearson, J., dissenting), quashed, 492 So. 2d 1322 (Fla. 1986)); *see also Pait v. State*, 112 So. 2d 380 (Fla. 1959) (finding no error where prosecutor propounded question to prospective jurors on voir dire concerning their attitudes toward a finding of guilt on a homicide charge based solely on a theory of felony murder). However, "[t]o the extent hypothetical questions involve the facts of the case they are not allowed." *Blevins v. State*, 766 So. 2d 401, 402 (Fla. 2d DCA 2000).

In the instant case, the State's questions were directed toward exploring the jurors' views regarding legal doctrines and the death penalty in the abstract. The State did not tell the jury that these were the aggravators that applied in this case. Instead, the State commented that these aggravators "possibly could be some of the aggravating circumstances that the Court would give you." Furthermore, the State did not ask the jurors what they thought about these aggravators, and the State did not identify any facts in the case. The State followed its comments with a discussion of the mitigating circumstances and whether the juror felt that he could weigh the

penalties in light of evidence of that nature. As an example, the State noted that age could be a mitigating factor. Unlike the case law prohibiting hypotheticals involving the facts of the case, the State's comments were not hypotheticals and did not reference any facts in the case. When read in context, the State's comments served only to explain the possible aggravating factors based on what the law permits.

Geralds does not argue how the trial court abused its discretion in limiting the aggravating factors the State was permitted to mention to those that the State believed the evidence would support. Indeed, Geralds makes no argument at all that the trial court abused its discretion in this ruling. On this record, we conclude that the State did not make inappropriate comments during voir dire, that the trial court did not abuse its discretion in denying defense counsel's objections to the comments, and appellate counsel did not render ineffective assistance for failing to raise this claim on appeal. *See Rutherford v. Moore*, 774 So. 2d 637, 643 (Fla. 2000) ("[T]he failure of appellate counsel to raise [a] meritless issue will not render appellate counsel's performance ineffective.").

In the second category of comments, Geralds raises six instances of prosecutorial comments that were not objected to and argues that appellate counsel was ineffective for failing to raise them on appeal. The first five were raised as ineffective assistance of trial counsel claims in Geralds' postconviction motion. We have already concluded that these claims were properly denied. Accordingly, appellate counsel cannot be deemed ineffective for failing to raise a meritless claim. *Id.*

*Geralds III*, 111 So. 3d at 805-07.

2.      Clearly Established Supreme Court Law

The law governing ineffective assistance of appellate counsel claims in set forth

*supra*.

3.      Federal Review of Claim

A review of the record supports the state court's determination with regard to this claim. As to the first category of alleged prosecutorial misconduct claims to which defense counsel objected, the prosecutor discussed the possible aggravating and mitigating factors in an effort to determine whether a juror could vote to recommend the death penalty based on instructions given by the court, and he started to list all of the statutory aggravators to the prospective juror. Defense counsel objected and the court ruled that only those aggravators that the State anticipated applied to the facts of the case be discussed. (Resentencing, Vol. I at 119-24). The following day, the following exchange occurred during *voir dire*:

> Q. [Appleman]: . . . . You may not hear all the evidence that went into that particular [guilt phase] proceeding. That bother either of you in any way like it did the first young lady?
>
> A. [Prospective Juror Greig]: It only bothers me–I mean I'm still not clear on how much information I will be given and whether I'll be able to ask questions [if] there's part of the information that needs some clarification on it.
>
> Q. The procedure does not provide for you asking questions of the witnesses.
>
> A. No. Certainly not the witness, but if we were deliberating would there be any–
>
> Q. Most certainly you're going to have the opportunity to ask questions of each other, discuss it in detail. Maybe I'm misunderstanding.
>
> A. Okay. What kinds of information will we be given? I know you said we'll be given the aggravating circumstances and the mitigating

circumstances. Just–are they just listed out? Certainly I would think not, but I don't know how much detail that I'm going to be given. I guess I'm concerned that I might not be able to make the wisest decision in my mind that I could make if I felt there was information gaps, I would be uncomfortable.

Q. Let me just bounce through this to a certain extent and see. If the information that was presented to you by the State dealt with these topics. See if you would be comfortable with this. The crime for which the defendant is to be sentenced was committed while he was engaged in the commission of, attempt to commit or flight after committing or attempting to commit the crime of robbery or burglary, and/or. Crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest. The crime for which the defendant is to be–

(Resentencing, Vol. II at 255-56). After which defense counsel objected and moved at

sidebar for discharge of the panel for deliberate misconduct by the prosecutor for going

into matters that the court had previously disallowed. The trial court denied the motion

and reiterated that any discussion of aggravating factors should be limited to the

evidence that was going to be presented. While Geralds argues that these exchanges

resulted in the State instructing the jurors on inapplicable aggravators, the prosecutor's

statements taken in context were meant to provide the prospective jurors with enough

information to elicit an informed response as to whether they could serve on a capital

sentencing jury. The prosecutor did not attempt to argue facts of the case and the voir

dire as a whole makes clear that the prosecutor did not engage in any alleged

misconduct.[34] Therefore, appellate counsel was not ineffective for failing to raise this meritless claim on appeal.

Geralds also contends that the prosecutor made comments which defense counsel failed to object to during both the original and resentencing trials. The comments he cites in his claim are the same comments that he cited in his ineffective assistance of trial counsel claims in Ground III, subsection E, *supra*. For the reasons stated therein, Geralds has failed to demonstrate that the prosecutor's comments were improper or that any of the comments amounted to fundamental error. Thus, appellate counsel's failure to raise this unpreserved claim on appeal is not deficient performance under *Strickland*, and the state court's determination with regard to this claim is entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

C. Weighing Mitigating Evidence

Geralds argues that the trial court failed to properly consider and weigh mitigating evidence and that his appellate counsel was ineffective for failing to raise the issue on appeal. ECF No. 1, pp. 173-75.

---

[34] The State argued that the following aggravating factors applied to the crime: (1) during the course of a felony; (2) to avoid arrest; (3) for financial gain; (4) HAC; and (5) CCP. (Resentencing, Vol. I at 258). The trial court found that the evidence only supported three aggravating factors, and these were submitted to the jury: (1) HAC; (2) during the course of a felony; and (3) CCP.

1.    State Court Determination

Geralds raised this claim in his state habeas petition, and the Florida Supreme

Court denied the claim, holding:

> Geralds argues that appellate counsel was ineffective for failing to argue that the trial court did not properly consider and weigh mitigating evidence. He argues that the trial court's analysis was flawed because it found that certain mitigating evidence, though it existed, was "not relevant to this crime" and gave it very little weight. According to Geralds, the reference to relevancy indicates that the trial court did not properly weigh the mitigating evidence because mitigating evidence need not be relevant to the crime. We reject this argument.
>
> Section 921.141(1), Florida Statutes (1993), provides that "evidence may be presented as to any matter that the court deems *relevant to the nature of the crime and the character of the defendant.*" (Emphasis supplied.) While a defendant has the right to present any mitigating circumstance to a jury or judge for consideration as a reason to spare his life, *see Smith v. Texas*, 543 U.S. 37, 44, 125 S. Ct. 400, 160 L. Ed.2d 303 (2004), the evidence must still meet a threshold of relevance, 937 So. 2d 612, 619 (Fla. 2006). "Although the threshold is low, the evidence must tend 'logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" *Farina*, 937 So. 2d at 619 (quoting *Smith v. Texas*, 543 U.S. at 44, 125 S. Ct. 400).FN27 In this case, the reference to relevancy does not invalidate the trial court's analysis because section 921.141(1) and case law require that mitigating evidence be relevant to the circumstances of the offense at issue, Geralds' character, or his prior record. Accordingly, we hold that appellate counsel cannot be deemed ineffective for failing to raise this issue on appeal.
>
> > FN27. In *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed.2d 973 (1978), a case Geralds cites for support, the United States Supreme Court held that the sentencer must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a

basis for a sentence less than death." *Id*. at 604, 98 S. Ct. 2954 (plurality opinion). This Court has held that *Lockett* requires the "admission of evidence that establishes facts *relevant* to the defendant's character, his prior record, and the circumstances of the offense in issue." *Hess v. State*, 794 So. 2d 1249, 1269 (Fla. 2001) (emphasis added) (quoting *Herring v. State*, 446 So. 2d 1049, 1056 (Fla. 1984), receded from on other grounds by *Rogers v. State*, 511 So. 2d 526, 533 (Fla. 1987)).

Geralds also argues that because of the reference to relevancy, the trial did not properly weigh evidence that (1) he was nonviolent; (2) he was fifteen years old at the time his parents divorced, and he became involved with a bad crowd; (3) he was a good worker; (4) he helped a friend deal with his parents' divorce; (5) a mental health professional diagnosed Geralds with bipolar and antisocial personality disorders; and (6) the mental health professional testified that Geralds was depressed from a young age. However, a review of the sentencing order reveals that the trial court did expressly consider some of these circumstances. The trial court specifically found that Geralds was a good worker and that he was diagnosed as having bipolar and antisocial personality disorders. Nevertheless, the trial court failed to expressly consider the other mitigation evidence. This Court has described the need for trial courts to enter sentencing orders "expressly evaluat[ing]" the defendant's proposed mitigation. *Campbell v. State*, 571 So. 2d 415, 419 (Fla. 1990), receded from on other grounds by *Trease v. State*, 768 So. 2d 1050, 1055 (Fla. 2000); *see also Rogers v. State*, 783 So. 2d 980, 995 (Fla. 2001). Accordingly, appellate counsel could have raised a claim that the trial court erred in not giving more express consideration of this mitigation pursuant to this Court's mandate to expressly evaluate each mitigating circumstance.

However, even if appellate counsel had raised this claim on appeal, it would not have merited relief because any error by the trial court in not treating this mitigation in greater detail was harmless beyond a reasonable doubt. *See State v. DiGuilio*, 491 So. 2d 1129, 1139 (Fla. 1986). The trial court properly found two substantial aggravating circumstances, including murder committed during the course of a robbery and HAC, which we have

said is one of the weightiest aggravators. Very little weight was given to the mitigating circumstances that the order described. Even if the trial court had expressly considered the mitigation evidence that Geralds identifies, there is no reasonable doubt that the trial court would have imposed the death penalty. Indeed, the trial court noted that the "aggravating circumstances far out weigh [*sic*] the mitigating factors" Geralds presented. Accordingly, we conclude that Geralds cannot establish that he was prejudiced by appellate counsel's failure to raise this mitigation claim on direct appeal.

*Geralds III*, 111 So. 3d at 807-09 (footnote omitted).

2.     Clearly Established Supreme Court Law

The law governing ineffective assistance of appellate counsel claims in set forth

*supra*.

3.     Federal Review of Claim

A review of the trial court's sentencing order supports the state court's

determination of this claim. In sentencing Geralds to death, the trial court found the

statutory mitigating circumstance of the age of the defendant to exist (he was twenty-

two years of age at the time of the crime); however, the court gave the circumstance

very little weight in light of the aggravating circumstances. As to non-statutory

mitigation presented by the defense, the court found as follows:

First. The defendant has a former wife and daughter whom he loves very much and he is very concerned for. The Court finds this circumstance does exist, but is not relevant to this crime and gives it very little weight.

Next. The defendant came from a divorced family and unloved by his mother. The Court finds this circumstance does exist, but is not relevant to this crime and gives it very little weight.

Next. According to the MMPI administered by Mr. Beller, the defendant has antisocial behavior and a bipolar manic personality. This profile, according to Mr. Beller, is consistent with someone who is extremely aggressive and acting out. Also, according to Mr. Beller, the defendant's profile suggests he has a sudden temper when under stress. His personality profile, as shown by his MMPI test results does exist.

However, in light of the additional evidence presented in Mr. Beller's testimony that the defendant is not psychotic, the defendant does know the difference between right and wrong, the defendant is of superior intelligence with an IQ of 121 or in the upper fifteen percent of the brightest in the population. The defendant, according to his former boss, is a good worker and able to follow instructions, he has no brain damage, he has the ability to think in the abstract in the superior range; the defendant's MMPI is frequently seen by Mr. Beller in other individuals not charged with murder or with any other crime. The defendant can be manipulative and the defendant is a person who has an uncaring attitude. Together with the facts and circumstances of the crime, the Court will give it very little weight. The Court specifically finds this mitigating circumstance of his MMPI profile, in view of the facts and circumstances of the crime stated by the Court in finding the existence of the third aggravating factor does not support any claim that the murder was not a cold, calculated murder without any pretense of an moral or legal justification. The defendant after having bound the victim for at least 20 minutes, with his uncaring attitude, killed the person he knew would identify him if he let her live.

Next. The defendant claims that he did not kill the victim. In light of the evidence in the case including the fact that the shoe prints of only one adult was found in the victim's home and these matched those found in the defendant's motel room, the Court finds this circumstance not to exist. The defendant has not offered any testimony or evidence to establish he was only an accomplice and his participation was minor. The only evidence offered is his testimony that he didn't do it. In view of the other evidence in this case, the Court does not believe his testimony.

(Resentencing, Vol. II at 912-14). As to the HAC aggravating circumstance, the court

found as follows:

> The circumstances of this killing indicate a conscienceless and pitiless regard for the victim's life and was unnecessarily tortuous to the victim. The murder was accomplished while the defendant was committing a robbery and burglary of the victim's home.

> Due to the swollen condition of her hands the evidence establishes that the victim was bound with plastic ties around her wrists for a least twenty minutes prior to her death. In order for these plastic ties to be placed around her wrists there would have to have been no struggling from the victim because of the nature of the ties themselves and the small holes in which the ends of the ties have to be placed through in order to tighten them.

> The victim was severely beaten prior to death as evidenced by the bruises and cuts on various parts of her face and chest area. There is evidence of ten to fifteen blunt force injuries to these areas of her body. These bruises indicated the blows were insufficient to knock her down and/or render her unconscious. Several blows to her face were consistent with a human fist as well as a foot. One of the blows to her chest appeared to be the result of a stomp by a foot with sufficient force to cause hemorrhage to the victim's right diaphragm.

> The victim struggled with the defendant prior to her death in at least three separate areas of the kitchen and dining, as evidence[d] by the blood patterns found at the crime scene. However, this was not a large area of space where this struggle took place. The first area of attack indicates the victim was standing when struck. The second area indicated the victim is most likely kneeling. And the third area indicates the victim laid in her own blood for at least several minutes before being dragged to the area where the victim's body was found.

> A towel was wrapped around her mouth and positioned and tied in such a manner to be used to choke the victim and control her movements. The towel was also used to drag the victim's body to another position.

> The victim was stabbed three separate times in the neck. The last stab wound was the fatal wound and was inflicted at least twenty minutes after

the victim was bound with the ties, with such force as to go to the hilt of the knife, severing the victim's windpipe and the large carotid artery. This was not an instantaneous or painless type of death.

In addition to the severe beating and bind of the victim, the evidence establishes that after the fatal wound was inflicted, the victim lived long enough to take several breaths and, due to her windpipe being severed, she could not speak or shout for mercy or assistance while she drowned on her own blood being sucked into her lungs.

(*Id*. at 906-07).

Given the foregoing, the state court's determination that, even if the trial court had specifically addressed the mitigation that Geralds identifies, there is not a reasonable doubt that the court would not have imposed a death sentence, is entitled to deference. Geralds has not identified any mitigation that arguably outweighs the weight of the aggravating circumstances in this case, in particular he has not identified any serious mental health deficits which mitigate the crime. Because Geralds cannot establish error even if this claim had been raised on appeal, he cannot demonstrate ineffective assistance of appellate counsel with regard to this claim. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground V: Trial Court Erred in Denying Juror Challenges for Cause

Geralds argues that the trial court erred in denying his challenges for cause of two prospective jurors who had been exposed to pretrial publicity. ECF No. 1, pp. 176-92.

1.       State Court Determination

Geralds raised this claim in the direct appeal of his convictions and sentence. The Florida Supreme Court denied the claim, holding as follows:

> Geralds first claims that the court improperly denied two defense challenges for cause to prospective jurors and thereby forced Geralds to trial with jurors who were unable to fairly decide his case. The State argues that the trial judge did not abuse his discretion in refusing to strike jurors Moss and Farrell for cause. After reviewing the colloquy between counsel and the jurors in question, we find that the trial court did not abuse its discretion. Although both jurors had seen the media coverage reporting the homicide, their responses on *voir dire* do not fairly suggest that these jurors were incapable of setting aside this information and rendering a verdict based on the evidence presented at trial. *See Bundy v. State*, 471 So. 2d 9, 20 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S. Ct. 295, 93 L. Ed.2d 269 (1986).

*Geralds I*, 601 So. 2d at 1159.

2.       Clearly Established Supreme Court Law

The Sixth Amendment guarantees to a defendant the right to be tried by an impartial jury whose verdict is "based on evidence received in open court, not from outside sources. " *Sheppard v. Maxwell*, 384 U.S. 333, 351(1966). The failure to give

an accused a fair hearing violates standards of due process. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). When pretrial publicity or an inflamed community atmosphere precludes the seating of an impartial jury, a change of venue or a continuance is required. *See Rideau v. Louisiana*, 373 U.S. 723 (1963); *Sheppard*, 384 U.S. 333. However, due process does not require that qualified jurors be totally ignorant of the facts and issues involved in a case. *See Murphy v. Florida*, 421 U.S. 794 (1975). As stated in *Irvin*, 366 U.S. at 723:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on evidence presented in court.

When deciding the question of whether a defendant was denied a fair trial due to an impartial jury, a court must consider any presumed and actual prejudice to the defendant. *See Coleman v. Zant*, 708 F.2d 541, 544-45 (11th Cir. 1983); *Meeks v. Moore*, 216 F.3d 951, 961 (11th Cir. 2000). The Eleventh Circuit Court of Appeals has defined presumed prejudice as follows: "'where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community, '[jury] prejudice is presumed and there is no further duty to establish bias.'" *Coleman*, 708 F. 2d at 544 (citing *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.

1980)). The test is whether "'an unacceptable risk is presented of impermissible factors coming into play.'" *Woods v. Dugger*, 923 F.2d 1454 (11th Cir. 1991) (quoting *Holbrook v. Flynn*, 475 U. S. 560, 570 (1986)). The presumptive prejudice standard is "rarely" applicable and is reserved for an "extreme situation;" thus the petitioner's burden is an extremely heavy one. *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985) (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)); *Woods*, 923 F.2d at 1459. The issue of presumed prejudice is a mixed one of law and fact. *Irvin*, 366 U.S. at 723. A reviewing court must examine the "totality of the circumstances" in evaluating the fairness of a petitioner's trial in light of pretrial publicity. *See Sheppard*, 384 U.S. at 352. Actual prejudice exists when two prerequisites are satisfied:

> First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court."

*Coleman*, 708 F.2d at 544 (citing and quoting *Irvin*, 366 U.S. at 723). The Court in *Irvin* elaborated on actual prejudice as follows:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

*Id*. at 722-23.

3.     Federal Review of Claim

Geralds argues that the trial court erred in denying his challenges for cause as to two prospective jurors. A review of the record, however, supports the state court's denial of this claim. Geralds alleges that prospective juror Michael Moss' *voir dire* testimony demonstrated that he could not be impartial. (Moss' testimony is found in TR Vol. III at 184-199). Moss was an Air Force officer and had been working for the preceding four months at a local television station doing the weather reports on weekends. While he had not heard anything about the case recently, Moss recalled reading about the crime when it happened; however, he did not remember a lot because he was not getting the newspaper at that time. Moss testified that he believed the victim was a school teacher and had interrupted a burglary and been stabbed. After stating that he could not totally set aside everything he had heard about the case, he explained:

> Well, I can't set aside the fact that I've heard the opinions of reporters and things that I read in the newspaper, although I can put that–what I mean by not setting it aside is the fact that I can't make myself not have read or heard those things, but I can set them aside and take the evidence presented in court as the only thing on which to base my judgment in this case.

(*Id*. at 188). Moss did not recall reading anything about Geralds specifically with regard to the murder; however, he had seen some coverage of his recent jail escape on television. Moss testified that he did not believe that the escape had any bearing on

Geralds' guilt or innocence of the murder. When asked whether he would "grasp back to the opinions of reporters or grasp back to news coverage," if some of the things he needs to base his decision on are not presented in court, Moss answered, "I would attempt not to, but it's hard to clearly say that those things wouldn't enter in." (*Id*. at 189). Moss later testified that he could follow the court's instructions and set aside anything he knew about the case previously and exclusively base his decision on what happened in the courtroom alone. (*Id*. at 190). Moss also testified that he would not feel any pressure to recommend a death sentence if he felt the State had not proved its case. On cross-examination, the following exchange occurred:

> Q. [Adams]: How if you're sitting on the jury are you going to keep out of your mind what you heard or read from what you hear or read in the courtroom? How are you going to do that?
>
> A. [Moss]: Well, you simply take what you hear in the courtroom and weight it to an overwhelming degree to anything you've heard previously.
>
> Q. You would consciously try to do that?
>
> A. Correct.
>
> Q. And then you would just use the words you would weight it to an overwhelming degree. Are you saying that you feel you could completely put things from outside the courtroom out of your mind or they might come in to some degree?
>
> A. Maybe they would be there to a small degree, I would grant that.

(*Id*. at 196-97). Defense counsel then moved to challenge Moss for cause due to his association with the news media and his answers regarding his inability to completely

set aside what he had heard previously. The trial court reserved ruling on the challenge, but later denied it.

Prospective juror Stephen Farrell testified that his sister-in-law lived in the vicinity of the Pettibone home and that her children were acquainted with the Pettibone children. (Farrell's testimony is found in TR Vol. V at 489-98). Farrell testified that while she and his wife discussed the murder at the time, he "really didn't get too involved with it," but just overheard their discussions. (*Id*. at 492). He elaborated about their conversations as follows:

> It was just something that [his sister-in-law] was concerned with about something like that happening so close to her house and just the proximity to the Cove area, that's really all the feedback that I got from the conversations about it, how something like that could happen so close to home and how they really felt bad about knowing the children and everything. That's basically the gist of the conversation that I recall.

(*Id*. at 493). As to what he remembered about the case, Farrell testified:

> Just, you know, about them finding the body and about later finding a vehicle, I believe, and really I really don't remember a whole lot about it. I never got involved with reading the case in the newspaper or anything. I don't get the newspaper and I very seldom get home in time to watch the news, so I really didn't see a lot of media coverage on it. It's what I heard from my wife and her sister talking. But it was sometime ago though.

(*Id*. at 492). He testified that he could give Geralds the presumption of innocence in light of the information shared by his sister-in-law and that he had not reached any

conclusion about his guilt or participation in the case. On cross-examination, Farrell

was asked if he had ever seen the Pettibone children, and he responded:

> Not to my knowledge. I've been over there and there's been other
> children there, I couldn't say for sure whether or not they were them or
> not. Like I say, this all occurred later. The information came later, at the
> time when I had seen the kids playing over there, they could very easily
> have been the Pettibone children, I really don't know.

(*Id*. at 495-96). Farrell explained that if the children testified in the case he "probably

would not recognize them it's been such a long time ago." (*Id*. at 496). Farrell testified

that he did not reach any conclusion as to Geralds' guilt after his arrest and that he had

not seen any publicity regarding the case over the last month or so. Defense counsel

moved to challenge Farrell for cause due to "his personal relationship through his wife

and her sister and their children in the Cove area and their expressed concern at the

time," but the trial court denied the challenge. (*Id*. at 498). Farrell served on the jury.

(*See* TR Vol IX at 1393).

While both Moss' and Farrell's *voir dire* testimony indicated that they had heard

some things about the case, neither suggested that they had formed opinions actually

prejudicial to the defendant. In fact, each explicitly testified that they had not formed

an opinion as to Geralds' guilt and that they could follow the trial court's instructions

and decide the case based on the evidence presented in court. The portions of their

testimony cited by Geralds are not sufficient to rebut the presumption of either

prospective juror's impartiality. Moreover, a trial court's findings of impartiality may be overturned only for "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (citing *Irvin*, 366 U.S. at 723); *Wainwright v. Witt*, 469 U. S. 412, 428 (1985) (holding that the judgment as to whether a venireman is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review; '[t]he respect paid such findings in a habeas proceeding certainly should be no less.'" (citing *Patton*, 467 U. S. at 1038)); *Uttech v. Brown*, 551 U. S. 1, 7 (2007) ("The Court in *Witt* instructed that, in applying this standard, reviewing courts are to accord deference to the trial court. Deference is owed regardless of whether the trial court engages in explicit analysis regarding substantial impairment; even the granting of a motion to excuse for cause constitutes an implicit finding of bias."); *White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (noting that "where . . . the federal courts review a state-court ruling under the constraints imposed by AEDPA, the federal court must accord an additional 'independent, high standard' of deference. . . . As a result, federal habeas review of a *Witherspoon–Witt* claim—much like federal habeas review of an ineffective-assistance-of-counsel claim—must be "doubly deferential." (citations omitted)). Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference. While this Court understands that the law does not require

members of a jury pool to have no knowledge of the crime or the defendant and that a

habeas claim of this type is reviewed in a doubly deferential manner, having presided

over capital cases as a state court judge, this Court finds it troubling that the trial court

did not grant the defense's challenges for cause in the two instances highlighted in this

claim. Notwithstanding this concern, given the Supreme Court law governing this

claim, Geralds he is not entitled to habeas relief on this ground.

Ground VI: Trial Court Erred in Denying Motion for Change of Venue

Geralds argues that the trial court erred in denying his motion for a change of

venue due to pretrial publicity which he believes prejudiced the community and denied

him a fair trial under both an inherent and actual prejudice analysis. ECF No. 1, pp. 192-

98.

1.    State Court Determination

Geralds raised this claim in the direct appeal of his convictions and sentence. The

Florida Supreme Court denied the claim, holding as follows:

> Geralds also argues that the trial court erred in denying his motion for a
> change of venue and/or for a continuance because pretrial publicity
> prevented empaneling a fair and impartial jury. In *Davis v. State*, we
> reiterated that "[a]n application for change of venue is addressed to a
> court's sound discretion, and a trial court's ruling will not be reversed
> absent a *palpable* abuse of discretion." 461 So. 2d 67, 69 (Fla. 1984)
> (emphasis added), cert. denied, 473 U.S. 913, 105 S. Ct. 3540, 87 L. Ed.2d
> 663 (1985); *see, e.g., Gaskin v. State*, 591 So. 2d 917, 919 (Fla. 1991);
> *Straight v. State*, 397 So. 2d 903, 906 (Fla.), cert. denied, 454 U.S. 1022,

102 S. Ct. 556, 70 L. Ed.2d 418 (1981); *Manning v. State*, 378 So. 2d 274, 276 (Fla. 1979). Geralds has not demonstrated "palpable" abuse in the present case. Our review of the record reveals that all the jurors who served stated affirmatively and unequivocally that they could put aside any prior knowledge of the crime and decide the case solely on the evidence adduced at trial. We therefore reject Geralds's argument that the trial court erred in denying the motions for change of venue and for continuance.

*Geralds I*, 601 So. 2d at 1159.

2.     Clearly Established Supreme Court Law

In addition to the standards regarding juror impartiality discussed in Ground V, *supra*, the Supreme Court has held that when pretrial publicity or an inflamed community atmosphere precludes the seating of an impartial jury, a change of venue or a continuance is required because the jury's verdict must be based on evidence received in open court, not from outside sources. There are two standards which guide analysis of this question, the "actual prejudice" standard and the "presumed prejudice" standard. Prejudice is presumed from pretrial publicity when the pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. *Rideau v. Louisiana*, 373 U.S. 723, 726–27 (1963). However, the presumed prejudice principle is "rare[ly]" applicable. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). *See Coleman v. Kemp*, 778 F.2d 1487. To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion

that the defendant was guilty before hearing the evidence adduced at trial. Second, it must be shown that these jurors could not have laid aside their preformed opinions and rendered a verdict based on the evidence presented in court. *Coleman v. Zant*, 708 F.2d 541, 544 (11th Cir. 1983).

3.    Federal Review of Claim

Geralds argues that the inflammatory nature of the pretrial publicity in his case saturated the community to such an extent that both actual and presumed prejudice were established. While Geralds refers to newspaper accounts published prior to trial, he has failed to allege with any specificity the content of these accounts other than stating that the media coverage of his case included "a detailed account about the offense and [his] escape two weeks before trial." ECF No. 1, p. 194. Geralds has not included any excerpts from this coverage nor has he provided any statistics with regard to the population of Bay County and the circulation of the relevant paper and other news media to establish that his jury pool was tainted by an atmosphere of hostility toward him.[35]  Geralds has failed to make any showing that the media accounts in his case contained anything other than factual information; thus, he has not made the

---

[35] The record indicates that a newspaper article and a tape of a news report as well as juror questionnaires were presented in court as part of Geralds' motion for a change of venue. Other than two affidavits, *see* PCR Vol. XX at 2330, the content of these exhibits is not in the record before this Court.

necessary showing to establish presumed prejudice. *Compare Coleman*, 778 F.2d at

1538-39.[36] *See also Rideau*, 373 U.S. 723, wherein the defendant's confession to

robbing a bank, kidnapping three of the bank's employees, and killing one of them

was videotaped and broadcast three times by a local television station which were seen

respectively by 24,000, 53,000, and 29,000 people in the community.

While Geralds argues that two of the jurors who served on his case mentioned

hearing or reading about his attempted escape from jail two weeks before his original

trial and that eleven of the jurors who tried the case had heard or read something about

the crime prior to trial, the law does not require that the jury pool have no knowledge

of the crime or the defendant. Furthermore, the record reflects that all of the jurors who

served on his case stated that they could follow the court's instructions and did not have

a preconceived notion about Geralds' guilt. "To hold that the mere existence of any

preconceived notion as to the guilt or innocence of an accused, without more, is

---

[36] The *Coleman* case involved a notorious murder by three escaped convicts who killed six members of the Alday family in a small community in Georgia. In *Coleman*, the Eleventh Circuit noted "there was publicity that was either calculated to provoke hostility or reflective of an atmosphere of hostility; including, *inter alia*, the 'precook' and other egregious remarks by the county's chief law enforcement officer, Sheriff White; the newspaper description of the defendants as smirking and other characterizations of remorselessness and other derogatory characterizations; the remarks of the defendants' own mother suggesting that mercy was inappropriate; the efforts and statements of numerous attorneys to avoid appointment, both reflecting their assessment of the community atmosphere and aggravating same; and the direct testimony of several residents and newsmen, whose job included assessment of the community atmosphere, to the effect that the community had prejudged the case." 778 F.2d 1487, 1538-39.

sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. at 723. Geralds has failed to rebut the presumption of juror impartiality in his case. *See Murphy v. Florida*, 421 U.S. 794, 800-01 (1975) (affirming denial of habeas relief based on actual prejudice claim and stating, "[t]he *voir dire* in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside. Some of the jurors had a vague recollection of the robbery with which petitioner was charged and each had some knowledge of petitioner's past crimes, but none betrayed any belief in the relevance of petitioner's past to the present case. Indeed, four of the six jurors volunteered their views of its irrelevance, and one suggested that people who have been in trouble before are too often singled out for suspicion of each new crime—a predisposition that could only operate in petitioner's favor." (footnotes omitted)). *See also Meeks v. Moore*, 216 F.3d 951, 961-62 (11th Cir. 2000) ("The fact that all except one of the jurors in both of Meeks' cases had been exposed to some pretrial publicity concerning the Walker and Thompson murders is unavailing because . . . 'the pretrial publicity in this case was essentially factual and was not so pervasive or insidious as to raise the presumption that any venireperson exposed to it was rendered incapable of giving [Meeks] a fair trial.'" (footnote and citation

omitted)); *see also Cummings v. Dugger*, 862 F.2d 1504, 1510-11 (11th Cir. 1989) (finding no actual prejudice even though eleven of twelve jurors had been exposed to some degree of pretrial publicity); *Spivey v. Head*, 207 F.3d 1263, (11th Cir. 2000) ("In contrast to *Coleman* where the trial court had to strike almost one-half of the prospective jurors who were questioned whether they had formed an opinion because they had a fixed opinion, here many of the prospective jurors had not heard anything about the case and most remembered very little, if anything, about it."). Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground VII: Rights to Confrontation and Due Process/Resentencing Trial

Geralds argues that his rights to confrontation and due process were violated when the court allowed a pathologist who had not performed the autopsy on Mrs. Pettibone to render an opinion about the manner and cause of her death. ECF No. 1, pp. 198-201.

1.      State Court Determination

Geralds raised this claim in his appeal of the imposition of the death penalty after his resentencing trial. The Florida Supreme Court denied the claim, holding as follows:

Geralds next argues the trial court abused its discretion by allowing Dr. James Lauridson, a pathologist who had not performed the victim's autopsy, to offer expert testimony as to the manner and cause of death of the victim.FN8 The determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, whose decision will not be reversed absent a clear showing of error. *Ramirez v. State*, 542 So. 2d 352, 355 (Fla. 1989). An expert is permitted to express an opinion on matters in which the witness has expertise when the opinion is in response to facts disclosed to the expert at or before the trial. ' 90.704, Fla. Stat. (1993); *see Capehart v. State*, 583 So. 2d 1009 (Fla. 1991) (holding chief medical examiner, who based her opinion on autopsy report, toxicology report, evidence receipts, photographs of body, and all other paperwork filed in case, could testify regarding cause of death and condition of victim's body, although she did not perform autopsy), cert. denied, 502 U.S. 1065, 112 S. Ct. 955, 117 L. Ed.2d 122 (1992).

> FN8 Geralds also asserts the trial court erred in three other related respects: (1) the trial court improperly denied defense counsel the right to rebut the autopsy procedures Dr. Sybers used and the right to present to the jury the possible unreliability of the materials upon which Dr. Lauridson based his opinion; (2) the trial court's admission of certain medical evidence constituted improper judicial notice and (3) this same evidence amounted to hearsay evidence without showing that Dr. Sybers was unavailable. There is no merit to these claims.

The trial judge's ruling in this case does not represent a "clear showing of error." Although there may be a difference of opinion regarding the weight to be given to Dr. Lauridson's testimony concerning the manner and cause of the victim's death, its admissibility was within the properly exercised discretion of the trial judge. *See Dragon v. Grant*, 429 So. 2d 1329, 1330 (Fla. 5th DCA 1983).

Moreover, there was no potential taint from Dr. Lauridson basing his opinion on the materials Dr. Sybers prepared and compiled because Dr. Lauridson based his independent conclusions largely on the objective evidence. Dr. Lauridson arrived at his conclusions by reviewing: (1) two to three hundred Kodachrome slides taken at the murder scene and during

the autopsy; (2) written records prepared by Dr. Sybers; and (3) Dr. Sybers' previous testimony he offered in this case. Given the wealth of objective evidence (*i.e.*, the slides) upon which Dr. Lauridson based his opinions, the trial court did not abuse its discretion in permitting Dr. Lauridson to testify.

*Geralds II*, 674 So. 2d at 100.

    2.    Clearly Established Supreme Court Law

The law governing Confrontation Clause claims is set forth in Ground IV (A) (2) (b), *supra*.

    3.    Federal Review of Claim

Geralds argues in this claim that he was unable to confront or question the autopsy procedures of Dr. Sybers during his resentencing trial because the State called another medical examiner, Dr. Lauridson, to testify as to the manner and cause of Mrs. Pettibone's death. Geralds also argues that the admitted materials concerning Dr. Sybers' autopsy which had been admitted in the original guilt phase trial was hearsay which he was unable to confront or rebut with information concerning the reliability of Dr. Sybers' work, and that the trial court erred in refusing to grant a continuance in order to secure Dr. Sybers as a witness. The Florida Supreme Court denied these claims and held that the determination of a witness's qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, and the admissibility of

Dr. Lauridson's testimony was within the properly exercised discretion of the trial judge in Geralds' case.

Geralds has not demonstrated that his right to confrontation was violated with regard to Dr. Lauridson's testimony because his testimony was not based on hearsay, but on his independent evaluation of the medical evidence. Also, Dr. Lauridson was subject to cross-examination by defense counsel. Furthermore, Dr. Sybers testified at Geralds' original trial, and defense counsel was given the opportunity to cross-examine him, although he declined to do so. (*See* TR Vol. XIII at 1830-75).[37] Dr. Lauridson was qualified as an expert in forensic pathology in Geralds' trial. In Florida, this was sufficient to allow his testimony with regard to the victim's cause of death. *See Capehart*

---

[37] The postconviction court found as follows in reviewing this claim:

The trial record is clear that all of the prior testimony of the witnesses from the guilt phase that was referenced during the penalty phase had been subjected to cross examination during the guilt phase.

First, the testimony of Dr. Lauridson was based not upon hearsay testimony of Dr. Sybers and *Crawford* does not apply to Dr. Lauridson's testimony. Dr. Lauridson testified at the re-sentencing to his own opinions and independent conclusions based primarily on the objective evidence as to the manner and cause of death. . . . Dr. Lauridson was subject to cross examination as to his opinions and conclusions. If there was an issue as to Dr. Sybers' preparing the materials the defendant has failed to plead any specific facts to show that Dr. Sybers improperly prepared those materials, including the slides. Furthermore, Dr. Sybers did testify at the original guilt phase of the trial and was subject to cross examination by defendant's trial attorney at that time as to how he prepared the materials.

Order Denying Defendant's Supplement to Amended Motion to Vacate (PCR Vol. IX at 1532).

*v. State*, 583 So. 2d 1009, 1012–13 (Fla. 1991) (holding that proper predicate was established for medical examiner's expert testimony regarding cause of victim's death and condition of body—even though examiner did not perform autopsy nor was autopsy report admitted into evidence—where examiner testified as to her qualifications as a medical examiner and that she formed her opinion based upon autopsy report, toxicology report, evidence receipts, photographs of body, and other paperwork filed in the case). *See Calloway v. State*, 210 So. 3d 1160, 1193-95 (Fla. 2017) (holding that the testimony of a substitute medical examiner regarding causes of death and injuries to victims did not violate Confrontation Clause in murder prosecution; substitute examiner was available to testify and was subject to cross-examination and explained that his independent opinion was derived from photographs taken by investigators at the scene and from the original examiner's autopsy reports, and this independent opinion was subject to cross-examination). This Court's authority to review state evidentiary rulings in a habeas case is limited, and such rulings are entitled to deference. *See, e.g.*, *Thomas v. Jones*, 891 F.2d 1500, 1504 (11th Cir. 1989). Finally, Geralds has not presented any evidence that there were irregularities in the manner in which Dr. Sybers performed the autopsy in this case which would demonstrate that any materials relied on by Dr. Lauridson in forming his opinion were unreliable. *See also Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012) (plurality opinion) ("When an expert testifies for the prosecution

in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause."). Geralds has not shown that he was prevented from rebutting any evidence regarding the medical evidence in his case. Therefore, Geralds has failed to demonstrate that the state court's denial of this claim is not entitled to deference.

Accordingly, Geralds is not entitled to habeas relief on this ground.

Ground VIII: Actual Innocence

In his last claim, Geralds contends that he has made a colorable claim of actual innocence and requests an evidentiary hearing to prove that no reasonable juror would have convicted him of the murder of Mrs. Pettibone. ECF No. 1, pp. 202-06.

1.      State Court Determination

Geralds argued that he was innocent of the murder and the death penalty in his motion for postconviction relief, arguing that under Florida law innocence of the death penalty can be shown by demonstrating insufficient aggravating circumstances or based on newly discovered evidence. (*See* PCR Vol. VII at 1173-75). The postconviction court summarily denied the claim, holding as follows:

> Defendant claims he is innocent of first degree murder and the death penalty. However, the Florida Supreme Court found that there is sufficient evidence to support his conviction for first degree murder, *Geralds*, 601 So. 2d at 1159, and that his death sentence was proportionate. *Geralds*, 674 So. 2d at 105. Thus, Defendant's claim is procedurally barred and without merit. Thus counsel was not ineffective for failing to raise this issue.

Order Denying Relief in Part, dated February 12, 2013 (PCR Vol. III at 1384). Geralds did not raise a freestanding claim of actual innocence in state court like the one he has raised in the instant petition.

2.      Clearly Established Supreme Court Law

In *Herrera v. Collins*, 506 U.S. 390, 417 (1993), the Supreme Court assumed "for the sake of argument in deciding [the] case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." Without explicitly announcing a standard by which to judge such a claim, the majority stated that the required threshold showing of innocence "would necessarily be extraordinarily high," in light of the disruptive effect of entertaining such a claim and the enormous burden on a state court of having to retry a case. *Id*. The majority then held that Herrera's showing of innocence fell short of such a standard. *Id*. at 418–19. The Eleventh Circuit has likewise recognized the possibility of freestanding actual innocence claims. *See Felker v. Turpin*, 83 F.3d 1303, 1312 (11th

Cir. 1996), cert. granted, 517 U.S. 1182 (1996) and cert. dismissed, 518 U.S. 651 (1996) ("[*Herrera*] left open the difficult question of whether federal habeas courts may entertain convincing claims of actual innocence."). Following *Herrera*, the Supreme Court held that actual innocence, if proved, can serve as a gateway through which a petitioner may pass to have his otherwise barred constitutional claim considered on the merits. *See Schlup v. Delo*, 513 U.S. 298 (1995). The test devised in *Schlup* is intended to "ensure[ ] that [the] petitioner's case is truly extraordinary, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* at 327 (internal quotation marks and citation omitted). Under *Schlup*, to establish the requisite probability, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* "To be credible" a gateway claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. *See also House v. Bell*, 126 S. Ct. 2064 (2006), which involved new DNA evidence showing that semen in the raped victim's nightgown came from her husband, not from the petitioner-defendant House, as well as other new testimony and blood evidence. The Court held that House had satisfied the gateway standard in *Schlup*, finding that "the central forensic proof connecting House to the crime—the blood and the semen—has been called into question, and House has put

forward substantial evidence pointing to a different suspect." *Id*. at 554. The Court nevertheless held that House had failed to satisfy whatever burden a hypothetical freestanding innocence claim would require.

    3.    Federal Review of Claim

Assuming without deciding that a freestanding claim of actual innocence is cognizable on federal habeas review, Geralds has failed to meet the extraordinarily high standard contemplated by the Court in *Herrera* and its other cases which have discussed a possible freestanding actual innocence claim. Geralds has not presented any new reliable evidence that calls into doubt his conviction nor has he made any other persuasive demonstration of actual innocence. Consequently, Geralds has failed to make the necessary showing which would entitle him to an evidentiary hearing on this claim.

Accordingly, Geralds is not entitled to habeas relief on this ground.

## V. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal

must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)). *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing); 28 U.S.C. § 2253(c)(2). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). This Court concludes that the following issues raised in Ground II, subclaims A and C, and in Ground V are debatable among jurists of reason and finds that the issues are adequate to deserve encouragement to proceed further: (1) whether Geralds was deprived of his right to the effective assistance of counsel during the guilt phase of his trial when his counsel allegedly (a) failed to present evidence from the crime scene, and (b) failed to investigate and present witnesses; and (2) whether the trial court erred in denying defense challenges for cause to two prospective jurors who were exposed to pretrial publicity. Therefore, Geralds should be granted leave to appeal on these two issues.

Case No.: 5:13cv167/MW

# VI. CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus, ECF No. 1, is **DENIED**. Geralds may appeal and a certificate of appealability is issued for appeal on the following issues raised in Ground II, subclaims A and C, and in Ground V: (1) whether Geralds was deprived of his right to the effective assistance of counsel during the guilt phase of his trial when his counsel allegedly (a) failed to present evidence from the crime scene, and (b) failed to investigate and present witnesses; and (2) whether the trial court erred in denying defense challenges for cause to two prospective jurors who were exposed to pretrial publicity. The Clerk shall close the file.

**SO ORDERED on May 13, 2019.**

**s/Mark E. Walker**
**Chief United States District Judge**

Case No.: 5:13cv167/MW